1   Elizabeth J. Cabraser
ecabraser@lchb.com
2   Scott P. Nealey
snealey@lchb.com
3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
4   275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
5   Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
6

7   *Plaintiffs' Liaison Counsel*
[Additional Counsel Listed on Signature Page]

8

### UNITED STATES DISTRICT COURT

9

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | Case No. M:05-CV-01699-CRB<br><br>MDL No. 1699 |
| THIS PLEADING RELATES TO: | **PURCHASE CLAIMS MASTER CELEBREX COMPLAINT** |
| *Aurora Balloveras v. Pfizer, Inc.*, Case No.: 05-20429-CIV-JORDAN/BROWN (S.D. Fla.) | |
| *Dorothy Greaves v. Pfizer, Inc., et al.*, Case No.: 05-cv-647 (D. Ariz.) | |
| *Frankenmuth Fin. Group, et al. v. Pfizer, Inc., et al.*, Case No.: 05-71656 (E.D. Mich.) | |
| *Health Care for All, et al. v. Pfizer, Inc., et al.*, Case No.:  05-10707 RCL (D. Mass.) | |
| *June Swan, et al. v. Pfizer, Inc., et al.*, Case No.:  05-00834EDL (N.D. Cal.) | |
| *North Carolina Fair Share, et al. v. Pfizer, Inc., et al.*, Case No.:  C05-03976-MMC (N.D. Cal.) | |
| *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund, et al. v. Pfizer, Inc., et al.*, Case No.: 1:05-cv-1109-JDT-TAB (S.D. Ind.) | |
| *Sheet Metal Workers' Int'l Ass'n Local No. 28 of Metro. New York & Long Island*, Case No.: 05 cv 4125 (S.D.N.Y.) | |
| *Betty A. Alexander, et al. v. Pfizer, Inc., et al.*, Case No.:  05-cv-01720-ML-ALC | |
| *National Health Ins. Co. v. Pfizer, Inc., et al.*, Case No.:  05-cv-04073 (N.D. Cal.) | |

1

**TABLE OF CONTENTS**

<u>Page</u>

I.  NATURE OF THIS ACTION...................................................................................... 1

    A.  Procedural Introduction......................................................................... 1

    B.  Summary of Allegations ........................................................................ 2

II.  JURISDICTION ........................................................................................................ 6

III.  PARTIES .................................................................................................................. 7

    A.  Plaintiffs ................................................................................................ 7

    B.  Defendants ........................................................................................... 22

IV.  FACTUAL BACKGROUND ................................................................................. 23

    A.  Development of Celebrex.................................................................... 23

    B.  FDA Approval..................................................................................... 25

    C.  The CLASS Study............................................................................... 25

    D.  The JAMA Publication of CLASS ..................................................... 26

    E.  Use of the CLASS Study to Promote Sales of Celebrex.................... 30

    F.  Misleading Articles in Medical Journal Used to Establish Celebrex
        in the Marketplace .............................................................................. 31

    G.  Defendants Provide Doctors With Misleading Literature................... 34

    H.  Marketing and Promotion.................................................................... 36

    I.  Examples of Misleading Materials Designed to Promote Celebrex as
       Offering a Heretofore Unavailable Improvement in the Quality of Life
       and/or as Providing Superior Pain Relief............................................ 38

    J.  Concealment of Cardiovascular Risks and Dangers .......................... 60

    K.  Pfizer Temporarily Halts the Celebrex Promotional Scheme ............ 65

    L.  Defendants' Continued Unlawful Marketing Campaign Caused Active
       Concealment of Celebrex's Deficiencies and Over Payments by
       End-Payors for Celebrex .................................................................... 66

V.  FRAUDULENT CONCEALMENT....................................................................... 67

VI.  CLASS ACTION ALLEGATIONS........................................................................ 68

    FIRST CLAIM FOR RELIEF (Violations of 18 U.S.C. § 1962(c)) ....................... 71

SECOND CLAIM FOR RELIEF (Violation of the State Consumer Protection Laws) ......... 78

THIRD CLAIM FOR RELIEF (Unjust Enrichment) ............................................................. 89

FOURTH CLAIM FOR RELIEF (Breach of Implied Warranty)........................................... 89

VII.   PRAYER FOR RELIEF ....................................................................................................... 94

VIII.   DEMAND FOR JURY TRIAL.............................................................................................. 95

# I.     NATURE OF THIS ACTION

## A.     Procedural Introduction

1.      This Master Complaint is submitted to serve the administrative functions of efficiency and economy and to present certain common claims and common questions of fact and law for appropriate action by this Court in the context of this Multidistrict proceeding.  This Master Complaint does not include all claims asserted in all of the purchase claims actions that have been transferred to this Court under 28 U.S.C. § 1407.  Those matters are set forth in the individual and class actions filed by purchase claims Plaintiffs and served against Defendants.  This Master Complaint does not constitute a waiver or dismissal of said actions or the claims asserted therein.

2.      This Class Action is brought by and on behalf of all Consumers and Third-Party Payors (Consumers and Third-Party Payors are referred to herein collectively as "Plaintiffs," "Class Members," and "End-Payors") who purchased or paid for the prescription drug Celebrex ("Celebrex"), an anti-inflammatory drug researched, manufactured, marketed, promoted, advertised, sold, and distributed by Defendants Pfizer, Inc. ("Pfizer"), Pharmacia Corporation ("Pharmacia"), and G.D. Searle & Co. ("Searle").

3.      Pursuant to Rule 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4)(A) of the Federal Rules of Civil Procedure, Plaintiffs will seek certification of a national End-Payor purchase claims class, through one or more actions transferred to or filed in this Court in the MDL 1699 litigation, consisting of:

> All End-Payors located in the United States, including Consumers and Third-Party Payors,[1] who purchased and/or paid for Celebrex not for resale during the period from December 1, 1998 through the present.[2]

4.      Alternatively, in the event that this Court determines that a national End-Payor purchase claims class would not satisfy the requirements for class certification pursuant to Fed. R. Civ. P. 23, Plaintiffs would move for the certification of individual state class actions, grouped

---

[1] Third-Party Payors include all entities that:  (a) provide, sponsor or insure a healthcare plan, which includes prescription drug coverage to natural persons, and (b) purchase, pay or insure all or part of the cost of prescription drugs prescribed and dispensed to those persons pursuant to a health plan.

[2] For further refinement of the class definition *see* Section VI, *infra*.

according to commonalities of state law consisting of, as to each state for which certification is sought:

> All End-Payors located in [State], including consumers and Third-Party Payors, who purchased and/or paid for Celebrex not for resale during the period from December 1, 1998 through the present.

5.    In the event that Plaintiffs are directed to pursue the statewide class course of action set forth in the forgoing paragraph, Plaintiffs intend to request the Panel for Multi-District Litigation ("MDL Panel" or "Panel") to remand, to its transferor forum, each state class action as to which Plaintiffs seek certification, solely for purposes of addressing the class certification question. Remand of the class certification question will allow appellate review of the statewide class certification question by the appropriate Circuit Court(s), thus ensuring that no party will have been prejudiced by the Panel's random selection of a transferee forum whose procedural jurisprudence would determine the class certification issue differently from that of the transferor forum that is charged with its ultimate trial.  For purposes of uniformity and judicial efficiency, Plaintiffs would further move the MDL Panel to appoint this Court to sit, by *ad hoc* designation, over the class certification issue in each transferor court as to which such remand is sought.

**B.    Summary of Allegations**

6.    Non-steroidal anti-inflammatory drugs ("NSAIDs") have been widely used to treat arthritis, acute and chronic pain for nearly 40 years.  Although they relieve symptoms in certain patients, such relief comes at the expense of important adverse effects, most notably upper gastrointestinal toxicity.  Use of NSAIDs leads to admission to hospital for ulcer complications (bleeding and perforation) in around 1% of users annually and results in thousands of deaths every year.

7.    The emergence of NSAIDs that selectively inhibit the cyclo-oxygenase 2 ("COX-2") isoform, which is inducible and expressed at sites of inflammation, while sparing COX-1, associated with gastroprotection, was an apparent pharmacological breakthrough promising real hope of a better future for NSAIDs.

8.      Celebrex was one of the new COX-2 inhibitors, Vioxx was the other.  Defendants believed that Celebrex had the potential to be a new blockbuster drug with yearly sales in the billions of dollars.  As part of the unlawful scheme set forth below, Defendants embarked on a massive marketing campaign directed to both doctors and consumers to accomplish that objective.  Television, print and other promotional materials gave the impression that Celebrex was a "breakthrough" drug clinically superior to older and far less expensive NSAIDs.

9.      Defendants represented that Celebrex provided symptomatic relief similar to ibuprofen and naproxen but was clinically superior because it was significantly less likely to cause the gastrointestinal adverse side effects commonly associated with other non-steroidal anti-inflammatory drugs.  For instance, NSAIDs can, in a limited group of patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use.  Pfizer promoted Celebrex as a safe and effective alternative that would have less deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

10.     The extent to which a drug is paid for by Third-Party Payors is determined by that drug's status on the Third-Party Payor's "formulary," which is a list of drugs that plan participants are authorized to purchase for payment under the benefit plan.

11.     Placement of a prescription drug on the formularies of Third-Party Payors, medical care organizations, and or prescription benefit managers (who are employed by the Third-Party Payors to design or administer the benefit plans) is critical to the success of the drug.  Defendants knew that preferred placement on these formularies would guarantee commercial success for Celebrex.

12.     In an elaborate and sophisticated manner, Defendants aggressively marketed Celebrex directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on Third-Party Payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Celebrex on their formularies.  Faced with the increased demand for the drug by consumers and health care professionals that resulted from Celebrex's successful advertising and marketing blitz, Third-Party Payors were compelled to add

Celebrex to their formularies.  Celebrex's marketing campaign specifically targeted Third-Party Payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Celebrex.

13.     Defendants' marketing and promotion of Celebrex was part of a scheme to create the impression and demand for Celebrex as a wide-ranging pain reliever that would enhance consumers' abilities to live a normal life or engage in activities such as running, playing a guitar, swimming, walking, taking exercise classes and a host of similar activities that many who suffer from chronic pain have difficulty performing.  The scheme was accomplished by unlawful means including, but not limited to:  (i) the suppression of data showing the cardiovascular risks associated with the use of Celebrex; (ii) the manipulation of data in an effort to show that Celebrex "when used for 6 months…is associated with a lower incidence of combined clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac) used at standard therapeutic dosages." [JAMA.2000;284:1247-1255] when in fact:  (a) the prespecified endpoint of the CLASS trial had been specifically defined as "Clinically Significant Upper Gastrointestinal Events" not the combination of symptomatic and serious complications reported as the endpoint in the JAMA report of the CLASS study[3]; (b) the study lasted 12 not six months; (c) even during the first six months of the study reported in JAMA patients taking Celebrex did not develop significantly fewer serious GI complications than those taking older NSAIDs; and (d) in fact, use of Celebrex for more than six months *increased* the risk of GI complications; (iii) the manipulation of data to give the appearance of superiority over NSAIDs in pain efficacy and safety when such superiority did not exist; (iv) false promotional materials directed to doctors and consumers; and (v) the use of reprinted articles from prestigious medical journals that falsely claimed Celebrex was proven to be safer than NSAIDs.

---

[3] "The definition of CSUGIEs [is that] chosen by the sponsor is …. This is a clinically meaningful definition and represents a major advance in the study of UGI toxicity of NSAIDs." From Medical Officer's Gastroenterology Advisory Committee Briefing Document, Lawrence Goldkind MD, **http://www.fda.gov/ohrms/dockets/ac/01/briefing/3677b1_05_gi.doc**

14.     From 1999 through 2003, Defendants spent approximately $400 million on direct-to-consumer advertising for Celebrex.  This expensive marketing effort paid off.  In 2004, Celebrex achieved $3.3 billion in worldwide sales, 82% of which occurred in the United States[4/5] (the US and New Zealand – with a population of less than 4 million – are the only two industrialized countries that allow direct-to-consumer advertising).  In 2004, Celebrex accounted for 6.3% of Pfizer's total worldwide sales of $52.5 billion.

15.     As a result of Defendants' scheme, they were able to create a market for Celebrex and to sell Celebrex at a premium price over NSAIDs and to have it become a standard treatment option as opposed to use of less expensive NSAIDs.  Also part of Defendants' scheme was their role in the American College of Rheumatology's guidelines for the treatment of osteoarthritis of the hip and knee issued in September, 2000.  These guidelines called for the use of Celebrex or Vioxx if acetaminophen failed to provide adequate relief.  Three out of the four authors had financial ties to the Defendants at the time these guidelines were written.

16.     The success of Defendants' scheme was recently documented in a study released on January 24, 2005, in the ARCHIVES OF INTERNAL MEDICINE, Volume 165, entitled *National Trends in Cyclooxygenage-2 Inhibitor Use Since Market Release*.  The authors of that study concluded that the "aggressive marketing techniques to patients and physicians" caused a growth not only in use of COX-2 inhibitors but also in overall market demand.

17.     In fact, Celebrex has been promoted as a superior pain reliever when for most patients it has no proven superiority over other NSAIDs.  Celebrex sells for $2.53 to $6.45 per day depending upon the dose, while NSAIDs sell for $0.21 to $0.31 per day.  Billions of dollars have thus been wasted in which Plaintiffs and Class Members have paid a premium price for a drug that is not a premium or superior product over equally available NSAIDs and other paid medications.  If Defendants had not engaged in the wrongful marketing, advertising and promotion of Celebrex, Plaintiffs and Class Members would have paid for other equally effective and less expensive

---

[4] $2.7 billion in US sales in 2004:  http://money.cnn.com/2006/01/17/news/companies/pfizer/

[5] $3.3 billion in worldwide sales in 2004:  http://money.cnn.com/2006/01/17/news/companies/pfizer/

medications.  Had the truth been told about its safety and efficacy, Celebrex would have sold at a price similar to that of other NSAIDs and would not have become a standard in the treatment of arthritis and other forms of pain relief.  The study in the ARCHIVES OF INTERNAL MEDICINE found that 63% of patients who received COX-2 inhibitors were at a low risk for developing the ulcers and gastrointestinal problems that the COX-2 inhibitors were aimed at preventing, and that Defendants' marketing scheme had played a significant role in over use of COX-2 inhibitors for this type of patient.  In fact, the ARCHIVES study understates the lack of a need for Celebrex.  A Federal Drug Administration ("FDA") reviewer found that Celebrex "did not appear to offer a unique advantage to high-risk patients."  Thus in both the non-risk and at-risk population, Celebrex was neither more effective nor safer than other NSAIDs.

18.     In this action Plaintiffs seek damages arising from the purchases of Celebrex resulting from Defendants' illegal scheme and/or conduct.

## II.     JURISDICTION

19.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, 18 U.S.C. § 1964(c), and because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.  This Court also has subject-matter jurisdiction under 15 U.S.C. § 1.

20.     This Court also has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. §§ 1332(d)(2) and (6).  This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Defendants systematically and continually conduct business throughout the State of California, including marketing, advertising, and sales directed to California residents.

# III.   PARTIES

## A.   Plaintiffs

21.     Plaintiff Aurora Balloveras ("Balloveras"), who filed Civil Action No. 05-20429-CIV-JORDAN/BROWN (S.D. Fla.), is a resident of Miami-Dade County, Florida, and is otherwise *sui juris*.  During the proposed Class Period, Balloveras was prescribed, purchased and consumed Celebrex within the state of Florida based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

22.     Plaintiff Bricklayers of Indiana Welfare Fund ("Bricklayers"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 9045 East 59th Street, Indianapolis, Indiana 46219.  Bricklayers is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Bricklayers is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

23.     Plaintiff California Public Interest Research Group, Inc. ("CALPIRG"), who filed Civil Action No. 05-00834EDL (N.D. Cal.), is one of California's leading public interest advocacy groups and has approximately 20,000 members.  It is located at 1107 9th Street, Suite 601, Sacramento, California.  During the Class Period, CALPIRG members purchased Celebrex and were injured by the illegal conduct alleged herein.  Such members include Robert Dawson, Laura S. Rasmussen, and Rosalind Hamilton.  Mr. Dawson took Celebrex for approximately four years to treat lower back and sciatic nerve pain, and he paid co-payments through his insurance plan.  Ms. Rasmussen took Celebrex for the treatment of osteoarthritis, and she paid co-payments through her insurance plan.  Ms. Hamilton took Celebrex for at least three years to treat arthritis, and paid co-payments through her insurance plan.  As an unincorporated association whose

members have suffered injury in fact and have lost money or property as a result of the illegal conduct alleged herein, CALPIRG has standing to pursue this class action on behalf of itself and all those similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

24.    Plaintiff Cavalier Homes, Inc. ("Cavalier"), who filed Civil Action No. 05-10707 (D. Mass.), is a Delaware corporation with its principal place of business in Alabama.  Cavalier purchased drugs, including Celebrex, on behalf of its employees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

25.    Plaintiff Commonwealth Care Alliance ("CCA"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a prepaid care system contracting with Medicare and Massachusetts Medicaid to provide comprehensive care to vulnerable, high-cost populations.  It is located in Boston, Massachusetts.  CCA is a Third-Party Payor that paid for Celebrex on behalf of its beneficiaries during the relevant time period, and was injured by the illegal conduct described in this Complaint.  CCA has standing to bring this action on behalf of itself and all other Third-Party Payors who paid for Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

26.    Plaintiff Frankenmuth Financial Group, Inc. ("Frankenmuth"), who filed Civil Action No. 05-71656 (E.D. Mich.), is an entity maintaining its principal place of business at Frankenmuth, Michigan.  Frankenmuth (or its members) has paid for purchases of Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

27.    Plaintiff Dorothy Greaves ("Greaves"), who filed Civil Action No. 05-cv-647 (D. Ariz.), is a resident of Arizona.  She purchased Celebrex in Arizona.  Had she known the truth about Celebrex, she would not have purchased it and/or certainly not at the price she paid when it was substantially inflated.  Greaves pursues this class action on behalf of herself and all others

1   similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged

2   herein and were damaged as a direct and foreseeable result of such conduct.

3         28.    Plaintiff Sarah Hare ("Hare"), who filed Civil Action No. 05-00834EDL (N.D.

4   Cal.), is an individual residing in California.  Plaintiff Hare purchased Celebrex and was injured by

5   the illegal conduct alleged herein.  Specifically, she has taken Celebrex for approximately four

6   years in the treatment of lower back and hip pain.  She pays co-payments through her insurance

7   plan.  As an individual, Plaintiff Hare pursues this class action on behalf of herself and all those

8   similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged

9   herein and was damaged as a direct and foreseeable result of such conduct.

10        29.    Plaintiff Beatrice Howard ("Howard"), who filed Civil Action No. 05-00834EDL

11   (N.D. Cal.), is an individual residing in California.  Plaintiff Howard purchased Celebrex and was

12   injured by the illegal conduct alleged herein.  Specifically, she took Celebrex for approximately

13   three years to treat arthritis.  She paid co-payments through her insurance plan.  As an individual,

14   Plaintiff Howard pursues this class action on behalf of herself and all those similarly situated based

15   on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a

16   direct and foreseeable result of such conduct.

17        30.    Plaintiff Health Care For All ("HCFA"), who filed Civil Action No. 05-10707 RCL

18   (D. Mass.), is a consumer health advocacy organization that has led the fight in Massachusetts to

19   expand access to affordable, quality health care since 1985.  It is located in Boston, Massachusetts.

20   HCFA's members purchase and have purchased Celebrex during the relevant Period and were

21   injured by the illegal conduct described in this Complaint.  As an organizational Plaintiff, HCFA

22   has standing to bring this action on behalf of itself and all consumers in the Commonwealth of

23   Massachusetts based on the cumulative impact of Defendants' wrongful conduct as alleged herein

24   and were damaged as a direct and foreseeable result of such conduct.

25        31.    Plaintiff IBEW 673 Fringe Benefit Funds Fund ("IBEW 673"), who filed Civil

26   Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of

27   business at 8358 Munson Road, Mentor, Ohio 44060.  IBEW 673 is an "employee welfare benefit

28

1  plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act

2  ("ERISA").  IBEW 673 is a non-profit trust, sponsored and administered by a Board of Trustees,

3  established through collective bargaining by labor unions and employers.  Pursuant to the trust

4  agreement under which it was created, it provides comprehensive healthcare benefits to

5  participants who are employed under various collective bargaining agreements, along with their

6  dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as

7  alleged herein and were damaged as a direct and foreseeable result of such conduct.

8      32.    Plaintiff IBEW Local 32 Health and Welfare Fund ("IBEW 32"), who filed Civil

9  Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of

10  business at 1975 North West Street, Lima, Ohio 45801.  IBEW 32 is an "employee welfare benefit

11  plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act

12  ("ERISA").  IBEW 32 is a non-profit trust, sponsored and administered by a Board of Trustees,

13  established through collective bargaining by labor unions and employers.  Pursuant to the trust

14  agreement under which it was created, it provides comprehensive healthcare benefits to

15  participants who are employed under various collective bargaining agreements, along with their

16  dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as

17  alleged herein and were damaged as a direct and foreseeable result of such conduct.

18      33.    Plaintiff IBEW Local 129 Fringe Benefit Funds ("IBEW 129"), who filed Civil

19  Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of

20  business at 36964 Detroit Road, Avon, Ohio 44011.  IBEW 129 is an "employee welfare benefit

21  plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act

22  ("ERISA").  IBEW 129 is a non-profit trust, sponsored and administered by a Board of Trustees,

23  established through collective bargaining by labor unions and employers.  Pursuant to the trust

24  agreement under which it was created, it provides comprehensive healthcare benefits to

25  participants who are employed under various collective bargaining agreements, along with their

26  dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as

27  alleged herein and were damaged as a direct and foreseeable result of such conduct.

28

34.     Plaintiff IBEW Local 683 Fringe Benefit Funds ("IBEW 683"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 23 West Second Avenue, Columbus, Ohio 43201.  IBEW 683 is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  IBEW 683 is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

35.     Plaintiff Indiana Carpenters Health and Welfare Fund ("ICHWF"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 2635 Madison Avenue, Indianapolis, Indiana 46225.  ICHWF is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  ICHWF is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

36.     Plaintiff Indiana Electrical Workers Benefit Trust ("IEWBT"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 1828 N. Meridian Street, Suite 103, Indianapolis, Indiana 46202.  IEWBT is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  IEWBT is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive

healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

37.     Plaintiff Indiana State Council of Carpenters Health and Welfare Fund ("ISC"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 5420 West Southern Avenue, Suite 407, Indianapolis, Indiana 46241.  ISC is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  ISC is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers. Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

38.     Plaintiff Indiana State District Council of Laborers and Hod Carriers Welfare Fund ("ISDC"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 413 Swan Street, Terre Haute, Indiana 47807.  ISDC is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  ISDC is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

39.     Plaintiff Indiana State Council of Roofers Health and Welfare Fund ("Roofers"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its

principal place of business at 1345 Northside Boulevard, South Bend, Indiana 46615.  Roofers is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Roofers is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

40.     Plaintiff Georgia Katsanos ("Katsanos"), who filed Civil Action No. 05-00834EDL (N.D. Cal.), is an individual residing in California.  Plaintiff Katsanos purchased Celebrex and was injured by the illegal conduct alleged herein.  Specifically, she has taken Celebrex for at least four years.  She paid co-payments through her insurance plan.  As an individual, Plaintiff Katsanos pursues this class action on behalf of herself and all those similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

41.     Plaintiff National Healthcare Insurance Company, who filed Civil Action C05-04073 (N.D. Cal.) is a life and health insurance company with its principal place of business at 1901 North State Highway 360, Grand Prairie, Texas 75050, and is involved in the business of providing health benefits, among others, to covered lives.  Plaintiff paid for prescriptions Celebrex dispensed to covered lives in several states.  Plaintiff has paid and provided, and will in the future pay and provide, health care benefits to its members and insureds as a direct result of the wrongful conduct of Defendant as fully alleged herein.

42.     Plaintiff Rose Lohman ("Lohman"), who filed Civil Action No. 05-05-10707 RCL (D. Mass.), has been taking Celebrex for ten years, has paid for Celebrex and has been injured as a result based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

43.     Plaintiff Michelle Madoff ("Madoff"), who filed Civil Action No. 05-10707 RCL (D. Mass.), is a resident of the State of Arizona.  Until recently Madoff took Celebrex and has made out-of-pocket payments for Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

44.     Plaintiff Helen Marconi ("Marconi"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a resident of Bronx, New York.  During the relevant time period, she purchased Celebrex and was injured by the illegal conduct described in this Complaint based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

45.     Plaintiff Robert Mariconi ("Mariconi"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a resident of Saddle Brook, New Jersey.  During the relevant time period, he purchased Celebrex and was injured by the illegal conduct described in this Complaint based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

46.     Plaintiff Evelyne Mayes ("Mayers"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a resident of Indianapolis, Indiana.  During the relevant time period, she purchased Celebrex and was injured by the illegal conduct described in this Complaint based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

47.     Plaintiff Judith C. Meredith ("Meredith"), who filed Civil Action No. 05-10707 (D. Mass.), is a resident of the Commonwealth of Massachusetts residing in Dorchester, Massachusetts.  During the relevant period, Meredith purchased Celebrex and was injured by the illegal conduct described in this Complaint.  Specifically, she began taking Celebrex approximately two years ago to treat pre-arthritis pains.  She had previously taken ibuprofen.  She began taking Celebrex after seeing the advertisements and asked her doctor to prescribe it for her.  She has paid co-payment amounts to purchase Celebrex through her prescription drug coverage plan provided

through her husband's employer.  As an individual, Meredith pursues this class action on behalf of herself and those similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

48.     Plaintiff Michiana Area Electrical Workers Health and Welfare Fund ("Michiana"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 1345 Northside Boulevard, South Bend, Indiana 46615.  Michiana is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security ct (ERISA").  Michiana is a non-profit trust, sponsored and administered by the Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

49.     Plaintiff Mary Morris ("Morris"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a resident of Fort Wayne, Indiana.  During the relevant time period, she purchased Celebrex and was injured by the illegal conduct described in this Complaint based on the cumulative impact of Defendants' wrongful conduct as alleged herein and was damaged as a direct and foreseeable result of such conduct.

50.     Plaintiff New England Carpenters Health Benefits Fund ("Carpenters"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is an employee welfare benefit plan established and maintained pursuant to sections 1002(1) and (3) of ERISA, for the purposes of providing health benefits to eligible participants and beneficiaries.  As such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Carpenters maintains its principal place of business in Wilmington, Massachusetts.  It provides comprehensive health coverage for over 22,000 participants and beneficiaries in the states of Maine, New Hampshire, Vermont and Massachusetts.  Carpenters is a Third-Party Payor that paid for Celebrex on behalf of

its beneficiaries during the relevant time period, and was injured by the illegal conduct described in this Complaint.  Carpenters has standing to bring this action on behalf of itself and all other Third-Party Payors who paid for Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

51.     Plaintiff North Carolina Fair Share ("NCFS"), who filed Civil Action No. C05-03976-MMC (N.D. Cal.), is a consumer health advocacy organization that has led the fight in North Carolina to expand access to affordable, quality health care.  It is located in Raleigh, North Carolina.  NCFS's members purchase and have purchased Celebrex during the relevant time period and were injured by the illegal conduct described in this Complaint.  As an organizational Plaintiff, NCFS has standing to bring this action on behalf of itself and all consumers in North Carolina based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

52.     Plaintiff Ohio State IBEW Health and Welfare Fund ("Ohio State"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 947 Goodale Boulevard, Columbus, Ohio 43216.  Ohio State is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Ohio State is a non-profit trust, sponsored and administered by a Board of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare benefits to participants who are employed under various collective bargaining agreements, along with their dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

53.     Plaintiff Painters Local No. 469 Health and Welfare Fund ("Painters 469"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of business at 7730 North 500 East, Decatur, Indiana 46615.  Painters 469 is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  Painters 469 is a non-profit trust, sponsored and administered by

1    a Board of Trustees, established through collective bargaining by labor unions and employers.

2    Pursuant to the trust agreement under which it was created, it provides comprehensive healthcare

3    benefits to participants who are employed under various collective bargaining agreements, along

4    with their dependents and retirees based on the cumulative impact of Defendants' wrongful

5    conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

6         54.    Plaintiff Painting Industry Insurance and Annuity Funds ("PIIAF"), who filed Civil

7    Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of

8    business at 8257 Dow Circle, Cleveland, Ohio 44136.  PIIAF is an "employee welfare benefit

9    plan" and an "employee benefit plan" as defined in the Employee Retirement Income Security Act

10   ("ERISA").  PIIAF is a non-profit trust, sponsored and administered by a Board of Trustees,

11   established through collective bargaining by labor unions and employers.  Pursuant to the trust

12   agreement under which it was created, it provides comprehensive healthcare benefits to

13   participants who are employed under various collective bargaining agreements, along with their

14   dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as

15   alleged herein and were damaged as a direct and foreseeable result of such conduct.

16        55.    Plaintiff Pipe Trades Industry Health and Welfare Plan ("Pipe Trades"), who filed

17   Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place of

18   business at 8838 East Milner, Terre Haute, Indiana 47803.  Pipe Trades is an "employee welfare

19   benefit plan" and an "employee benefit plan" as defined in the Employee Retirement Income

20   Security Act ("ERISA").  Pipe Trades is a non-profit trust, sponsored and administered by a Board

21   of Trustees, established through collective bargaining by labor unions and employers.  Pursuant to

22   the trust agreement under which it was created, it provides comprehensive healthcare benefits to

23   participants who are employed under various collective bargaining agreements, along with their

24   dependents and retirees based on the cumulative impact of Defendants' wrongful conduct as

25   alleged herein and were damaged as a direct and foreseeable result of such conduct.

26        56.    Plaintiff Plumbers and Steamfitters Local 42 Health & Welfare Plan

27   ("Plumbers 42"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity,

28

maintaining its principal place of business at 187 Woodlawn Avenue, Norwalk, Ohio 44857.
Plumbers 42 is an "employee welfare benefit plan" and an "employee benefit plan" as defined in
the Employee Retirement Income Security Act ("ERISA").  Plumbers 42 is a non-profit trust,
sponsored and administered by a Board of Trustees, established through collective bargaining by
labor unions and employers.  Pursuant to the trust agreement under which it was created, it
provides comprehensive healthcare benefits to participants who are employed under various
collective bargaining agreements, along with their dependents and retirees based on the cumulative
impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and
foreseeable result of such conduct.

57.     Plaintiff Plumbers and Steamfitters Local No. 166 Health and Welfare Plan
("Plumbers 166"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity,
maintaining its principal place of business at 2930 West Ludwig Road, Fort Wayne, Indiana 46818.
Plumbers 166 is an "employee welfare benefit plan" and an "employee benefit plan" as defined in
the Employee Retirement Income Security Act ("ERISA").  Plumbers 166 is a non-profit trust,
sponsored and administered by a Board of Trustees, established through collective bargaining by
labor unions and employers.  Pursuant to the trust agreement under which it was created, it
provides comprehensive healthcare benefits to participants who are employed under various
collective bargaining agreements, along with their dependents and retirees based on the cumulative
impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and
foreseeable result of such conduct.

58.     Plaintiff Plumbers Local No. 210 Health and Welfare Fund ("Plumbers 210"), who
filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity, maintaining its principal
place of business at 2901 East 83rd Place, Merrillville, Indiana 46410.  Plumbers 210 is an
"employee welfare benefit plan" and an "employee benefit plan" as defined in the Employee
Retirement Income Security Act ("ERISA").  Plumbers 210 is a non-profit trust, sponsored and
administered by a Board of Trustees, established through collective bargaining by labor unions and
employers.  Pursuant to the trust agreement under which it was created, it provides comprehensive

1    healthcare benefits to participants who are employed under various collective bargaining

2    agreements, along with their dependents and retirees based on the cumulative impact of

3    Defendants' wrongful conduct as alleged herein and were damaged as a direct and foreseeable

4    result of such conduct.

5         59.     Plaintiff Service Employee International Union Local No. 3 Health & Welfare Fund

6    ("Service Employee") who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity,

7    maintaining its principal place of business at 1735 East 23rd, Cleveland, Ohio 44114.  Service

8    Employee is an "employee welfare benefit plan" and an "employee benefit plan" as defined in the

9    Employee Retirement Income Security Act ("ERISA").  Service Employee is a non-profit trust,

10   sponsored and administered by a Board of Trustees, established through collective bargaining by

11   labor unions and employers.  Pursuant to the trust agreement under which it was created, it

12   provides comprehensive healthcare benefits to participants who are employed under various

13   collective bargaining agreements, along with their dependents and retirees based on the cumulative

14   impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and

15   foreseeable result of such conduct.

16        60.     Plaintiff Sheet Metal Workers Local No. 20 Welfare and Benefit Fund ("Sheet

17   Metal 20"), who filed Civil Action No. 1:05-cv-1109-JDT-TAB (S.D. Ind.), is an entity

18   maintaining its principal place of business at 2828 East 45th Street, Indianapolis, Indiana 46220.

19   Sheet Metal 20 is an "employee welfare benefit plan" and an "employee benefit plan" as defined in

20   the Employee Retirement Income Security Act ("ERISA").  Sheet Metal 20 is a non-profit trust,

21   sponsored and administered by a Board of Trustees, established through collective bargaining by

22   labor unions and employers.  Pursuant to the trust agreement under which it was created, it

23   provides comprehensive healthcare benefits to participants who are employed under various

24   collective bargaining agreements, along with their dependents and retirees based on the cumulative

25   impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and

26   foreseeable result of such conduct.

27

28

1       61.    Plaintiff Sheet Metal Workers' International Association Local No. 28 of

2 Metropolitan New York & Long Island ("Sheet Metal 28"), who filed Civil Action No. 05 cv 4125

3 (S.D.N.Y.), is a labor union health and welfare fund that provides health and prescription drug

4 benefits to its member in Metropolitan New York and Long Island, and specifically, it has paid or

5 reimbursed members for prescription drug benefits including for the purchase of the drug Celebrex.

6 Sheet Metal 28 is headquartered in Mineola, New York.  Sheet Metal 28 (or its members)

7 purchased Celebrex based on the cumulative impact of Defendants' wrongful conduct as alleged

8 herein and were damaged as a direct and foreseeable result of such conduct.

9       62.    Plaintiff Southern Ohio Painters Health and Welfare Fund ("S. Ohio"), who filed

10 Civil Action No. 1:05 01-cv 1109 JDT-TAB (S.D. Ind.), is an entity, maintaining its principal place

11 of business at 2621 East Third Street, Dayton, Ohio 45403.  S. Ohio is an "employee welfare

12 benefit plan" as defined in the Employee Retirement Income Security Act ("ERISA").  S. Ohio is a

13 non-profit trust, sponsored and administered by a Board of Trustees, established through collective

14 bargaining by labor unions and employers.  Pursuant to the trust agreement under which it was

15 created, it provides comprehensive healthcare benefits to participants who are employed under

16 various collective bargaining agreements, along with their dependents and retirees based on the

17 cumulative impact of Defendants' wrongful conduct as alleged herein and were damaged as a

18 direct and foreseeable result of such conduct.

19       63.    Plaintiff Steamfitters' Industry Welfare Fund ("Steamfitters"), who filed Civil

20 Action No. 05 cv 3814 (S.D.N.Y.), is a union health and welfare fund that provides health and

21 prescription drug benefits to its members, and specifically, it has paid or reimbursed members for

22 prescription drug benefits for Bextra for its members and was injured by the illegal conduct alleged

23 herein.  Steamfitters is headquartered in the city of New York, in the State of New York.

24       64.    Plaintiff June Swan ("Swan"), who filed Civil Action No. 05-00834EDL (N.D.

25 Cal.), is an individual residing in California.  Plaintiff Swan purchased Celebrex and was injured

26 by the illegal conduct alleged herein.  Specifically, she has taken Celebrex for approximately two

27 years in the treatment of arthritis and hip pain.  She pays co-payments through her insurance plan.

28

1   As an individual, Plaintiff Swan pursues this class action on behalf of herself and all those

2   similarly situated based on the cumulative impact of Defendants' wrongful conduct as alleged

3   herein and was damaged as a direct and foreseeable result of such conduct.

4       65.     Plaintiff United Senior Action of Indiana ("USAI"), who filed Civil Action No. 05-

5   10707 RCL (D. Mass.), is a consumer health advocacy organization that had fought to expand

6   access to affordable, quality health care.  It is located in Indiana.  Its members have purchased

7   Celebrex during the relevant period and were injured by the illegal conduct described in this

8   Complaint.  As an organizational Plaintiff, USAI has standing to bring this action on behalf of

9   itself and all consumers in Indiana based on the cumulative impact of Defendants' wrongful

10  conduct as alleged herein and were damaged as a direct and foreseeable result of such conduct.

11      66.     Plaintiff Linda A. Watters, Commissioner ("Wattters"), who filed Civil Action

12  No. 05-71656 (E.D. Mich.), Offices of Financial and Insurance Services for the State of Michigan

13  in her capacity as Rehabilitator of The Wellness Plan and in her capacity as Liquidator of Michigan

14  Health Maintenance Organization Plans, Inc., formerly known as OmniCare Health Plan, Inc., is a

15  Michigan official whose function is to collect and liquidate all assets and liabilities of the former

16  private Third-Party Payors Wellness Plan and OmniCare.  At all times relevant to this Complaint,

17  Wellness Plan and OmniCare were private Third-Party Payors whose function was to assume the

18  risk of payment of medical and prescription costs on behalf of the participants in its plan.  Wellness

19  Plan and Omnicare paid for purchases of Celebrex based on the cumulative impact of Defendants'

20  wrongful conduct as alleged herein and were damaged as a direct and foreseeable result of such

21  conduct.

22      67.     Plaintiff Wisconsin Citizen Action ("WCA"), who filed Civil Action No. 05-10707

23  RCL (D. Mass.), is a consumer health advocacy organization that had fought to expand access to

24  affordable, quality health care.  It is located in Wisconsin.  Its members have purchased Celebrex

25  during the relevant period and were injured by the illegal conduct described in the Complaint.  As

26  an organizational Plaintiff, it has standing to bring this action on behalf of itself and all consumers

27

28

1    in Wisconsin based on the cumulative impact of Defendants' wrongful conduct as alleged herein

2    and were damaged as a direct and foreseeable result of such conduct.

3        68.    Plaintiff Stephen Keisker is a resident of Danville, Hendricks County, Indiana.

4    Mr. Keisker paid for the entire cost of his Celebrex prescription out-of-pocket.  He took Celebrex

5    between 1999 and 2001 and was economically injured as described herein.

6        69.    Plaintiff Betty A. Alexander, who filed Civil Action No. 05-1720 (E.D. La.), is a

7    person of the full age of majority domiciled in Orleans Parish, Louisiana, and is a Louisiana

8    consumer who paid for the prescription drug Celebrex.

9        70.    Plaintiff Allied Services Division Welfare Fund ("ASD"), who filed Civil Action

10   No. 05-1720 (E.D. La.), a division of Transportation Communication International Union –

11   AFL-CIO, CLC ("TCU"), is a health and welfare benefit fund with its principal place of business at

12   53 West Seegers Road, Arlington Heights, Illinois 60005, and is involved in the business of

13   providing health and pension benefits, among others, to covered lives.  ASD is a multi-employer

14   employee welfare benefit plan within the meaning of the Employee Retirement Income Security

15   Act, 29 U.S.C. § 1001(2), and § 1002(37).  ASD paid for prescriptions of Celebrex dispensed to

16   covered lives in several states.  ASD has paid and provided, and will in the future pay and provide,

17   health care benefits to its members and insureds as a direct result of the wrongful conduct of the

18   Defendant as fully alleged herein.

19       71.    Each of the plaintiffs (or its members) purchased Celebrex based on the cumulative

20   impact of Defendants' wrongful conduct as alleged herein and were damaged as a direct and

21   foreseeable result of such conduct.

22   **B.    Defendants**

23       72.    Defendant Pharmacia is a Delaware corporation with its principal place of business

24   in New Jersey.  At all relevant times, Pharmacia has been engaged in the business of marketing and

25   selling Celebrex nationwid.

26

27

28

73.     Defendant Pfizer is a Delaware corporation with its principal place of business in New York.  In 2003, Pfizer acquired Pharmacia for nearly $60 billion.  During the relevant time period, Pfizer has been engaged in the business of marketing and selling Celebrex nationwide.

74.     Defendant Searle is a Delaware corporation with its principal place of business in Illinois.  At all relevant times, Searle has been engaged in the business of marketing and selling Celebrex nationwide.

75.     G.D. Searle was the discoverer and developer of Celebrex.  In 1999, Searle and Pfizer joined forces to co-promote Celebrex.  Thereafter, Pharmacia acquired Searle in 2000 and Pharmacia merged with Pfizer on April 16, 2003.

## IV.     FACTUAL BACKGROUND

**A.     Development of Celebrex**

76.     Celebrex is one of the new entries in a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs").  Aspirin and ibuprofen are examples of well-known NSAIDs.

77.     NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclooxygenase or "COX."  There are two forms of COX enzymes – COX-1 and COX-2.

78.     In addition to transmitting pain sensations, COX-1 is involved in maintaining and repairing gastrointestinal tissue.

79.     In addition to transmitting pain sensations, COX-2 is involved in the production of prostacyclin, a substance responsible for preventing the formation of blood clots.

80.     It is generally accepted in the medical community that blocking the COX-1 enzyme hampers the body's ability to repair gastric tissue and causes harmful gastrointestinal side-effects, including stomach ulceration and bleeding.  In addition, blocking the COX-1 enzyme decreases the production of thromboxane in platelets, diminishing thromboxane's effect of vasoconstriction and platelet aggregation, and thereby increasing the risk of abnormal bleeding.

81.     Traditional NSAIDs, like aspirin, reduce pain sensations by inhibiting both COX-1 and COX-2 enzymes simultaneously.  As would be expected, traditional NSAIDs increase the risk of ulcers in the stomach and intestines.  However, because of a complex chemical balance in the human body, traditional NSAIDs do not cause blood clots, but aspirin reduces the risk of clots and helps to protect heart function.

82.     It is generally accepted in the medical community that blocking the COX-2 enzyme encourages the formation of blood clots and increases the risk of various clot-related cardiovascular events, including:  heart attack, stroke, unstable angina, cardiac clotting and hypertension.

83.     It is generally accepted in the medical community that blocking the COX-2 enzyme encourages the formation of blood clots and causes various clot-related cardiovascular events, including:  heart attack, stroke, unstable angina, cardiac clotting and hypertension.

84.     Traditional NSAIDs, like aspirin, reduce pain sensations by inhibiting both COX-1 and COX-2 enzymes simultaneously.  As would be expected, traditional NSAIDs may cause ulcers in the stomach and intestines.  However, because of a complex chemical balance in the human body, traditional NSAIDs do not cause blood clots, but aspirin reduces the risk of clots and helps to protect heart function.

85.     For decades, in the absence of other treatment options, consumers seeking pain relief were forced to accept and live with the gastrointestinal risks of traditional NSAIDs.

86.     Defendants set out to remedy this problem by developing "selective" inhibitors that would block only COX-2 production, and thus (theoretically) allow the proper maintenance of gastric tissue while still reducing pain and inflammation sensations.

87.     The emergence of NSAIDs that selectively inhibit the cyclo-oxygenase 2 (COX-2) isoform, which is inducible and expressed at sites of inflammation, while sparing COX-1, associated with gastroprotection, was a pharmacological breakthrough promising real hope of a better future for NSAIDs.

**B.     FDA Approval**

88.     Defendant Searle sought FDA approval for Celebrex on June 29, 1998.  In its pre-approval marketing plans, Defendants planned that Celebrex would be approved and that such approval would include an indication that it was safer than NSAIDs in protecting against GI complications.  The treatment of arthritis pain with reduced GI complications was the single most important attribute to the planned marketing and promotion of Celebrex and its place as a new blockbuster drug.

89.     Pre-approval marketing plans stressed that Celebrex was superior to NSAIDs and thus a "breakthrough" in science and safety.  Pre-approval plans were to promote Celebrex as offering a significant reduction in GI complications.

90.     The FDA granted new drug approval on December 23, 1999.  However, Defendants did not obtain approval to promote Celebrex as less likely to cause clinically serious GI events than conventional NSAIDs.  The FDA warned Searle that any promotional activities "that make or imply comparative claims about the frequency of clinically serious GI events compared to NSAIDs or specific NSAIDs will be considered false and/or misleading…."  This finding by the FDA was a potentially serious blow to Defendants.

91.     As a result, the Celebrex package inserts had to include a warning that serious gastrointestinal toxicity "can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs)."

**C.     The CLASS Study**

92.     Defendants funded a significant clinical trial to demonstrate that Celebrex had greater gastrointestinal safety than traditional NSAIDs:  the Celecoxib Long-Term Arthritis Safety Study ("CLASS").

93.     Defendants expected CLASS to show that Celebrex was statistically significant in reducing serious GI complication over NSAIDs and that the results would allow removal of the warning label.  Removal of the warning label was viewed as critical to breaking the NSAID barrier, *i.e.*, competing against NSAIDs based on GI superiority.

94.     The CLASS trial was a long-term, double-blind study of gastrointestinal toxicity in 8,059 patients taking Celebrex, ibuprofen or diclofenac to treat arthritis.  Patients with heart problems were allowed to participate in the CLASS trial, and were permitted to take low doses of aspirin to reduce the risk that they would suffer an adverse cardiovascular event during the study.

95.     When the CLASS study was completed, the results were reported to the U.S. Food and Drug Administration's Arthritis Drugs Advisory Committee ("the Committee") as part of a request to exempt Celebrex from including the standard NSAID gastrointestinal safety warning in its package insert.

96.     After reviewing the CLASS results, ***the Committee concluded that patients taking Celebrex had not experienced fewer gastrointestinal complications than those taking traditional NSAIDs***.  In other words, CLASS showed that Celebrex failed to achieve its primary endpoint of reduced "clinically significant serious gastrointestinal events."  Without evidence of enhanced safety, the Committee then recommended that the Celebrex package insert contain the same gastrointestinal warnings as traditional NSAIDs, and advised further studies to assess the risk of COX-2 inhibitors when taken with aspirin.

97.     Thus, Defendants' clinical studies did not have their intended effect:  Celebrex was not permitted to claim increased gastrointestinal safety over traditional NSAIDs.

98.     Defendants, prior to the CLASS findings, had initiated extensive pre-release marketing campaigns to convey the uniform message that Celebrex provided effective relief of arthritis pain without the potential gastrointestinal side-effects of traditional NSAIDs.

**D.     The JAMA Publication of CLASS**

99.     The results of the CLASS study were published in the September 13, 2000 issue of JAMA.  CLASS is what is known as a Phase 4 post-approval study, which was required by the FDA.  Before any drug is approved, manufacturers have to submit data to the FDA that demonstrate the drug's safety and effectiveness.

100.    Each of the Defendants played a role in the establishment of the CLASS trial and how the results were then portrayed to the FDA, JAMA and to the medical community.

101.     CLASS, which included over 8,000 people with rheumatoid and osteoarthritis, compared the risk of gastrointestinal problems in people taking Celebrex with the risk in those taking ibuprofen (Motrin, Advil) and diclofenac (Voltaren).  ***The article in JAMA concluded that Celebrex, "when used for 6 months ... is associated with a lower incidence of clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac)."***  The accompanying editorial supported this conclusion:  "The results of this important study ... provide ***promising data*** to suggest that [Celebrex is] ... ***effective in reducing***, but not eliminating, the risk of symptomatic [minor] ulcers and [major] ulcer complications in the enormous number of individuals who might benefit from these drugs.…"

102.     There was, however, one very large problem.  The manufacturer's original research plan, as submitted to the FDA, had defined the duration of the CLASS study that compared Celebrex with ibuprofen as 12 months, and that of the study comparing Celebrex with diclofenac as 16 months.  And, indeed, the combined study had run for a full 12 months.  ***The authors, however, submitted only the first six months of data for the article in JAMA.***  Peer reviewers, editors, and editorialists had no way of knowing that the study had last for 12, not six, months.  As a result, data from the ***second*** six months of the study were unreported and invisible to even the most careful readers of the JAMA article.  The missing data invalidated the conclusions presented in the JAMA article:  ***six of the seven serious gastrointestinal complications that occurred in the second half of the study were in patients taking Celebrex***.

103.     Pharmacia had presented a statistical argument to the FDA justifying its omission of the data from the second half of its study.  The company claimed that since a higher percentage of people taking diclofenac dropped out of the study because of minor symptoms like heartburn, the data from the second half of the study were invalid because of what is called "informed censoring." Pharmacia argued that these dropouts would have gone on to develop serious gastrointestinal complications, and their dropping out of the study artificially minimized the risk of serious complications in the people taking diclofenac.  The FDA flatly rejected this argument.  It countered that there was no proof that the people with heartburn would have developed more serious

gastrointestinal problems.  Further, the FDA GI reviewer concluded that if minor symptoms caused people in the study to stop taking diclofenac, people in the real world would similarly stop taking the drug if it caused heartburn and would similarly protect themselves from going on to develop serious gastrointestinal complications.

104.    The FDA's opinion of the manufacturer's decision to publish only half of the data from its study was clear:  "[T]he sponsor's presentations of 6-month data ... are not statistically valid or supportable."  The FDA's gastroenterology reviewer concluded that the first six months of data – which had been presented in the JAMA article as if they were a report of the entire study – were not worthy of separate consideration:  "Based on the lack of adequate rationale, these post-hoc analyses will not be further discussed or presented in this review."  Looking at the data from the entire year of the study, the FDA's gastroenterology reviewer concluded that "***the sponsor has failed to demonstrate a statistically significant lower rate" of serious GI complications in the people who took Celebrex compared with the people who took the other NSAIDs***.  When the reviewer looked at only the second six months of data (*i.e.*, the data that had not been published in the JAMA article), he ***concluded that the risk of serious GI complications appeared to be higher in the people who took Celebrex "compared to <u>both</u> ibuprofen and diclofenac***" (emphasis in original).  This was hardly an endorsement for a drug whose only advantage (besides the convenience of a once-daily dosing) was that it supposedly caused fewer serious GI problems.

105.    The disparity between the CLASS article published in JAMA and the information in the FDA's files by no means stopped there.  The primary question that the CLASS study had been designed to answer had been changed, producing results that were far more favorable to the manufacturer.  The original research design submitted to the FDA by the manufacturer of Celebrex had stated:  "The primary objective of this study is to compare the incidence of ***clinically significant*** [major] upper gastrointestinal events … in patients taking Celebrex to patients taking NSAIDs."  The term "***clinically significant***" refers to complications that would generally require hospitalization:  active bleeding, perforation of the stomach or duodenum requiring surgery, or obstruction of the outlet of the stomach.  The research plan specifically called for the less serious

gastrointestinal side effects to "be categorized and analyzed separately." Indeed the FDA's gastroenterology reviewer specifically commented that the plan to identify the "truly significant" serious gastrointestinal complications alone was a "major strength of the current study."

106.    But when the results of the study were published in JAMA, the incidences of major and minor gastrointestinal complications were combined. Why the change? The results of the study as originally designed failed to show that the people who took Celebrex developed significantly fewer major gastrointestinal complications than the people who took ibuprofen or diclofenac, even for just the first six months. *Only by combining the minor GI symptoms with the more serious gastrointestinal complications could the article conclude that Celebrex caused a statistically significant decrease in gastrointestinal complications compared with the other NSAIDs*. As noted above, when the FDA looked at the results of the CLASS study in terms of the research question that had *originally* been posed, Celebrex was not significantly safer than the other NSAIDs.

107.    Finally, the most important measure of safety is the overall frequency of serious side effects – including, but not limited to, gastrointestinal side effects. For the full 12 months of the study, *the people in the CLASS study who took Celebrex experienced 11 percent more serious complications* (in all body systems combined) than the people who took the older and less expensive anti-inflammatory drugs. This difference did not reach statistical significance but certainly is significant in countering Pharmacia's claim that Celebrex is better than older NSAIDs because it's safer.

108.    These findings contributed to the FDA's decision to send one of its rare "Warning Letters" to the CEO of Pharmacia in February 2001. The letter cites repeated unsubstantiated marketing claims that Celebrex is the preferred NSAID for people taking a blood thinner and that it is safe and effective for the treatment of acute pain – a use for which it was not approved – and points out that Pharmacia's marketing material fails to warn of the possibility of serious GI complications caused by the drug. The Warning Letter concludes by saying:

> Your promotional activities described above raise significant health
> and safety concerns in that they minimize crucial risk information

and promote Celebrex for unapproved new uses.  In two previous
untitled letters dated October 6, 1999, and April 6, 2000, we objected
to your dissemination of promotional materials for Celebrex that …
contained unsubstantiated comparative claims, and lacked fair
balance.  Based upon your written assurances that this violative
promotion of Celebrex had been stopped, we considered these
matters closed.  Despite our prior written notification, and
notwithstanding your assurances, Pharmacia has continued to engage
in false or misleading promotion of Celebrex.

109.    Also included in the Warning Letter was the requirement that Pharmacia send out
the "Dear Healthcare Provider" letter.  Of course, the letter sent out by the manufacturer was not
quite as specific as the FDA's Warning Letter.  Few doctors, even if they had bothered to wade
through the difficult language, had the time or inclination to find out the story behind the letter.  As
a result, ***doctors continue to this day to prescribe Celebrex for their patients based on the
"scientific evidence" published in JAMA***, not understanding that it was incomplete and presented
an inaccurate picture of the so-called safety advantage of Celebrex over other less expensive
NSAIDs.

**E.      Use of the CLASS Study to Promote Sales of Celebrex**

110.    The JAMA article falsely concluded that Celebrex was associated with a lower
incidence of complications than NSAIDs.

111.    The flawed conclusions of CLASS were widely distributed and believed by
physicians.  Tens of thousands of reprints of CLASS were bought from the publisher and a recent
search of the Science Citation Index yielded 169 articles citing it, more than 10 times as many
citations as any other article published in the same issue.  The reprints were used by the Celebrex
sales team to convince doctors that the "scientific evidence" showed that Celebrex was safer for
their patients than older, less expensive NSAIDs.  The wide distribution of the JAMA article
purporting to present the results of the CLASS study increased sales of Celebrex.

112.    According to the BRITISH MEDICAL JOURNAL, Volume 324, June 1, 2002, many
physicians still believe the CLASS study:

Publishing and distributing overoptimistic short term data using post
hoc changes to the protocol, while omitting disappointing long term
data of two trials, which involved large numbers of volunteers, is
misleading.  While some of the problems related to CLASS were

partially covered in the news sections of BMJ and other journals, it was not emphasised how flawed the trial actually was, and how inadequate the authors' justifications.  Consequently, CLASS may still be relied on by many physicians without reference to these flaws.  In our experience most still believe the findings published originally.  For example, most of 58 physicians attending an osteoarthritis workshop in Berne, Switzerland, in December 2001 had not realized that CLASS was seriously biased.

113.    The JAMA article was critical to the launch of Celebrex.  Once a drug is introduced into the market and establishes itself at a certain price point, unless there is a withdrawal of the drug, that price point remains.  By use of the incomplete study information published in JAMA, as well as other misleading statements, Defendants were able to establish the price of Celebrex.

**F.      Misleading Articles in Medical Journal Used to Establish Celebrex in the Marketplace**

114.    Defendants also used the placement of misleading articles in prestigious journals as a means to falsely promote Celebrex.  Defendants placed articles, through paid consultants, in prestigious journals including JAMA, ARCHIVES OF INTERNAL MEDICINE and other publications.

115.    An example is a "Special Article" appearing in ARTHRITIS & RHEUMATISM, Vol. 43, No. 9, September 2000, entitled *Recommendations for the Medical Management of Osteoarthritis of the Hip and Knees*.  These guidelines, endorsed by the American College of Rheumatology (the professional society of arthritis specialists, became the gold standard for treatment of osteoarthritis ("OA").  Three out of four of the expert authors had financial relationships with Searle and Pharmacia.  These guidelines state if non-pharmacologic therapies (like heat, ice, and physical therapy) fail to provide adequate relief from osteoarthritis pain, drug treatment should be initiated with acetaminophen (Tylenol).  If acetaminophen provides inadequate relief, the next drugs recommended were COX-2 specific inhibitors, not conventional NSAIDs.  Without regard for the proscription included in the FDA's new drug approval letter to Searle about Celebrex, the guidelines assert that COX-2 inhibitors, based on endoscopic studies, have an advantageous safety profile.  The FDA's letter of December 31, 1998 addressing this issue stated:

" … any promotional use of endoscopic data without the qualifying explanations of that data found in the approved labeling … will be considered false and misleading."  [Label: The correlation between findings of endoscopic studies, and the relative incidence of

clinically serious upper GI events that may be observed with different products, has not been fully established.]

***Nonetheless, the authors of these guidelines concluded that COX –2 inhibitors, based on endoscopic studies, have an advantageous safety profile.  Referring to the CLASS study, the authors noted that data from this study had not yet been published.***

116.    Medical journals that publish articles can add substantially to their income selling reprints to drug companies.  Drug companies in turn give these reprints to their sales force who provide these to doctors as proof of a drug's superiority or qualities.

117.    The publication of these guidelines [OR DO YOU WANT IT TO SAY:  the "Special Article" helped] establish the use of COX-2 inhibitors as the standard drug therapy for the treatment of OA.  Defendants purchased reprints this article and it was used to promote the use of Celebrex for OA patients.  As a result of such use, Celebrex became the standard course of treatment in such patients.

118.    At the time these guidelines were written, the results of the CLASS study had not yet been published (the two articles were published almost simultaneously in September of 2000), but Defendants were aware of the results of the CLASS study.  When the results of the CLASS study were published in JAMA, showing that Celebrex does not significantly reduce the risk of serious GI complications in comparison to other NSAIDs, Defendants did not seek to correct the guidelines, and continued to distribute reprints despite the fact that the guidelines did not reflect the best available scientific evidence.  The authors, being paid by the pharmaceutical industry, did not print a correction and these guidelines continued to be used by physicians as the prescribing standard.

119.    The guidelines *may* have been formulated on the best evidence that had been published at the time they were issued in the September 2000 issue of ARTHRITIS & RHEUMATISM.  But the CLASS study had been completed by March 2000 – and certainly this information *should have been included* in the guidelines that were issued in September 2000 and remained in effect through the time that Vioxx was taken off the market.  These guidelines were available continuously on the government sponsored guidelines website, www.guideline.gov, during that

1    time.  There was no revision of the posted guidelines when the results of the CLASS study were

2    (such as they were) published in JAMA the same month, September 2000.  The CLASS study

3    showed that among the subset of patients taking aspirin, those treated with Celebrex experienced

4    no fewer GI complications than those treated with older, less expensive NSAIDs – even for the

5    first six months of the study that were published.  Nor were the guidelines updated when the FDA

6    "Warning Letter" dispelled the claim that Celebrex is safer than other NSAIDs in patients on anti-

7    coagulants.  Nor were they updated with the data from the February 2001 Advisory Committee

8    Meeting became available to the public on the FDA's website.

9        120.    The guidelines listed factors that increase the risk of GI bleeding, and said that

10   COX-2 inhibitors (Celebrex and Vioxx at the time) were the drugs of choice (after acetaminophen)

11   for people at elevated risk.  Even though the FDA reviewers dispelled that argument at the

12   February 2001 Advisory Committee Meeting, the guidelines remained in place, not reflecting the

13   updated information that should have caused them to be revised.  Furthermore, in a section of the

14   guidelines labeled "Initiation of treatment in the patient who is not at increased risk for an upper GI

15   adverse event**,"** the guidelines state:

16            The approach recommended for treatment of patients not at increased
             risk for an upper GI adverse event is similar to that described above
17            (Table 3) [for people at increased risk]

18   In other words, for patients at increased risk and for those not at increased risk of GI complications,

19   the guidelines recommend treatment with a COX-2 selective inhibitor if acetaminophen does not

20   provide adequate relief – even though the FDA GI reviewer concluded that Celebrex offers a safety

21   advantage for neither group.  These guidelines set the standards of good medicine and are

22   admissible in malpractice cases as evidence of community standards.

23       121.    Another example of the use of flawed studies to promote Celebrex use arises from

24   publication of the article *The Coxibs, Selective Inhibitors of Clyclooxygenase-2* that appeared in the

25   NEW ENGLAND JOURNAL OF MEDICINE, Vol. 345, No. 6, on August 9, 2001.  Though prohibited by

26   the then editorial policy of the New England Journal of Medicine, both of the authors received

27   money from Searle and/or Pharmacia.  The authors concluded that, "clinical trials have

28

1
2
3
4
5
6
7

demonstrated that treatment with highly selective cyclooxygenase-2 inhibitors [Celebrex and

Vioxx] causes significantly fewer serious gastrointestinal adverse events than does treatment with

non-selective NSAIDs."  However, with the results of CLASS publicly available on the FDA

website for seven months at the time this review article was published, the authors and Defendants

were (or should have been) aware that there was no evidence of Celebrex being less likely to cause

serious GI complications than other NSAIDs.  Despite the error in this report, reprints of it were

used by Defendants' sales force to market Celebrex to doctors.

8
9
10
11

122.    Another example of the use of flawed studies to promote Celebrex use is contained

in a corporate-sponsored review article appearing in the BRITISH MEDICAL JOURNAL on

September 21, 2002, where one of the authors was employed by Pfizer, which promoted falsely the

safety of Celebrex over NSAIDs:

12
13
14
15
16
17

> In this review of randomised controlled trials we have shown that
> celecoxib is as effective as other NSAIDs for the relief from
> symptoms of osteoarthritis and rheumatoid arthritis.  The confidence
> intervals around the point estimates of efficacy were reasonably
> narrow, which mean that it is unlikely that there were clinically
> important differences.  Compared with other NSAIDs, however,
> celecoxib showed increased upper gastrointestinal safety and
> tolerability.  Rates of withdrawal due to gastrointestinal adverse
> event, dyspepsia, and abdominal pain were 40-60% lower, while the
> incidence of ulcers and serious upper gastrointestinal events was 40-
> 75% lower.

18
19
20

123.    This review was published 2-1/2 years after the CLASS study was completed, and

Pfizer was aware that CLASS did not support this conclusion, yet Pfizer took no corrective steps

with respect to publication of this article.

21

**G.      Defendants Provide Doctors With Misleading Literature**

22
23
24
25
26

124.    Prior to the publication of CLASS, Defendants continuously sent doctors materials

that were false and misleading in order to create and expand the Celebrex markets.  For example, in

1999, Defendants Searle and Pfizer co-promoted a series of slides used by the sales force, claiming

that NSAIDs resulted in $500 million in excess medical care costs for GI diseases.  The implication

intended was that Celebrex did not cause GI diseases.  There was no scientific basis for such a

27
28

claim and CLASS demonstrated otherwise, yet these claims stayed alive in the minds of physicians and helped promote Celebrex sales.  This claim was never retracted or corrected by Defendants.

125.    In 1999, Defendants sent literature to the medical community claiming that Celebrex demonstrated "significantly fewer GI ulcers in 12-week serial endoscopy studies."  After CLASS was published, Defendants never corrected the misleading impressions created by this type of statement.

126.    At panel presentations to doctors on Celebrex, Defendants presented statistics showing costs arising from NSAID-associated GI diseases, juxtaposed against claims regarding "new Celebrex" and its effectiveness.  This juxtaposition was designed to falsely convey the GI safety and cost/effectiveness of Celebrex.  Also included were slides stating Celebrex "safely" delivers relief, again intending to create the false impression the older, less expensive NSAIDs were not as safe.

127.    After CLASS was completed, none of these misleading safety claims were corrected by Defendants.

128.    After CLASS rejected GI claims, Defendants did not correct the misleading impression they had created.  Further, these claims were made in written materials *after* the FDA rejected the use of endoscopic studies as a basis for claiming safety:

> FROM CELEBREX NEW DRUG APPROVAL LETTER 12/31/98:
>
> Please note that any advertising and/or promotional activity of this product will be considered false and/or misleading under Section 502 of the Act if it presents suggestions or representations that COX-2 selectivity confers on the product any claims of safety beyond what has been demonstrated in clinical studies and presented in the approved labeling.  Additionally, promotional activities that make or imply comparative claims about the frequency of clinically serious GI events compared to groups of NSAIDs or specific NSAIDs will be considered false and/or misleading without differences having been demonstrated in adequate, well-controlled studies.  Finally, any promotional use of the endoscopic data without the qualifying explanations of that data found in the approved labeling (paragraph beginning on line 251 in the enclosed label text) will be considered false and/or misleading.  If you have any questions or concerns about this matter please contact the Center for Drug Evaluation and Research's Division of Drug Marketing, Advertising and Communications.

129.     In a January 2000 letter to thousands of "Healthcare Professionals," jointly authored by Searle and Pfizer, Defendants described Celebrex as the "#1 selling brand of prescription arthritis medicine" and noted that "serious GI toxicity can occur with … NSAIDs." The message, no such GI toxicity occurs with Celebrex, this claim was unsupported and its falsity was never corrected.

130.     In 2000, Pfizer and Searle sent doctors a description of Celebrex indicating that it has "excellent GI tolerability." Again, this was part of a successful effort to create the impression that Celebrex caused significantly fewer GI problems than the older, less expensive NSAID. This statement was misleading when made and never corrected.

131.     In 2000, Defendants jointly agreed to send doctors materials describing Celebrex as a "scientific breakthough" which was not the case. Celebrex has no "breakthrough" clinical advantage over the older, less expensive NSAIDs.

132.     In 2000, Defendants jointly agreed to send doctors materials claiming that Celebrex was more effective in pain relief than naproxen. This claim was based on a study published in 1999 [Pharmacotherapy 19(11):1269-78, 1999], in which the primary endpoint was functional status and Celebrex and naproxen were equivalent. The finding that Celebrex reduced pain more than naproxen was post-hoc, and therefore of far less importance. The FDA Medical Officer Review commented on the results of CLASS:

> While these protocols were not primarily intended to address effectiveness, it is disappointing that celecoxib at four times and twice the upper recommended dose for OA and RA, respectively, appeared to offer no substantial therapeutic gains.

133.     All of the above materials are examples of false and misleading materials that conveyed superiority claims that persist in the medical community and led to the astounding success of Celebrex.

## H.     Marketing and Promotion

134.     With the knowledge that Celebrex provides no better pain relief than older anti-inflammatory drugs (in fact, all doses of Celebrex provide significantly less relief in studies of dental pain than two over the counter Advil tablets) and that Celebrex is no less likely to cause

serious GI complications, Defendants continued pouring money into advertising campaigns that uniformly emphasized the gastrointestinal safety of Celebrex and its relief of symptoms.

135.    Pharmacia and Searle spent more than $78 million on consumer advertising for Celebrex in the year 2000.  Defendants spent more than $400 million on direct-to-consumer advertising for Celebrex from 1999 to 2003.  Defendants' direct-to-consumer advertising had as its goal convincing patients that Celebrex was clinically superior to older, less expensive NSAIDs and that they should see their doctors and request a prescription for Celebrex.  This was accomplished by use of the messages set forth below.

136.    In addition, Defendants' sales forces have blitzed doctors' offices with literature and verbal presentations designed to convince both doctors and consumers that Celebrex was a superior drug for treatment of osteoarthritis, acute pain in adults, painful menstrual cycles and other types of disease.  They aggressively promoted Celebrex as an improvement over other NSAIDs, like naproxen and ibuprofen, because it had a lower risk of side effects such as gastrointestinal ulcers and bleeding.  Defendants did not promote or provide balanced presentation of Celebrex.

137.    Such marketing efforts to physicians have become commonplace in recent years. Drugs, including Celebrex, that might once have been used primarily by specialists are routinely promoted to, and prescribed by, doctors who are less familiar with the drugs' full research record. Drug companies, with Pfizer in the forefront, spent billions on such "detailing" to physicians – *i.e.*, sales people dropping by to leave marketing materials and drug samples, and speaking to physicians about their companies' drugs.

138.    Such large-scale marketing efforts have paid huge dividends to Defendants and other drug companies.  The number of blockbuster drugs, defined as drugs with more that $1 billion in annual retail prescription sales, was only 15 in 1999 but grew to 34 in 2003.

139.    As a result of Defendants' uniformly misleading advertising campaigns, Celebrex was wildly successful.  Celebrex became Pharmacia's best selling drug with more than $2.6 billion in sales for 2000 and $3.1 billion in sales for 2001.  After acquiring Pharmacia, Pfizer has

continued to enjoy blockbuster sales of Celebrex, with $2.7 billion in revenue from U.S. sales (out of $3.3 billion in worldwide sales) in 2004.

**I.      Examples of Misleading Materials Designed to Promote Celebrex as Offering a Heretofore Unavailable Improvement in the Quality of Life and/or as Providing Superior Pain Relief**

140.    Despite the lack of scientific evidence to support such claims, Defendants' advertisements often focused on one of two themes that were either expressly stated or implied by the words and images.  One was that Celebrex provided previously unavailable improvements in quality of life.  The second was that Celebrex provided superior pain relief.

141.    The marketing plans for Celebrex were premised on an FDA approval that did not require a GI warning so that Defendants could claim that Celebrex was superior to NSAIDs and Vioxx.  The marketing plan went forward in large measure with a concerted effort to disguise the true scientific evidence about the safety and efficacy of Celebrex.

142.    From 1999 through the present, Defendants have repeatedly engaged in misleading advertising devised to portray Celebrex as safer than other pain relievers.

143.    For example, on October 16, 1999, the FDA sent Defendant Searle a letter regarding misleading claims with respect to Celebrex.  The FDA found as follows:

> NDA #20-998
>
> • Searle claims that, "With more than 5 million patients on Celebrex, physicians know what to expect when they prescribe Celebrex — the new standard of care for analgesic and anti-inflammatory therapy in the management of pain for OA and RA."  This statement makes a broad superiority claim comparing Celebrex to not only the class of NSAIDs, of which Celebrex is a member, but to all analgesic and anti-inflammatory therapies available for the management of osteoarthritis (OA) and rheumatoid arthritis (RA).  However, this global superiority claim has not been demonstrated by substantial evidence.  Therefore, this claim is false or misleading.
>
> • Searle also presents several unsubstantiated comparative claims to Vioxx (rofecoxib), including but not limited to, "Why should I use Celebrex over Vioxx?  My first response to your question leads me to ask, 'With all the experience that you and thousands of other physicians just like you have with the proven efficacy and benefit of superior safety of Celebrex, why wouldn't you want to prescribe Celebrex?'"  (emphasis

1

2

3

> added).  This claim suggests Celebrex has a "superior safety"
> profile compared to Vioxx, when such has not been
> demonstrated by substantial evidence.  Therefore, DDMAC
> considers this unsubstantiated comparative claim to be false
> or misleading.

4    144.    Typical of Defendants' misleading advertising is an advertisement called "Guitar

5    TV ad."  The Guitar TV advertisement in its entirety makes a representation about the indication

6    and benefits of Celebrex for osteoarthritis or rheumatoid arthritis.  A woman playing an acoustic

7    guitar is featured.  The visuals focus on her hands/fingers and playing ability (*i.e.*, she finger-picks

8    the strings with one hand while executing chord changes with the other hand).  These images are

9    accompanied by a voice-over:  "With Celebrex, I will play the long version."  Together, these

10   images and claims suggest that because of using Celebrex, there is a direct benefit to this patient's

11   wrist/hand/finger joints related to movement and flexibility such that she can now play the long

12   version of the song whereas she previously could not.

13   145.    This advertisement is just one of many designed to have consumers believe that

14   Celebrex will provide better relief or in some way improve the quality of their lives more than

15   older, less expensive NSAIDs, many of which are available without a prescription.

16   146.    Recently, the FDA issued a warning letter regarding this advertisement:

17       While the Guitar TV ad suggests a direct benefit to this patient's

18       wrist/hand/finger joints related to movement and flexibility, it fails to
         state the actual approved indication (*e.g.*, relief of signs and
         symptoms of osteoarthritis).  It also fails to include any risk

19       information about Celebrex, thus omitting the major side effects and
         contraindications (including warnings and precautions) of Celebrex

20       as required by 21 CFR 202.1(e)(1).  Omission of this information
         implies that there are no risks to the patient who takes Celebrex,

21       which overstates the drug's safety.

22   147.    Similarly the FDA found another Celebrex TV advertisement to be misleading.  The

23   FDA described this advertisement as follows:

24       *Announcer:  "Celebrex presents, arthritis tips."*

25       Woman dressed as doctor:  "Arthritis is the most wide-spread
         crippling disability in the United States today.  Arthritis is the

26       predominant cause of activity limitations and is a major determinate
         of nursing home institutionalization for the elderly.  One out of every

27       7 people and 1 in every 3 families is affected by arthritis.  If you feel
         any pain or discomfort in your joints, contact your local doc."

28

1

*Announcer: "These arthritis tips have been brought to you by Celebrex."*

2

148.     The FDA found this advertisement to be misleading.

3

The Arthritis Tips TV ad is a product-specific drug ad for Celebrex that is misleading because it omits important information about the drug's safety and effectiveness and makes unsubstantiated effectiveness claims.  The ad promotes Celebrex by identifying the drug by name at the beginning and end of the ad.  Moreover, stating that Celebrex is presenting/bringing you arthritis tips clearly suggests that Celebrex is an arthritis treatment.  The Arthritis Tips TV ad purports to quantify the disease burden of "arthritis" ("the most wide-spread crippling disability in the United States today … the most predominant cause of activity limitations and … a major determinate of nursing home institutionalization for the elderly.  One out of every 7 people and 1 in every 3 families is affected by arthritis.")  Finally, the Arthritis Tips TV ad directs viewers to contact their local doctor "if you feel any pain or discomfort in your joints" and follows this statement with another reference to Celebrex.

Overstatement of Effectiveness.  The Arthritis Tips TV ad is misleading because it overstates the proven effectiveness of Celebrex for the treatment of "arthritis."  The Arthritis Tips TV ad discusses the serious progressive effects of arthritis, noting that it commonly can lead to "crippling disability" and "nursing home institutionalization of the elderly."  The viewer is then instructed "if you feel any pain or discomfort in your joints, contact your local doc.  These arthritis tips have been brought to you by Celebrex."  The totality of this presentation therefore suggests that Celebrex is an effective treatment for preventing or modifying the progression of arthritis, such that crippling disability and nursing home institutionalization may be avoided.

Celebrex is indicated only for relief of the signs and symptoms of OA and RA.  Celebrex is not indicated for disease modification (i.e., altering the course of the progression of arthritis).  Moreover, we are not aware of substantial evidence or substantial clinical experience demonstrating that treatment with Celebrex will prevent crippling effects or disability due to arthritis or prevent nursing home institutionalization of elderly patients with arthritis.  Therefore, your Arthritis Tips TV ad greatly overstates the proven benefits of Celebrex.

Omission of Risk Information.  The Arthritis Tips TV ad fails to disclose any risk information about Celebrex and thus omits the major side effects and contraindications (including warnings and precautions) of Celebrex as required by 21 C.F.R. 202.1(e)(1).  Omission of this information implies that there are no risks to the patient who takes Celebrex, thus overstating its safety.

149.     In the same letter the FDA found that various Celebrex print advertisements made

unsubstantiated claims with respect to less expensive alternative drugs:

1

        Unsubstantiated Superiority Claims

2

        The print ad features the prominent headline "Strength They Can
Stay With" and shows a chart comparing Celebrex, Ibuprofen and

3

Naproxen, titled "6-Month Patient Persistency Rate." Over the chart
is the statement, "In a study of approximately 1 million patients,

4

persistency rates of different OA/RA treatments were assessed at 6
months." The tagline below the Celebrex logo in the print ad is

5

"Proven strength that lasts."

6

        The above referenced claims imply that Celebrex is more effective
(i.e., stronger) than ibuprofen and naproxen for treatment of

7

osteoarthritis or rheumatoid arthritis and that patients "stay with" or
are more compliant with Celebrex therapy than the compared

8

products. We are not aware of substantial evidence or substantial
clinical experience to support these claims. The cited retrospective

9

retail pharmacy database analyses by NDC Health, "Persistency
Analysis: Celebrex, Vioxx, and All Other NSAIDs," August 2002

10

and "Persistency Analysis: Celebrex, Vioxx, Ibuprofen, and
Naproxen," from November 2002 (almost 2 years ago), do not

11

contain any data or information demonstrating that patients found
Celebrex to be more effective than the other products, or that patients

12

will be more "persistent" or compliant with Celebrex therapy.
Moreover, the database information did not note the indication for

13

which the drug was prescribed, so the suggestion that these rates
reflect specifically OA/RA patients is misleading. In addition, the

14

analyses do not account for factors that affect persistence or
compliance such as cost insurance coverage, side effects, dosage

15

regimen, and ease of use. Therefore, the analyses do not constitute
substantial evidence or substantial clinical experience demonstrating

16

that OA/RA patients are more compliant with Celebrex or stay on
Celebrex longer because it is more effective than other products for

17

the treatment of OA or RA.

18

       150.    Since its introduction, Defendants have issued promotional material designed to tie

19

Celebrex to improving quality of life. It has distributed materials making numerous dramatic

20

claims tied to the drug regarding quality of life, in terms of being able to do personal and work-

21

related activities. A Pfizer infomercial shows people returning to their work and activities. These

22

patients go from not being able to work or do anything they want to do, to being able to work and

23

do everything they want to do, pain-free. Patients talk about being able to "do anything," "do as

24

much as I want to do," being "back to doing what I do," and such. They talk about "enjoying life"

25

again, how the drug improved their "quality of life," and how the drug "gave them back their lives"

26

(a theme repeated over and over in the advertisement and in the background music). One person

27

28

states that "you can be free."  Another states that the medicine "brought new vitality in life."
Everyone portrayed has 100% efficacy in all of these outcomes.

151.    Such claims are misleading and purport to promote Celebrex as superior.  In fact, as
the FDA has recently noted, "none of the comparative studies with naproxen, ibuprofen, and
diclofenac to-date has been designed to demonstrate superiority or a specified degree of similarity
in a rigorous way."

152.    In addition, Defendants caused to be published the following advertisements which
were designed to appeal to consumers or doctors which misstated or deceptively conveyed
Celebrex's superiority.

153.    TELEVISION ADVERTISEMENT:  *The "I Will Not" advertisement*.  This
campaign, ran in October 2003 and April 2004, portrays people engaging in various physical
activities.  The tag line for the advertisement is "With Celebrex I will not …"  This is followed by
various variations in this theme.

a.     The advertisement shows a woman jogging with announcer stating:  "With
Celebrex I will no longer give in to the joint pain of osteoarthritis.  Just one Celebrex provides up
to 24 hour relief from the pain of osteoarthritis."

b.     The advertisement shows a woman playing golf with announcer stating:
"With Celebrex I will not stop at 9 when I really want to play 18."  The announcer further states:
With Celebrex I will not settle for part time relief.  If you are struggling with joint pain maybe you
should stop trying to manage it by yourself."

c.     The advertisement shows a woman running on a beach, a woman playing
golf, people doing tai chi, a man pitching softball, a couple hiking, a man pushing a child on a
marry-go-round, a man swimming and a woman kayaking.  The advertisement has a small
disclaimer that runs for a few seconds on the bottom of the screen that says, "Individual results
may vary."

154.    Each of the "I Will Not" foregoing advertisement scenes overstate the effectiveness
of Celebrex.  Each implies complete pain relief and complete return of movement and functionality

for all patients which is not representative of the results from Celebrex clinical trials.  And each misrepresents the fact that the relief provided by Celebrex is not superior to that provided by older, less expensive NSAIDs, several of which are available without a doctor's prescription.  The small disclaimer regarding individual results hardly counteracts the overall message of this advertisement.

155.    The "I Will Not" advertisement makes unsubstantiated superiority claims.  By stating that "if you are struggling with joint pain maybe you should stop trying to manage it by yourself" the advertisement falsely implies that Celebrex is superior to over-the-counter NSAIDs, and created unnecessary physician visits by conveying the message a doctor can prescribe a medication that is superior to those available without a prescription.

156.    TELEVISION ADVERTISEMENT: *The "Fixing the Preschool" advertisement*. The theme of this campaign, ran during May 2001, is a group of people fixing up a building that will be a preschool.  The advertisement starts out with the announcer:  "If you have osteoarthritis there is reason to celebrate … Celebrex."  The advertisement then shows people engaging in various activities repairing the schoolhouse.  It shows a man on a ladder taking down a sign with the text:  "Mark, arthritic shoulder."  It shows a woman cleaning a blackboard with the text: "Sarah, arthritic back."  The announce states, "Celebrex specifically targets only the Cox-2 enzyme – a key source of arthritis pain.  Celebrex relieves arthritis pain plus stiffness too."  The advertisement shows a woman working with a trowel with the text:  "Julia, arthritic hands."  The announcer states:  "Powerful 24 hour relief from osteoarthritis pain, inflammation and stiffness." The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

157.    This campaign overstates the effectiveness of Celebrex and implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials.  The small disclaimer regarding individual results does not counteract the overall message of this advertisement.

158.     This advertisement campaign makes unsubstantiated superiority claims.  By stating that "Celebrex specifically targets only the Cox-2 enzyme – a key source of arthritis pain" it falsely implies that it is superior to other NSAIDs.

159.     TELEVISION ADVERTISEMENT:  ***"The Softball Game" Advertisement***.  The theme of this advertisement, run during September 2000 and May 2001, is a softball game.  The advertisement starts out with the announcer stating:  "If you have osteoarthritis there is reason to celebrate … Celebrex."  The announcer states: "Celebrex specifically targets only the Cox-2 enzyme – a key source of arthritis pain.  24 hour relief from pain and stiffness."  The ad shows a woman helping a young boy to bat with the text:  "Jill, arthritic hands."  It shows a group of women doing the wave with the text:  "Rita, arthritic back."  It shows the umpire raising his arms with the text:  "John arthritic shoulder."  The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that says "Individual results may vary."

160.     This advertisement overstates the effectiveness of Celebrex.  It implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials.  The small disclaimer regarding individual results does not counteract the overall message of this advertisement.

161.     This advertisement makes unsubstantiated superiority claims.  By stating that "Celebrex specifically targets only the Cox-2 enzyme – a key source of arthritis pain" it falsely implies that it is superior to other NSAIDs.

162.     TELEVISION ADVERTISEMENT:  ***"A Day in the Park" Advertisement***.  The theme of this advertisement, ran during November 2000, is people engaging in various activities in a park.  The advertisement starts with a theme song "celebrate, celebrate do what you like to do."  The announcer states:  "If you have osteoarthritis there is reason to celebrate it's Celebrex.  Powerful 24 hour relief from osteoarthritis pain and stiffness.  Celebrex is the first arthritis medicine that targets only the Cox-2 enzyme."  The advertisement shows people doing tai chi with the text:  "Ann, arthritic shoulder."  The ad shows a man and a child riding push scooters with the text:  "Bill, arthritic knee."  It shows a man rowing a boat with the text:  "Dave, arthritic shoulder."

1   It shows a woman pushing a child on a swing with the text:  "Liz, arthritic back."  The

2   advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen that

3   says "Individual results may vary."

4        163.   This advertisement overstates the effectiveness of Celebrex.  The advertisement

5   implies complete pain relief and complete return of movement and functionality for all patients

6   which is not representative of the results from Celebrex clinical trials.  The small disclaimer

7   regarding individual results does not counteract the overall message of this advertisement.

8        164.   This advertisement makes unsubstantiated superiority claims.  By stating:

9   "Powerful 24 hour relief from osteoarthritis pain and stiffness.  Celebrex is the first arthritis

10   medicine that targets only the Cox-2 enzyme" the ad falsely implies that Celebrex is superior to

11   other NSAIDs.

12        165.   TELEVISION ADVERTISEMENT:  *"I Will Not …" Advertisement #2.*  The

13   advertisement portrays people engaging in various physical activities.  The tag line for the ad is:

14   "With Celebrex I will not give in to the pain of osteoarthritis."  The advertisement shows a man

15   swimming, a couple canoeing and a woman running.  The announcer states:  "Just one Celebrex

16   provides up to 24 hour relief from the pain of osteoarthritis."  The ad shows a woman playing golf

17   with a voice over:  "With Celebrex I can line up my putt."  It shows woman playing a guitar with

18   the voice over:  "I can play the long version."  The announcer states: "One pill, 24 hours so you can

19   live your life the way you want.  With Celebrex I will not settle for part time relief."  The

20   advertisement shows people hiking, a woman painting a chair, a man fishing, a woman playing a

21   guitar, people doing yoga and a man pushing a merry-go-round.  The announcer states, "If you are

22   suffering from pain, inflammation or stiffness maybe you should stop trying to manage it on your

23   own."  The advertisement has a small disclaimer that runs for a few seconds on the bottom of the

24   screen that says "Individual results may vary."

25        166.   This advertisement overstates the effectiveness of Celebrex.  It implies complete

26   pain relief and complete return of movement and functionality for all patients which is not

27

28

1    representative of the results from Celebrex clinical trials.  The small disclaimer regarding

2    individual results hardly counteracts the overall message of this advertisement.

3        167.    The advertisement makes unsubstantiated superiority claims.  By stating that "if you

4    are suffering from pain, inflammation or stiffness maybe you should stop trying to manage it on

5    your own" the advertisement implies that it is superior to over-the-counter NSAIDs which is not

6    supported in clinical trials.  By stating, "with Celebrex I will not settle for part time relief" the

7    advertisement implies that it is superior to other arthritis treatments which is not supported in

8    clinical trials.

9        168.    TELEVISION ADVERTISEMENT: *"Dancing" Advertisement*.  The theme of this

10   advertisement, ran during July 2002, is people dancing.  The advertisement shows a couple dancing

11   with a voice over that states:  "Even with osteoarthritis these arms still have a way with the ladies."

12   The text on screen says:  "Arthritic Elbow."  The next scene shows a woman dancing with a voice

13   over that states:  "These legs hardly miss a beat" with text "arthritic knee."  The next scene shows a

14   couple dancing with the voice over:  "These hands haven't lost their touch" with text "arthritic

15   hands."  The announcer states:  "Just one Celebrex last 24 hours.  Provides powerful arthritis pain

16   relief that is non-narcotic."  The advertisement has additional footage of the above people dancing.

17   The advertisement has a small disclaimer that runs for a few seconds on the bottom of the screen

18   that says "Individual results may vary."

19       169.    This advertisement overstates the effectiveness of Celebrex.  It implies complete

20   pain relief and complete return of movement and functionality for all patients which is not

21   representative of the results from Celebrex clinical trials.  The small disclaimer regarding

22   individual results does not counteract the overall message of this advertisement.

23       170.    Each of the foregoing advertisements also failed to disclose the increased risk of

24   heart problems that were known to Defendants at the time Celebrex was launched.  Defendants

25   concealed a study completed June 24, 1999 comparing Celebrex to placebo for the slowing of the

26   progression of Alzheimer's Disease and overall safety.  Patients taking Celebrex were 3.6 times

27   more likely to experience a serious cardiovascular event (2.1% of patients taking placebo vs. 7.7%

28

1    of patients taking Celebrex).[6]  Pfizer's report of this study shows that the increased risk of

2    cardiovascular complications in patients taking Celebrex was statistically significant.[7]

3    Furthermore, among patients taking Celebrex there were 12% more serious adverse events (25.6%

4    vs. 22.9%) and 59% more deaths (4.6% vs. 2.9%).  The study was never published and was not

5    presented to the FDA in time to be included in the February 2001 Advisory Committee Meeting

6    that considered the safety of Celebrex.  Had the findings from this study been published and

7    disclosed to the FDA in a timely manner, sales of Celebrex — based primarily on the claimed

8    safety advantage over older, less expensive NSAIDs — would have been dramatically less.  These

9    findings would have been of singular importance to prescribing doctors given the concern,

10   appropriately express in the JAMA article reporting the first six months of the CLASS study, about

11   the theoretical risk of increased adverse events disturbing the clotting balance with selective

12   COX-2 inhibition:

13               Although it has been hypothesized that COX-2–specific inhibitors
             might increase the risk of cardiovascular thromboembolic events via
14           inhibition of vascular prostacyclin synthesis without a corresponding
             inhibition of platelet thromboxane, no such increase was evident in
15           the current study.

16   Pharmacia's failure to make the results of this study available are particularly vexing, because it

17   was completed eight months before the CLASS study was completed, and it's results should have

18   informed the report published in JAMA.

19               171.    As part of the scheme alleged herein, Defendants engaged in a massive direct-to-

20   consumer advertising campaign in the print media designed to create consumer demand for

21   Celebrex.  The following is a sampling of such advertisements.

22

23

24

25       [6] Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721), Public Citizen, January 31, 2005.  http://citizen.org/publications/release.cfm?ID=7359

26       [7] A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body
     system terms (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorders; Myo, Endo, Pericardial & Valve
27   Disorders).  These differences were primarily driven by the individual terms cardiac failure, fibrillation atrial, and
     angina pectoris.  http://www.clinicalstudyresults.org/documents/company-study_76_0.pdf

28

1
2
3
4
5
6
7
8
9
10
11
12



13    172.    This advertisement which ran during October 2003, in its entirety, overstates the

14  effectiveness of Celebrex.  The advertisement implies complete pain relief and complete return of

15  movement and functionality for all patients which is not representative of the results from Celebrex

16  clinical trials.  It also seeks to bolster its image and acceptance by claiming that 23 million people

17  are using it and by virtue of the fact it is the "#1 doctor-prescribed drug."  However, these figures,

18  if true, are misleading by virtue of acceptance of Celebrex was the result in large measure to

19  Defendants' deceptive scheme for marketing Celebrex.

20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14

 

15       173.   This advertisement which ran during January 2000 overstates the effectiveness of

16 Celebrex.  The advertisement implies complete pain relief and complete return of movement and

17 functionality for all patients which is not representative of the results from Celebrex clinical trials.

18 This advertisement makes unsubstantiated superiority claims.  The advertisement claims that

19 Celebrex is a "breakthrough" implying that it is superior to other NSAIDs which is not supported

20 in clinical trials, and in fact is misleading given the lack of statistical significance between

21 Celebrex and older NSAIDs, and the lack of disclosure of the cardiovascular risks presented by

22 Celebrex.  It also represents that it is the "#1 selling brand" which would not have been the case if

23 Defendants had not engaged in the unlawful scheme described herein.

24
25
26
27
28



174.    This advertisement which ran during March 2000 overstates the effectiveness of Celebrex.  The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims without disclosure of cardiovascular risks.  The advertisement claims that Celebrex is a "breakthrough" implying that it is superior to other NSAIDs which is not supported in clinical trials.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16     175.    This advertisement which ran during January 2001 overstates the effectiveness of

17   Celebrex.  The advertisement implies complete pain relief and complete return of movement and

18   functionality for all patients which is not representative of the results from Celebrex clinical trials.

19   This advertisement makes unsubstantiated superiority claims.  By stating that it is the "first arthritis

20   medicine that targets only the COX-2 enzyme" it wrongly implies that it is superior to other

21   NSAIDs and fails to disclose the cardiovascular risks associated with Celebrex.

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14

 

15
16
17
18
19
20
21
22
23
24
25
26
27
28

176.    This advertisement which ran during June 2001 overstates the effectiveness of Celebrex.  The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and fails to disclose the cardiovascular risks associated with Celebrex.  By stating that it is the "first arthritis medicine that targets only the COX-2 enzyme" it falsely implies that it is superior to other NSAIDs.

1

2

3

4

5

6

7

8

9

10

11

12

13



14     177.    This advertisement which ran during May 2001 overstates the effectiveness of

15   Celebrex.  The advertisement implies complete pain relief and complete return of movement and

16   functionality for all patients which is not representative of the results from Celebrex clinical trials.

17   This advertisement makes unsubstantiated superiority claims without disclosure of the

18   cardiovascular risks associated with Celebrex.  By stating that it is the "first arthritis medicine that

19   targets only the COX-2 enzyme" it falsely implies that it is superior to other NSAIDs.

20

21

22

23

24

25

26

27

28

PURCHASE CLAIMS MASTER CELEBREX COMPLAINT




178.   This advertisement which ran during February 2000 overstates the effectiveness of Celebrex.  The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and fails to disclose the cardiovascular risks associated with its use.  The advertisement claims that Celebrex is a "breakthrough" falsely implying that it is superior to other NSAIDs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



179.    This advertisement which ran during September 1999 overstates the effectiveness of Celebrex.  The advertisement implies complete pain relief and complete return of movement and functionality for all patients which is not representative of the results from Celebrex clinical trials. This advertisement makes unsubstantiated superiority claims and fails to disclose cardiovascular risks.  The advertisement claims that Celebrex is a "breakthrough" falsely implying that it is superior to other NSAIDs.

1
2
3
4
5
6
7
8
9
10
11
12
13



14   180.    This advertisement which ran during July 2004 overstates the effectiveness of

15 Celebrex and the FDA warned Defendants that it was misleading, for failure to disclose risk

16 information, and for overstating the effectiveness of Celebrex.  The advertisement implies

17 complete pain relief and complete return of movement and functionality for all patients which is

18 not representative of the results from Celebrex clinical trials.

19
20
21
22
23
24
25
26
27
28

Celebrex Physician Directed Ads




181.    This advertisement which ran during July 2000 makes unsubstantiated superiority claims.  By comparing the effectiveness of Celebrex to naproxen the advertisement falsely implies that it is superior to other NSAIDs.  The statement "Excellent GI tolerability" is false and misleading, particularly in light of the reference to GI complications for NSAIDs with no such mention of complications for Celebrex.  Further, Celebrex did not show excellent GI tolerability.  Rather, its tolerability was no different than NSAIDs and in fact the CLASS study showed increased complications from Celebrex.

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15

182.    This advertisement which ran during November 1999 makes unsubstantiated

16
superiority claims.  By comparing the effectiveness of Celebrex to naproxen the advertisement

17
falsely implies that it is superior to other NSAIDs, and falsely claims that there are "significantly

18
fewer GI ulcers" when in fact this is not statistically proven.  This advertisement is misleading by

19
referring to significantly lower endoscopic ulcers, which were found by the FDA not to be

20
significant and is further misleading for the failure to balance that statement with the FDA finding

21
that Celebrex was not better in safety than NSAIDs.  In addition, by referring to NSAIDs and GI

22
complications without reference to Celebrex and GI complications the advertisement is unbalanced

23
and misleading.

24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26      183.    The above three advertisements which ran during February and March 2004 are

27  misleading.  In a letter to Pfizer the FDA stated:  "The print ad features the prominent headline

28

1  "Strength They Can Stay With" and shows a chart comparing Celebrex, Ibuprofen and Naproxen,

2  titled "6-Month Patient Persistency Rate."  Over the chart is the statement, "In a study of

3  approximately 1 million patients, persistency rates of different OA/RA treatments were assessed at

4  6 months."  The tagline below the Celebrex logo in the print ad is "Proven strength that lasts."

5  184.    In the letter to Pfizer the FDA stated:  "The above referenced claims imply that

6  Celebrex is more effective (*i.e.*, stronger) than ibuprofen and naproxen for treatment of

7  osteoarthritis or rheumatoid arthritis and that patients 'stay with' or are more compliant with

8  Celebrex therapy than the compared products.  We are not aware of substantial evidence or

9  substantial clinical experience to support these claims.  The cited retrospective retail pharmacy

10  database analyses by NDC Health, 'Persistency Analysis:  Celebrex, Vioxx, and All Other

11  NSAIDs,' August 2002 and 'Persistency Analysis:  Celebrex, Vioxx, Ibuprofen, and Naproxen,'

12  from November 2002 (almost two years ago), do not contain any data or information

13  demonstrating that patients found Celebrex to be more effective than the other products, or that

14  patients will be more 'persistent' or compliant with Celebrex therapy.  Moreover, the database

15  information did not note the indication for which the drug was prescribed, so the suggestion that

16  these rates reflect specifically OA/RA patients is misleading.  In addition, the analyses do not

17  account for factors that affect persistence or compliance such as cost insurance coverage, side

18  effects, dosage regimen, and ease of use.  Therefore, the analyses do not constitute substantial

19  evidence or substantial clinical experience demonstrating that OA/RA patients are more compliant

20  with Celebrex or stay on Celebrex longer because it is more effective than other products for the

21  treatment of OA or RA."

22  **J.      Concealment of Cardiovascular Risks and Dangers**

23  185.    The CLASS study published in 2000 assessed the incidence of clinically significant

24  upper GI events seen over one year of treatment with Celebrex compared to ibuprofen and

25  diclofenac.  A post-hoc analysis was done between those patients taking low-dose aspirin for

26  cardiac protection and those patients not taking low-dose aspirin.  The published article found that

27  the incidence of cerebrovascular accident, myocardial infarction, and angina was not statistically

28

1    different between patients taking the three drugs.  However, the published data only reflected a 6-

2    month period used by the company to espouse an unsupportable claim of decreased GI toxicity.

3         186.    The 12-month data set available from the FDA revealed that the rate of combined

4    anginal adverse events was 1.4% in the celecoxib group versus 1.0% in either NSAID group, a

5    non-statistically significant difference.  However, this tendency toward increased cardiovascular

6    toxicity was described by the FDA Medical Officer Dr. Witter, "For anginal disorders (especially

7    the combined disorders), ***there seems to be a trend toward more [cardiac adverse] events in those***

8    ***patients receiving celecoxib,*** regardless of aspirin use."  Had the results of the study completed in

9    1999 been available to the FDA Medical Officer, they surely would have given this finding greater

10    significance.

11         187.    This trend was ***magnified*** in those patients not taking low-dose aspirin.  Combined

12    anginal disorders were increased in these patients; the celecoxib group had 0.6% vs. 0.2% and 0%

13    in the diclofenac and ibuprofen groups, respectively.  There were also more combined atrial serious

14    cardiac adverse events with celecoxib, 0.3% compared to 0.1% and 0% in the diclofenac and

15    ibuprofen groups, respectively.  Dr. Witter commented, "In the non-aspirin users, there appears to

16    be a slight trend toward more [serious cardiac adverse] events in those patients receiving celecoxib

17    for combined atrial and anginal disorders."  Additionally, the rate of myocardial infarction was

18    higher in the celecoxib group, 0.2%, compared with the other two drugs, 0.1%.  Dr. Witter also

19    referred to data from the original NDA for celecoxib in his discussion, "There were suggestions of

20    a dose-response relationship (…100mg BID celecoxib, 0% crude mortality rate vs. 400 mg BID

21    celecoxib, 0.64% crude mortality rate) between cardiovascular mortality and [increased] celecoxib

22    use that could not be adequately addressed by the data."

23         188.    The FDA was concerned enough that they ordered a cardiorenal consult by Medical

24    Officer Dr. Throckmorton on the same CLASS study data.  In his report he noted, "The CLASS

25    trial data do not support a large adverse effect of celecoxib on cardiovascular mortality or on

26    serious adverse events related to thrombosis relative to either diclofenac or ibuprofen.  The data do

27

28

not exclude a less apparent pro-thrombotic effect of celecoxib, such as might be reflected in the relative rates of cardiac adverse events related to ischemia."

189.   While none of the CLASS data was statistically significant, they revealed a consistent and worrisome trend toward increased cardiovascular toxicity, particularly that related to increased thrombosis.

190.   The reviewers' recommendations were, "Our findings suggest a potential increase in cardiovascular event rates for the presently available COX-2 inhibitors ... definitive evidence of such an adverse effect will require a prospective randomized clinical trial ....  Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents. Until then, we urge caution in prescribing these agents to patients at risk for cardiovascular morbidity."  Although employing a placebo group from a different trial weakens the validity of their analysis, the author's call for a prospective randomized clinical trial powered to truly analyze the cardiovascular risk to benefit ratio was then exactly correct.  Recently, however, such a placebo-controlled trial of celecoxib has clearly demonstrated this risk (as did the study that was completed in 1999, but not disclosed to the FDA in a timely fashion).

191.   This trial was the APC colon polyprecurrence prevention study, in which approximately 2,000 patients took celecoxib or a placebo.  Interestingly, this was the longest celecoxib trial to date with a mean duration of treatment being 33 months as opposed to the much shorter 12-month duration of the CLASS study.  A statistically significant elevation in the risk for a major fatal or non-fatal cardiovascular event (a composite endpoint of cardiovascular death, acute myocardial infarction, and stroke) was seen in those patients taking celecoxib compared to those in the placebo group.  This followed a dose-response relationship:  the relative risk at 400mg/day of celecoxib was 2.5 while the relative risk at 800mg/day was 3.4.  Because of this unacceptable danger, the trial was prematurely halted.  The FDA released an explanatory statement which said, "While we have not seen all available data on Celebrex, these findings are similar to recent results

from a study of Vioxx (rofecoxib), another drug in the same class as Celebrex.  Vioxx was recently voluntarily withdrawn by Merck."

192.    Given the above data and trends, advertising, promotional and other materials, promoting the safety of Celebrex was misleading.  This trend and the omission of material facts in Defendants' promotional materials are more alarming in view of a 1999 study that was unpublished that showed patients taking Celebrex were more likely than those taking a placebo to have heart attacks.  Though the study was small, its conclusions contradicted years of claims by Defendants that no trial of Celebrex had ever shown adverse cardiac results.  Plus, when combined with the CLASS results, this clearly raised a red flag as to risks that physicians should have been made aware of.

193.    Each of the foregoing advertisements also failed to disclose the increased risk of heart problems that were known to Defendants at the time Celebrex was launched.  Defendants concealed until recently a study completed June 24, 1999 comparing Celebrex to placebo for the slowing of the progression of Alzheimer's Disease and overall safety.  Patients taking Celebrex were 3.6 times more likely to experience a serious cardiovascular event (2.1% of patients taking placebo vs. 7.7% of patients taking Celebrex).[8]  Pfizer's report of this study shows that the increased risk of cardiovascular complications in patients taking Celebrex was statistically significant.[9]  Furthermore, among patients taking Celebrex there were 12% more serious adverse events (25.6% vs. 22.9%) and 59% more deaths (4.6% vs. 2.9%).  The study was never published and was not presented to the FDA in time to be included in the February 2001 Advisory Committee Meeting that considered the safety of Celebrex.  Had the findings from this study been published and disclosed to the FDA in a timely manner, sales of Celebrex — based primarily on the claimed safety advantage over older, less expensive NSAIDs — would have been dramatically less.  These

---

[8] Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721), Public Citizen, January 31, 2005.  http://citizen.org/publications/release.cfm?ID=7359

[9] A statistically significant difference favoring placebo in adverse events was observed for certain CV-related body system terms (Cardiovascular Disorders, General; Heart Rate and Rhythm Disorders; Myo, Endo, Pericardial & Valve Disorders).  These differences were primarily driven by the individual terms cardiac failure, fibrillation atrial, and angina pectoris.  http://www.clinicalstudyresults.org/documents/company-study_76_0.pdf

findings would have been of singular importance to prescribing doctors given the concern, appropriately express in the JAMA article reporting the first six months of the CLASS study, about the theoretical risk of increased adverse events disturbing the clotting balance with selective COX-2 inhibition:

> Although it has been hypothesized that COX-2–specific inhibitors might increase the risk of cardiovascular thromboembolic events via inhibition of vascular prostacyclin synthesis without a corresponding inhibition of platelet thromboxane, no such increase was evident in the current study.

Pharmacia's failure to make the results of this study available are particularly vexing, because it was completed eight months before the CLASS study was completed, and it's results should have informed the report published in JAMA.

194.   Defendants' 1999 results as to the cardiovascular risks presented by Celebrex were confirmed in a study relayed by New Zealand's Medical Research Institute, which found that patients taking Celebrex had a cardiovascular risk as great as those taking Vioxx.

195.   The concealment of cardiovascular risks was evidenced by a letter sent to the FDA on January 31, 2005:

> January 31, 2005

> Dr. Lester M. Crawford, Acting Commissioner
> Food and Drug Administration
> 5600 Fishers Lane
> Rockville, MD  20857

> Dear Dr. Crawford,

> Since filing our petition last week (January 24th) to immediately ban celecoxib (Celebrex) and valdecoxib (Bextra)[1] **we have discovered the results of an unpublished randomized placebo-controlled study of Pfizer**, finished more than four years ago, that showed a significantly increased rate (3.5-fold) of serious cardiovascular adverse events and **more than a doubling in the rate of cardiovascular deaths in people using celecoxib compared to those using a placebo in a study concerning Alzheimer's disease.**
> (Emphasis added.)

> * * *

> The combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6-fold increase in cardiovascular risk in those people taking celecoxib. (p=0.03)

* * *

> Thus, there was a statistically significant increase in the composite of all serious cardiovascular events in patients getting Celebrex compared to patients getting a placebo.

196.    Defendants concealed this study because its publication would have impacted the marketing and pricing of Celebrex and its use by Class Members.  Since its "Black Box" warning concerning cardiovascular risks issued in August 2005, which constitutes only a partial disclosure, Celebrex sales have dropped by 48%.

**K.      Pfizer Temporarily Halts the Celebrex Promotional Scheme**

197.    On or about September 30, 2004, Merck withdrew its COX-2 inhibitor, Vioxx from the marketplace.  In response, Pfizer issued a statement indicating it was "confident in the long term cardiovascular safety of Celebrex" and indicated that "since the introduction of COX-2 inhibitors, the rate of hospitalizations for gastrointestinal events associated with long term arthritis treatment has declined significantly."

198.    The foregoing statement was misleading in that it failed to show the existence of reliable studies indicating that Celebrex did present cardiovascular risks and there was no statistically significant evidence to support the claim that Celebrex or other COX-2 inhibitors lead to a decrease in serious GI complications.  In fact, data from a Canadian study shows that after COX-2 inhibitors became available in 2000 there was a 41% increase in NSAID use (accounted for entirely by COX-2 inhibitors) and a 10% increase in the hospitalization rate for GI bleeding – belying the claim above.[10]

199.    On December 17, 2004, Pfizer shocked consumers by disclosing a study that demonstrated an increased risk of cardiovascular disease (the 1999 study referred to above).  Pfizer

---

[10] Mamdani M., Juurlink D.N., Kopp A., et al., Gastrointestinal bleeding after the introduction of COX-2 inhibitors: ecological study, *British Medical Journal Online*: http://bmj.bmjjournals.com/cgi/reprint/bmj.38068.716262.F7v1

then announced on December 20, 2004, that it would stop all television, radio, newspaper and magazine advertising.  Pfizer did so because it was aware that its previous campaign was misleading.

200.    On February 1, 2005, Pfizer finally admitted it was aware of the 1999 clinical trial finding that elderly patients using Celebrex were far more likely to suffer heart problems than patients taking a placebo.  The study was never published and was not submitted to the FDA until 2001, four months after the FDA's review of Celebrex and Vioxx.  An FDA reviewer who was unaware of the study has stated that had the Panel known about this study, it might have acted differently on Celebrex prior to August 2005.  Celebrex, unlike Vioxx, was not required by the FDA to carry warnings of cardiovascular risk.  The lack of warning is a main reason why Celebrex has achieved greater commercial success than Vioxx.

**L.    Defendants' Continued Unlawful Marketing Campaign Caused Active Concealment of Celebrex's Deficiencies and Over Payments by End-Payors for Celebrex**

201.    As a result of Merck's claims, Plaintiffs and members of the Class purchased and/or paid for Celebrex even though a monthly supply was much more expensive than other NSAIDs.

202.    To justify the disparity of Celebrex's pricing as compared to other NSAIDs and to ensure that physicians would prescribe and that End-Payors would purchase and pay for the drug, Celebrex misrepresented the safety and efficacy of Celebrex and omitted, concealed and suppressed the risks, dangers, and disadvantages of the drug.  Consequently, Celebrex captured a large market share of anti-inflammatory drugs prescribed for and used by patients.  In 2004 alone, sales of Celebrex exceeded $1.2 billion, despite the significantly higher cost of Celebrex as compared to other pain relievers in the same family of drugs.

203.    Celebrex's deceptive and misleading marketing campaign concealed, omitted, and suppressed information that resulted in overcharges to consumers and Third-Party Payors, such as Plaintiffs and the Class, for, in whole or in part, the costs of Celebrex.  Millions of End-Payors, including consumers and Third-Party Payors, have already paid for, and/or purchased and consumed Celebrex at prices based on the proposed wholesale price, which was about one hundred times the cost of a generic aspirin.  These End-Payors did not get the benefit of the bargain that

Defendants held out to them and as a result End-Payors paid more than they would have or should have because Celebrex was promoted and advertised as a premium drug with reduced side effects for the purpose of deceiving consumers and End-Payors about Celebrex's adverse cardiovascular, and GI effects.

## V.   FRAUDULENT CONCEALMENT

204.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed its unlawful conduct from Plaintiffs and the Class.

205.   Plaintiffs and the Class did not discover, and could not discover through the exercise of reasonable diligence, that Defendants had unlawfully concealed, omitted, and suppressed the serious adverse effects of Celebrex. Defendants conducted its unlawful activities in secret, concealed the nature of their unlawful conduct, and attempted to confine information concerning the adverse effects of Celebrex. Defendants attempted to withhold such information from Plaintiffs and members of the Class, the medical community, regulators and the public. Defendants fraudulently concealed its activities through various means and methods designed to avoid detection.

206.   Plaintiffs and the Class could not have discovered Defendants' unlawful conduct at an earlier date through the exercise of reasonable diligence because Defendants actively and purposefully concealed their unlawful activities.

207.   Defendants engaged in a successful, illegal fraud on consumers, Third-Party Payors and the general public, by which they deliberately and affirmatively concealed material information on the risks, dangers, defects, and disadvantages of Celebrex, in at least the following respects:

        a.      By failing to disclose adverse effects of Celebrex to Plaintiffs, the Class, the medical community, regulators, and the public;

        b.      By failing to warn Plaintiffs, the Class, the medical community, regulators, and the public of those adverse effects;

c.      By agreements among senior Pfizer and Pharmacia officials in meetings and in communications not to discuss publicly, or otherwise reveal, the totality of the adverse effects caused by Celebrex, Defendants' concealment of those adverse effects, and the nature and substance of other acts and communications in furtherance of Defendants' illegal scheme; and

d.      By concealing studies showing increased risk of cardiovascular disease.

208.    As a result of Defendants' fraudulent concealment, Plaintiffs and the Class purchased and/or paid for Celebrex and could not reasonably have discovered Defendants' misconduct regarding Celebrex prior to April 7, 2005.  Plaintiffs and the Class therefore assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the Class.

## VI.      CLASS ACTION ALLEGATIONS

209.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a national Class defined as follows:

> All End-Payors located in the United States, including Consumers and Third-Party Payors,[11] who purchased and/or paid for Celebrex not for resale during the period from December 1, 1998 through the present.

> Excluded from the proposed Class are (i) Defendants, any entity in which Defendants have a controlling interest or which have a controlling interest in Defendants, and Defendants' legal representatives, predecessors, successors and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons, (iv) governmental agencies, and (v) those who resold Celebrex.[12]

210.    Plaintiffs also define state law subclasses as defined in the various courts set forth below.

---

[11] Third-Party Payors include all entities that:  (a) provide, sponsor or insure a healthcare plan, which includes prescription drug coverage to natural persons, and (b) purchase, pay or insure all or part of the cost of prescription drugs prescribed and dispensed to those persons pursuant to a health plan.

[12] Plaintiffs have named class representatives for the Class, but have not named class representatives for every jurisdiction.  Should the Court so require or direct, Plaintiffs are prepared to name proposed class representative Plaintiffs for every jurisdiction, or for each statewide class, and for each subclass the Court may designate.

211.    The members of the Class are so numerous that joinder of all their members would be impractical.  Celebrex has been prescribed to, paid for and ingested by millions of consumers nationwide.

212.    There are questions of law and fact common to the Class that predominate over questions affecting only individual members, including, but not limited to:

      a.    Whether Defendants engaged in a fraudulent and/or deceptive scheme to portray Celebrex as a drug having superior qualities to other NSAIDs;

      b    Whether Defendants engaged in a scheme to create consumer demand for Celebrex based on deceptive statements concerning Celebrex's safety and efficacy;

      c.    Whether as a result of this scheme Celebrex was over prescribed;

      d.    Whether the price of Celebrex was inflated as a result of the scheme;

      e.    Whether Defendants formed an enterprise for the purposes of carrying out the scheme;

      f.    Whether Defendants used the U.S. mails and wires to facilitate the scheme;

      g.    Whether Defendants' conduct violated RICO;

      h.    Whether Defendants are liable to Plaintiffs and the Class for damages under state consumer protection statutes;

      i.    Whether Defendants made material misrepresentations or material omissions about the cardiovascular risks associated with using Celebrex and regarding the effectiveness of Celebrex; and

      j.    Whether members of the Class are entitled to damages based on their payments for Celebrex, and, if so, the nature and amount of such damages.

213.    Plaintiffs' claims and defenses are typical of the claims and defenses belonging to absent members of the Class, because Defendants have uniformly misrepresented that Celebrex is safer and more effective than traditional NSAIDs, overpromoted the benefits of Celebrex and uniformly failed to disclose the material cardiovascular risks associated with Celebrex.

1    Defendants' actions have deprived Plaintiffs and the members of the Class of their ability to make

2    an informed decision about whether to pay for Celebrex, and if so at what price.

3          214.   Plaintiffs will fairly and adequately assert and protect the interests of absent

4    members of the Class, because Plaintiffs have retained counsel competent and experienced in

5    complex class action litigation and have no interest adverse to any absent Class Members.

6          215.   Class certification is proper under Federal Rule of Civil Procedure 23(b)(1)(A),

7    because the prosecution of separate actions by individual Class Members would create a risk of

8    inconsistent or varying adjudications with respect to individual members of the Class and establish

9    incompatible standards of conduct for Defendants.

10         216.   Class certification is proper under Federal Rule of Civil Procedure 23(b)(1)(B),

11   because the prosecution of separate actions by individual Class Members would create a risk of

12   adjudications with respects to individual Class Members which would, as a practical matter, be

13   dispositive of the interest of the other members not parties to these adjudications and/or

14   substantially impair their ability to protect these interests.

15         217.   Class certification is proper under Federal Rule of Civil Procedure 23(b)(2), because

16   Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby

17   making final injunctive relief or corresponding declaratory relief appropriate for the Class.

18         218.   Class certification is proper under Federal Rule of Civil Procedure 23(b)(3), because

19   common issues of law and fact predominate over any questions affecting only individual members

20   of the Class, and a class action is superior to other available methods for the fair and efficient

21   adjudication of this controversy.

22         219.   The need for Class-wide notice does not provide a barrier to certification, in that

23   notice can be effectively disseminated to Class by techniques customarily used in consumer class

24   actions, including published notice, Internet notice and direct mailings based on readily available

25   computer databases (such as the one Defendants used to send their "Dear Patient" correspondence).

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CLAIM FOR RELIEF
### (Violations of 18 U.S.C. § 1962(c))

220.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

221.    This claim, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against Defendants on behalf of the Class.

222.    Plaintiffs, the members of the Class, and Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

223.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of an association-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

**Celebrex Enterprise**

224.    For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting of each of the Defendants, including their directors, employees and agents and includes outside advertising agencies utilized by Defendants and the Medical Directors of Searle and Pfizer. While maintaining their separate legal identities and titles, each of these entities and persons joined together to run the Enterprise.  The association-in-fact is referred to herein as the "Celebrex Enterprise."  At all relevant times, the Celebrex Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating information about Celebrex, which all too often included disseminating false and misleading information for the purpose of trying to make Celebrex a blockbuster drug, (b) jointly presenting data to the FDA and other medical journals that is misleading and/or has been manipulated to distort the results of clinical trials, (c) selling, promoting, and distributing Celebrex to Plaintiffs and Class Members, (d) achieving as a goal breaking the NSAID barrier, *i.e.*, having Celebrex replace NSAIDs as the preferred treatment, and (e) deriving profits from these activities beyond those that could have been attained without operation of the Celebrex Enterprise.  The Celebrex Enterprise had as a common purpose creating a demand for Celebrex in a class of consumers who could have used NSAIDs and

achieved the same pain relief at a lower cost.  Defendants have this as a purpose because without the Celebrex Enterprise, they would not be able to sell Celebrex at the prices at which it was sold. During most of the time relevant to this Complaint, each Defendant maintained a separate legal identity while operating the Celebrex Enterprise and others associated with and part of the Celebrex Enterprise maintained their separate identities.  The Celebrex Enterprise continues to operate through Pfizer and through the instructions it issues to its agents for the purpose of carrying out the objectives of the Celebrex Enterprise.  Agents and members of the Celebrex Enterprise include advertising agencies used to create Celebrex advertisements and doctors who co-author articles promoting the efficacy of Celebrex.  As to each Defendant, the association-in-fact met on a regular basis to discuss the operations of the Celebrex Enterprise and the Celebrex Enterprise's efforts were coordinated and agreed to by each Defendant.

225.    Each of the members of the Celebrex Enterprise had a systemic linkage, because there are contractual relationships, financial ties and continuing coordination of activities between the Defendants and the Celebrex Enterprise.  As to each Defendant, there was a common communication network by which information concerning the Celebrex Enterprise was exchanged on a regular basis.  Typically this communication occurred by the use of electronic mail or the telephone in which Defendants planned the operation of the Celebrex Enterprise alleged herein and ran its continuing operation.

226.    As part of their conduct of the Celebrex Enterprise and as part of the Enterprise's decisional marketing structure, Defendants agreed to maintain close communication between scientists at each company who were studying safety and efficacy, agreed to control media access to safety news and to provide each company's sales force with an agreed response to safety issues. Defendants also agreed to issue jointly sponsored advertisements that furthered the purposes of the Celebrex Enterprise.

227.    With the merger of Pfizer and Pharmacia and the purchase of Searle by Pharmacia, the Celebrex Enterprise is now an association-in-fact consisting of the individuals at Pfizer in charge of running the Celebrex Enterprise, including the sales executives in charge of marketing

1    efforts, executives in charge of advertising and those in charge of developing responses to safety

2    issues.  This association-in-fact meets on a regular basis to guide the operation of the Celebrex

3    Enterprise.

4            228.    At all relevant times, each of the Defendants was a knowing participant in the

5    Celebrex Enterprise and benefited from its operation.

6            **Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

7            229.    The Celebrex Enterprise engaged in and affected interstate commerce because it

8    engaged in the following activities across state boundaries:  The transmission and publication of

9    false and misleading information concerning Celebrex; the sale, promotion and/or distribution of

10   Celebrex; and/or the transmission and/or receipt of sales and marketing literature; and/or the

11   transmission and/or receipt of invoices, statements and payments related to the use or

12   administration of Celebrex.

13           230.    Defendants' illegal conduct and wrongful practices were carried out by an array of

14   employees, as well as by consultants and doctors, working across state boundaries, who necessarily

15   relied upon frequent transfers of documents and information, products and funds by the U.S. mails

16   and interstate wire facilities.

17           231.    The nature and pervasiveness of the Celebrex Enterprise, which was orchestrated

18   out of the corporate headquarters of Defendants, necessarily required those headquarters to

19   communicate directly and frequently by the U.S. mails and by interstate wire facilities with the

20   various local district managers overseeing the sales force(s), the numerous pharmaceutical sales

21   representatives who, in turn, directly communicated with providers and employees who

22   communicated with the public.

23           232.    Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire

24   facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and

25   cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part

26   of the successful operation of the Celebrex Enterprise alleged herein depended upon secrecy, and

27   as alleged above, Defendants took deliberate steps to conceal their wrongdoing.  However,

28

1    Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and

2    wire fraud occurred, and how those acts were in furtherance of the Celebrex Enterprise, and do so

3    below.

4         233.    Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the

5    Celebrex Enterprise involved thousands of communications, including *inter alia*:

6             a.       Marketing materials about Celebrex, which were sent by Defendants to

7    health care providers located across the country;

8             b.       Television and print advertisements issued on dozens of occasions;

9             c.       Written representations made by Defendants, which were made at least

10   annually and in many cases several times during a single year;

11            d.       Documents submitted to the FDA, JAMA and other medical journals

12   designed to conceal the risks of Celebrex and to falsely promote its safety and superiority;

13            e.       Written and oral communications directed to U.S. Government agencies that

14   fraudulently misrepresented Celebrex;

15            f.       Written and oral communications with health insurers and patients, including

16   Plaintiffs and members of the Class, inducing payments that were made in reliance on the

17   safety and effectiveness of Celebrex;

18            g.       Receipts of money sent on tens of thousands of occasions through the U.S.

19   mails and interstate wire facilities – the wrongful proceeds of the Celebrex Enterprise;

20            h.       The exchange between Defendants and JAMA (to purchase reprints) and that

21   JAMA never retracted the obviously incomplete and misleading articles, so misleading that

22   the FDA ruled that reprints handed out by drug representatives had to be stamped with "this

23   article contains unsubstantiated comparative claims"; and

24            i.       In addition to the above-referenced RICO predicate acts, it was foreseeable

25   to Defendants that others would distribute publications containing false information about

26   the effectiveness of Celebrex through the U.S. mails and by interstate wire facilities.

27   Further, Defendants' corporate headquarters have, in furtherance of the Celebrex

28

1    Enterprise, communicated through use of the U.S. mails and by interstate wire facilities

2    with their various local headquarters or divisions.  These uses of the U.S. mails include

3    some of the documents referenced in this Complaint.

4    **Conduct of the RICO Enterprise's Affairs**

5    234.    Defendants exerted control over their Celebrex Enterprise and, in violation of

6    Section 1962(c) of RICO, conducted or participated in the conduct of the affairs of that RICO

7    enterprise, directly or indirectly, in the following ways:

8    (a)    Each Defendant has directly or indirectly controlled the written and televised

9    promotional materials with respect to Celebrex;

10    (b)    Each Defendant has directly or indirectly controlled some of the medical

11    literature regarding the effectiveness of Celebrex;

12    (c)    Each Defendant has directly or indirectly controlled the goals of the

13    Celebrex Enterprise, *i.e.*, to have Celebrex break the NSAID barrier;

14    (d)    Each Defendant has controlled the sales and marketing plans for Celebrex;

15    (e)    Each Defendant has directly controlled the creation and distribution of

16    marketing, sales, and other materials used to inform health care providers nationwide of the

17    benefits of using Celebrex;

18    (f)    Each Defendant has controlled and participated in the affairs of its Celebrex

19    Enterprise by using a fraudulent scheme to manufacture, market and sell Celebrex; and

20    (g)    Each Defendant intended to (and did) distribute publications containing false

21    information through the U.S. mails and by interstate wire facilities.

22    235.    The Celebrex Enterprise had a joint decision-making structure, under which each

23    Defendant jointly agreed on how Celebrex was to be promoted and agreed as to how the affairs of

24    the Celebrex Enterprise should be conducted.

25    236.    Each of the members of the Celebrex Enterprise had a systemic linkage, because

26    there are contractual relationships, financial ties and continuing coordination of activities between

27    the Defendants and the Celebrex Enterprise.  As to each Defendant, there was a common

28

communication network by which information concerning the Celebrex Enterprise is exchanged on a regular basis.  Typically this communication occurs by the use of electronic mail or the telephone in which Defendants plan the operation of the Celebrex Enterprise alleged herein and ran its continuing operation.  This communication also occurred at meetings of the sales departments of each Defendant.

237.    As part of their conduct of the Celebrex Enterprise and as part of the Enterprise's decisional marketing structure, Defendants agreed to maintain close communications between scientists at each company who were studying safety, agreed to control media access to safety news and to provide each company's sales force with an agreed response to safety issues.

238.    In violation of Section 1962(c) of RICO, each Defendant conducted the affairs of the Celebrex Enterprise with which they associated by reporting fraudulent, false, deceptive and/or incomplete information as to the safety of Celebrex that were then disseminated nationwide.

**Defendants' Pattern of Racketeering Activity**

239.    Each Defendant conducted and participated in the affairs of the Celebrex Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Celebrex Enterprise.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), by means of which Defendants intended to defraud Plaintiffs, members of the Class and other intended victims of the Celebrex Enterprise.

240.    Defendants' fraudulent and unlawful Celebrex Enterprise consisted, in part, of disseminating by means of the U.S. mails and interstate wire facilities fraudulent information as to the safety and superiority of Celebrex.  As a result, Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

241.     Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Class.  Each separate use of the U.S. mails and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class.  Each Defendant has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Celebrex Enterprise.

**Defendants' Motive**

242.     Defendants' motive in creating and operating the Celebrex Enterprise and conducting the affairs of the Celebrex Enterprise described herein was to fraudulently obtain sales and profits.

243.     The Celebrex Enterprise was designed to, and did, encourage others, including health care providers, to advocate the use of Celebrex.  Thus, each Defendant used the Celebrex Enterprise to sell more Celebrex, thereby fraudulently gaining sales and market share and profits.

**Damages Caused by Defendants' Enterprise**

244.     Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be injured in their business or property because Plaintiffs and members of the Class have paid billions of dollars in overpayment for Celebrex.

245.     Through the use of the RICO enterprise, Defendants engaged in a pattern of racketeering activity including at least multiple episodes of mail fraud and wire fraud.  Consumers and third party payors were injured in their property by reason of these violations, by, among other things, having to pay hundreds of millions of dollars for Celebrex by reason of the unlawful conduct....  Defendants and their co-conspirators engaged in numerous overt predicate fraudulent racketeering acts in furtherance of the conspiracy, and by reason of this conduct consumers and third party payors were injured in their property.

246.    Defendants' use of the mails and wires to perpetrate its fraud involved thousands of communications, including but not limited to:  communications with health insurers and patients, including Plaintiffs, inducing payments for Celebrex to be made based on misrepresentations concerning the safety, efficacy, and usefulness of Celebrex.

247.    Defendants' fraudulent scheme consisted of, inter alia:  deliberately misrepresenting the uses for which Celebrex was safe and effective so that Plaintiffs and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective and actively concealing and causing others to conceal, information about the true safety and efficacy of Celebrex.

248.    Plaintiffs and members of the Class have been injured in their business and property by reason of these violations in that Plaintiffs and the members of the Class have made hundreds of millions of dollars in payment for Celebrex that they would not have made had Defendants not engaged in its pattern of racketeering activity.  By reason of the unlawful acts engaged in by Defendants, Plaintiffs and the Class have suffered ascertainable loss of damages.

249.    Plaintiffs' harm is caused by an indivisible course of conduct.  It is impossible to segregate the cumulative and compounding effect of Defendants' multi-faceted wrongful conduct in creating the artificial demand for Celebrex as well as its price inflation.  The intent of Defendants' conduct was to have the multi-faceted nature of its conduct increase demand for Celebrex and inflate its price.

250.    Under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Violation of the State Consumer Protection Laws)**

251.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

252.    Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of Celebrex to Plaintiffs and the proposed Class Members.

253.    As a proximate result of the Defendants' misrepresentations, Plaintiffs and the proposed Class Members have suffered an ascertainable loss, in an amount to be determined at trial.

254.    Defendants intended that Plaintiffs and Class Members rely on their materially deceptive practices and purchase Celebrex as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact with respect to the true nature of Celebrex:

a.    Defendants' promotions of Celebrex as a safe drug for the treatment of pain and as having fewer side effects than comparable drugs on the market were deceptive, unfair, and unlawful in that Celebrex actually had an undisclosed risk of adverse cardiovascular events, did not have added benefits over NSAIDs, and was promoted solely for financial reasons and not due to any material increase in medical safety or efficacy over NSAIDs;

b.    Defendants' conduct was unfair, unlawful, and deceptive in that Defendants knew Celebrex was unsafe and increased the risk of adverse cardiovascular events, such as heart attack and stroke, to unacceptable levels, but omitted to disclose these facts to doctors and patients until 2005;

c.    Defendants' conduct was unfair, unlawful and deceptive by virtue of their manipulation of data in an effort to show that Celebrex was associated with a lower incidence of serious upper GI events when compared to NSAIDs when this was not true.

d.    Defendants' conduct was unfair, unlawful, and deceptive in that they failed to adequately disclose that no long term clinical trials have been conducted comparing valdecoxib to either placebo or non-selective NSAIDs, and that two short term trials of patients provided valdecoxib after coronary artery bypass graft ("CABG") surgery should

have a two-fold increased risk of serious adverse cardiovascular events compared to a placebo.

e.      Defendants' conduct was unfair, unlawful, and deceptive in that they suppressed, manipulated, and concealed information that would demonstrate Celebrex was not superior to NSAIDs in the majority of patients;

f.      Defendants portrayed Celebrex as a relief for symptoms and diseases without any statistically significant evidence for doing so;

g.      Defendants omitted material information known to them in order to induce doctors to prescribe Celebrex and consumers to purchase Celebrex at a price that exceeded its actual worth;

h.      Defendants established Celebrex as a standard course of treatment based upon the use of reprints of articles appearing in prestigious medical journals which Defendants knew were false and/or misleading; and

i.      Defendants committed unlawful acts by promoting and advertising Celebrex in a manner that violated the Federal Food, Drug, and Cosmetic Act.  See 21 U.S.C. §§ 331(a) and (b), 352(a), (f), and (n) and 355(a).

255.   Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes that allow third-party payors to bring claims.  Plaintiffs assert this claim on behalf of third-party payors located in the states that permit TPP claims under the consumer protection laws as set forth below.

(a)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Code § 40.50.471, *et seq.*;

(b)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(c)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including § 4-88-113(f), and § 4-8-102(5);

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* and the Consumer Legal Remedies Act, Civ. Code § 1750 *et seq.* ("CLRA");

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code § 2512;

(h)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

(i)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;

(k)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

(l)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(m)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*, including § 30-14-102(5);

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

(t)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358-A:1(1);

(v)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

(w)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.,* including § 51-15-01(4);

(aa)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.,* including § 1345.01(B);

(bb)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.,* including § 646.605(4);

(dd)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.,* including § 201-2(2);

(ee)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.,* including § 6-13.1(3);

(ff)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.,* including § 39-5-10(9);

(gg)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.,* including § 37-24-1(8);

(hh)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.,* including § 47-18-103(9);

(ii)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.,* including § 17.45(4);

(jj)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.,* including § 59.1-198;

(ll)     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.,* including § 19.86.010(1);

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*; and

1     (oo)  Defendants have engaged in unfair competition or unfair or deceptive acts or

2 practices in violation of Wyo. Stat. § 40-12-100, *et seq.,* including § 40-12-102(a)(i).

3     256.  Defendants' actions, as complained of herein, constitute unfair competition or

4 unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state

5 consumer protection statutes that allow consumers to pursue claims.  Plaintiffs thus assert this

6 claim on behalf of Class Members in the states identified below and pursuant to the statutes

7 identified below:

8     (a)  Defendants have engaged in unfair competition or unfair or deceptive acts or

9 practices in violation of Alaska Stat. Code § 40.50.471, *et seq.*;

10     (b)  Defendants have engaged in unfair competition or unfair or deceptive acts or

11 practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

12     (c)  Defendants have engaged in unfair competition or unfair or deceptive acts or

13 practices in violation of Ark. Code § 4-88-101, *et seq.*;

14     (d)  Defendants have engaged in unfair competition or unfair or deceptive acts or

15 practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* and the Consumer Legal

16 Remedies Act, Civ. Code § 1750 *et seq.* ("CLRA");

17     (e)  Defendants have engaged in unfair competition or unfair or deceptive acts or

18 practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

19     (f)  Defendants have engaged in unfair competition or unfair or deceptive acts or

20 practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

21     (g)  Defendants have engaged in unfair competition or unfair or deceptive acts or

22 practices in violation of 6 Del. Code § 2511, *et seq.*;

23     (h)  Defendants have engaged in unfair competition or unfair or deceptive acts or

24 practices in violation of D.C. Code § 28-3901, *et seq.*;

25     (i)  Defendants have engaged in unfair competition or unfair or deceptive acts or

26 practices in violation of Fla. Stat. § 501.201, *et seq.*;

27

28

1        (j)       Defendants have engaged in unfair competition or unfair or deceptive acts or

2    practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

3        (k)       Defendants have engaged in unfair competition or unfair or deceptive acts or

4    practices in violation of Idaho Code § 48-601, *et seq.*;

5        (l)       Defendants have engaged in unfair competition or unfair or deceptive acts or

6    practices in violation of 815 ILCS § 505/1, *et seq.*;

7        (m)       Defendants have engaged in unfair competition or unfair or deceptive acts or

8    practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

9        (n)       Defendants have engaged in unfair competition or unfair or deceptive acts or

10   practices in violation of Kan. Stat. § 50-623, *et seq.*;

11       (o)       Defendants have engaged in unfair competition or unfair or deceptive acts or

12   practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

13       (p)       Defendants have engaged in unfair competition or unfair or deceptive acts or

14   practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

15       (q)       Defendants have engaged in unfair competition or unfair or deceptive acts or

16   practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

17       (r)       Defendants have engaged in unfair competition or unfair or deceptive acts or

18   practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

19       (s)       Defendants have engaged in unfair competition or unfair or deceptive acts or

20   practices in violation of Mich. Stat. § 445.901, *et seq.*;

21       (t)       Defendants have engaged in unfair competition or unfair or deceptive acts or

22   practices in violation of Minn. Stat. § 325F.67, *et seq.*;

23       (u)       Defendants have engaged in unfair competition or unfair or deceptive acts or

24   practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

25       (v)       Defendants have engaged in unfair competition or unfair or deceptive acts or

26   practices in violation of Mont. Code § 30-14-101, *et seq.*;

27

28

(w)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(z)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

1        (jj)     Defendants have engaged in unfair competition or unfair or deceptive acts or

2     practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

3        (kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or

4     practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

5        (ll)     Defendants have engaged in unfair competition or unfair or deceptive acts or

6     practices in violation of Tenn. Code § 47-18-101, *et seq.*;

7        (mm)  Defendants have engaged in unfair competition or unfair or deceptive acts or

8     practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

9        (nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or

10    practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

11       (oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or

12    practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

13       (pp)    Defendants have engaged in unfair competition or unfair or deceptive acts or

14    practices in violation of Va. Code § 59.1-196, *et seq.*;

15       (qq)    Defendants have engaged in unfair competition or unfair, deceptive acts or

16    fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

17       (rr)     Defendants have engaged in unfair competition or unfair or deceptive acts or

18    practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

19       (ss)     Defendants have engaged in unfair competition or unfair or deceptive acts or

20    practices in violation of Wis. Stat. § 100.20, *et seq.*; and

21       (tt)     Defendants have engaged in unfair competition or unfair or deceptive acts or

22    practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

23    257.    Plaintiffs provided notice of this litigation as follows:

24    258.    In addition, on March 1, 2006, notice was sent to each Attorney General in each of

25  the states requiring notice and where demand on a Defendant is required, such demand was made

26  on March 1, 2006.

27

28

259.    Pursuant to Section 1782 of the CLRA, in conjunction with the filing of this action,
Plaintiffs have notified Defendants in writing of the particular violations of Section 1770 of the
CLRA (the "Notice") and has demanded that Defendants refund the purchase price of Celebrex.
Plaintiffs sent the Notice by certified mail, return-receipt requested to Defendants' registered agent
of service/principal place of business in California.

260.    As a direct, proximate and foreseeable result of Defendants' actions, Plaintiffs and
members of the Class paid for higher priced Celebrex instead of purchasing a lower-priced generic
and/or a lower priced Celebrex.

261.    If Plaintiffs and members of the Class had not been deceived concerning the safety
and effectiveness of Celebrex, they would have taken steps so as to not purchase Celebrex at the
prices set by Defendants.  Among the possible steps is to exclude Celebrex from their approved
schedules, set a lower scheduled value in the formulary, set a high co-pay obligation, and otherwise
dissuade doctors from prescribing Celebrex.

262.    Defendants' unlawful actions caused the purchase of, or payment for Celebrex by
Plaintiffs, and as a result Plaintiffs paid more than they otherwise would have for NSAIDs:  had a
reasonable Plaintiff known the truth that Defendants misrepresented and concealed that Plaintiffs
would have used and/or paid for another less expensive, equally effective, and at least as safe
NSAID — many of which were available without a prescription and therefore would not have
generated unnecessary physician visits with the unnecessary expense to plaintiffs.  Defendants
would have lost a sale, and Plaintiffs would have avoided loss.

263.    Plaintiffs and members of the Class were injured by the cumulative and indivisible
nature of Defendants' conduct.  The cumulative effect of Defendants' conduct directed at
physicians and consumers was to artificially create demand for Celebrex in lieu of other NSAIDs
and/or caused Celebrex to command an artificially inflated price.  Each aspect of Defendants'
conduct combined to artificially create sales of Celebrex and/or to result in overpayments by Class
Members.

264.     As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Class have suffered actual economic damage by paying for Celebrex in lieu of other cheaper drugs and/or to pay at an artificially inflated price.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

265.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

266.     To the detriment of Plaintiffs and members of the Class, Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful collection of, inter alia, payments for Celebrex.

267.     Plaintiffs and members of the Class were injured by the cumulative and indivisible nature of Defendants' conduct.  The cumulative effect of Defendants' conduct directed at physicians and consumers was to artificially create demand for Celebrex at an artificially inflated price.  Each aspect of Defendants' conduct combined to artificially create sales of Celebrex.

268.     Defendants have unjustly benefited through the unlawful and/or wrongful collection of, inter alia, payments for Celebrex and continue to so benefit to the detriment and at the expense of Plaintiffs and members of the Class.

269.     Accordingly, Plaintiffs and members of the Class seek full restitution of the Defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## FOURTH CLAIM FOR RELIEF
### (Breach of Implied Warranty)

270.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

271.     Defendants are merchants and are in the business of selling selective COX-2 inhibitor drugs such as Celebrex.

1      272.    Celebrex was not of merchantable quality and was not fit for its intended use,

2 because it causes increased risk of serious cardiovascular and cerebrovascular adverse events,

3 including heart attacks, strokes and other serious and harmful adverse health effects.

4      273.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

5 fit for such use in violation of Ala. Code § 7-2-314, *et seq.*

6      274.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

7 fit for such use in violation of Alaska St. § 45.02.314, *et seq.*

8      275.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

9 fit for such use in violation of Ariz. Rev. Stat. Ann. § 47-2314, *et seq.*

10      276.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

11 fit for such use in violation of Ark. Code Ann. § 4-2-314, *et seq.*

12      277.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

13 fit for such use in violation of Cal. Comm. Code § 2314, *et seq.*

14      278.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

15 fit for such use in violation of Co. Rev. St. § 4-2-314, *et seq.*

16      279.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

17 fit for such use in violation of Conn. Gen. Stat. Ann. § 42a-2-314, *et seq.*

18      280.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

19 fit for such use in violation of 6 Del. C. § 2-314, *et seq.*

20      281.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

21 fit for such use in violation of D.C. Code Ann. § 28:2-314, *et seq.*

22      282.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

23 fit for such use in violation of Fla. Stat. Ann. § 672.314, *et seq.*

24      283.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

25 fit for such use in violation of Ga. Code Ann. § 11-2-314, *et seq.*

26      284.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and

27 fit for such use in violation of Haw. Rev. Stat. § 490:2-314, *et seq.*

28

285.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Id. Code § 28-314, *et seq.*

286.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*

287.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Indiana Code Ann. § 26-1-2-314, *et seq.*

288.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Iowa Code Ann. § 554.2314, *et seq.*

289.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Kansas Stat. Ann. § 84-2-314, *et seq.*

290.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Ky. Rev. Stat. § 355.2-314, *et seq.*

291.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of, and is liable in redhibition under, La. Civ. Code Ann. art. 2520, *et seq.*

292.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of 11 Maine Rev. Stat. Ann. § 2-314, *et seq.*

293.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Md. Code Ann., Com. Law § 2-314, *et seq.*

294.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Mass. Gen. Laws Ann. Ch. 106, § 2-314, *et seq.*

295.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Mich. Comp. Laws Ann. § 440.2314, *et seq.*

296.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Minn. Stat. Ann. § 336.2-314, *et seq.*

297.     Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Miss. Code Ann. § 75-2-314, *et seq.*

298.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Missouri Rev. Stat. § 400.2-314, *et seq.*

299.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Mont. Code Ann. § 30-2-314, *et seq.*

300.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Neb. Rev. Stat. U.C.C. § 2-314, *et seq.*

301.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Nev. Rev. Stat. U.C.C. § 104.2314, *et seq.*

302.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.H. Rev. Stat. Ann. § 382-A:2-314, *et seq.*

303.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.J. Stat. Ann. § 12A:2-314, *et seq.*

304.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.M. Stat. Ann. § 55-2-314, *et seq.*

305.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.Y. U.C.C. Law § 2-314, *et seq.*

306.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.C. Gen. Stat. Ann. § 25-2-314, *et seq.*

307.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of N.D. Stat. § 41-02-31, *et seq.*

308.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Ohio Rev. Code Ann. § 1302.27, *et seq.*

309.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of 12A Okla. Stat. § 2-314, *et seq.*

310.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Or. Rev. Stat. § 72.3140, *et seq.*

311.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of 13 Pa. Stat. Ann. § 2314, *et seq.*

312.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of R.I. Gen. Laws § 6A-2-314, *et seq.*

313.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of S.C. § 36-2-314, *et seq.*

314.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of S.D. ST. 857A-2-314, *et seq.*

315.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Tenn. Code Ann. § 47-2-314, *et seq.*

316.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Tex. Bus. & Com. Code Ann. § 2.314, *et seq.*

317.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Ut. Code Ann. § 70A-2-314, *et seq.*

318.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Va. Code Ann. § 8.2-314, *et seq.*

319.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Vt. Stat. Ann. § 9A-2-314, *et seq.*

320.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Wa. Rev. Code § 62A.2-314, *et seq.*

321.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of W. Va. Code § 46-2-314, *et seq.*

322.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Wis. Stat. Ann. § 402.314, *et seq.*

323.    Pfizer breached its implied warranty that Celebrex was of merchantable quality and fit for such use in violation of Wyo. Stat. § 34.1-2-314, *et seq.*

324.    As a proximate cause of Pfizer's breach of warranty, Plaintiffs and the Class suffered ascertainable losses, injuries and damages as specified herein in an amount to be determined at trial.

325.    In marketing and selling Celebrex, Defendants impliedly warranted that Celebrex provided effective pain relief without the gastrointestinal side effects of traditional NSAIDs.

326.    In marketing and selling Celebrex, Defendants intentionally mislead purchasers to believe, and impliedly warranted, that Celebrex possessed the same cardio-protective properties and skin dangers as traditional NSAIDs.

327.    In reality, Celebrex failed to provide effective pain relief without the gastrointestinal side effects of traditional NSAIDs.  Celebrex also did not possess the same cardio-protective properties and skin dangers as traditional NSAIDs.  In fact, Celebrex caused or exacerbated cardiovascular injury far more often than traditional NSAIDs, and even more often than other selective COX-2 inhibitor drugs.  Accordingly, for these and other reasons, Celebrex was not fit for the purposes for which it was sold and used, and it does not pass without objection in the trade.

328.    Defendants did not effectively disclaim or otherwise limit their implied warranty of merchantability with respect to Celebrex.  Therefore, Defendants breached the implied warranty of merchantability as to Plaintiffs and each member of the Class.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.    The Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages, and declaring Plaintiffs as representative of the Class and Plaintiffs' counsel as counsel for the Class; and designating such 23(c)(4)(A) class issues and/or 23 (c)(4)(B) subclasses as appropriate.

B.    The conduct alleged herein be declared, adjudged and decreed to be unlawful;

1    C.    Plaintiffs and the Class be granted an award of damages in such amount to be

2  determined at trial, with trebled damages as provided by law;

3    D.    Plaintiffs and the Class be granted an award of punitive damages in such amount to

4  be determined at trial;

5    E.    Defendants be enjoined from continuing the illegal activities alleged herein;

6    F.    Plaintiffs and the Class recover their costs of suit, including reasonable attorneys'

7  fees and expenses as provided by law; and

8    G.    Plaintiffs and the Class be granted such other, further, and different relief as the

9  nature of the case may require or as may be determined to be just, equitable, and proper by this

10  Court.

11                    **VIII.   DEMAND FOR JURY TRIAL**

12    Plaintiffs demand a jury trial on all issues so triable.

13  DATED:  March 1, 2006                    Respectfully submitted,

14

15                            LIEFF, CABRASER, HEIMANN &
                               BERNSTEIN, LLP

16

17                            By: _____

18                            _____
                               Elizabeth J. Cabraser

19                            Elizabeth J. Cabraser
                               **ecabraser@lchb.com**
20                            Scott P. Nealey
                               snealey@lchb.com
21                            Embarcadero Center West
                               275 Battery Street, 30th Floor
22                            San Francisco, CA  94111-3339
                               Telephone:  (415) 956-1000
23                            Facsimile:  (415) 956-1008

24                            *Plaintiffs' Liaison Counsel*

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAGENS BERMAN SOBOL SHAPIRO LLP


By___/s/ Steve W. Berman_____
    Steve W. Berman
steve@hbsslaw.com
Douglas C. McDermott
doug@hbsslaw.com
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594


Thomas M. Sobol
David S. Nalven, DN-2374
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, Fourth Floor
Cambridge, MA  02142
Telephone:  617-482-3700
Facsimile:  (617) 482-3003


James R. Dugan, II, T.A. (LSBA No. 24785)
David L. Browne (LSBA No. 20729)
Douglas R. Plymale (LSBA No. 28409)
DUGAN & BROWNE, LLC
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone:  (504) 648-0180
Facsimile:  (504) 648-0181


Art Sadin
SADIN LAW FIRM, P.C.
1104 S. Friendswood Drive, Suite A
Friendswood, TX  77546
Telephone:  (281) 648-7711
Facsimile:  (281) 648-7799


Lewis Kahn
KAHN GUATHIER LAW GROUP, L.L.C.
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone:  (504) 455-1400
Facsimile:  (504) 455-1498


Christopher A. Seeger
SEEGER WEISS, LLP
One William Street
New York, NY  10004-2502
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Don Barrett
BARRETT LAW OFFICES
450 Court Square
Lexington, MS  39095-0987
Telephone:  (662) 834-2376
Facsimile:  (662) 834-2628

Frank M. Pitre
COTCHETT, PITRE, SIMON & McCARTHY
San Francisco Airport Officer Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

Leonard Barrack
Robert Hoffman
Jeffrey Gittleman
Chad Carder
BARRACK, RODOS & BACINE
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA  19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

Howard M. Bushman
HARKE & CLASBY LLP
155 South Miami Avenue, Suite 600
Miami, Florida  33130
Telephone:  (305) 536-8219
Facsimile:  (305) 536-8229

L.S. Charfoos (N.Y Reg #2061406)
Jason J. Thompson (P47184)
Ann K. Mandt (P46314)
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Ave.
Detroit, MI  48202
Telephone:  (313) 875-8080
Facsimile:  (313) 875-8522

Ronald S. Goldser
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey S. Goddess
ROSENTHAL, MONHAIT, GROSS & GODDESS
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899-1070
Telephone:  (302) 656-4433
Facsimile:  (302) 658-7567

Richard L. Horwitz
POTTER ANDERSON & CORROON, LLP
1313 N. Market St., Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE  19899-0951
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

Garve W. Ivey, Jr.
Barry A. Ragsdale
William Adair, Jr.
IVEY & RAGSDALE
315 West 19th Street
P. O. Box 1349
Jasper, AL  35502-1349
Telephone:  (205) 221-4644
Facsimile:  (205) 252-8484

Jonathan B. Lowe
LOWE MOBLEY & LOWE
P. O. Box 576
Haleyville, AL  35575-0576
Telephone:  (205) 486-5296
Facsimile:  (205) 486-4531

Jeffrey L. Kodroff
SPECTOR, ROSEMAN & KODROFF, PC
1818 Market Street, Suite 2500
Philadelphia, PA  19106
Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611

Christopher A. Neal
CHRISTOPHER A. NEAL & ASSOCIATES, P.C.
300 Harwood
Bedford, TX  76021
Telephone:  (817) 545-6100
Facsimile:  (817) 589-2530

*Attorneys for the Celebrex Purchaser Plaintiffs*