LAW OFFICES OF PETER G. ANGELOS, P.C.
One Charles Center, 100 N. Charles Street
Baltimore, Maryland 21201-3804
T 410.649.2000
F 410.649.2101

Attorneys for Plaintiff, Jane A. Gagliardo

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | ) ) ) ) ) |
| | Case No. 3:07-CV-0592-CRB<br><br>MDL NO. 1699<br>District Judge: Charles R. Breyer |
| JANE A. GAGLIARDO,<br>As Executrix of the Estate of<br>JOHN B. GAGLIARDO,<br><br>                    Plaintiff<br><br>and<br><br>To the Use of<br>JANE F. STROMEYER<br><br>                    Plaintiffs,<br><br>        v.<br><br>PFIZER, INC., PHARMACIA CORP.,<br>MONSANTO COMPANY, and G.D.<br>SEARLE, LLC,<br><br>                    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | STIPULATION OF THE PARTIES CONSENTING TO FILING OF AMENDED COMPLAINT |

IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff, Jane A.

Gagliardo, and Defendants, Pfizer Inc. (improperly captioned as "Pfizer, Inc."), Pharmacia

Corporation (formerly known as the Monsanto Company that was incorporated in 1933), and

G.D. Searle LLC (improperly captioned as G.D. Searle, LLC)(collectively, "Defendants") that:

-1-

STIPULATION OF THE PARTIES CONSENTING TO FILING OF AMENDED COMPLAINT

1.  Plaintiff shall be permitted to file, in the place and stead of the previously filed Complaint herein, the proposed Amended Complaint (hereinafter referred to as the "Amended Complaint"), a true and correct copy of which is attached hereto as Exhibit A.

2.  Defendants shall have up to and including April 11, 2007, to answer, move, or otherwise respond to the Amended Complaint.

3.  This stipulation shall not be construed to preclude Defendants' right to request an extension of time to answer, move, or otherwise respond to the Amended Complaint, if necessary.

4.  This stipulation shall not be construed to toll the running of the applicable statute of limitations in this action.

5.  Defendants reserve all rights and defenses that were available to them as of the date of the filing of the original Complaint in this action, including, but not limited to, the right to assert the affirmative defense of statute of limitations.

6.  This Stipulation may be executed in counterparts which, together, shall constitute one and the same Stipulation. Copies of signatures shall have the force and effect of original signatures. Either party to this Stipulation may present it to the Court to be so-ordered.

-2-

**STIPULATION OF THE PARTIES CONSENTING TO FILING OF AMENDED COMPLAINT**

1

DATED: March 26, 2007    LAW OFFICES OF PETER G. ANGELOS, P.C.

2

3                               By: _____
                                  James T. Fitzgerald

4                        Attorneys for Plaintiff, Jane A. Gagliardo

5

6

7

DATED: March 22, 2007    DLA PIPER US LLP

8

9                               By: _____
                                  Raymond M. Williams

10                       Charnanda T. Reid

11                      Attorneys for Defendants, Pfizer Inc., Pharmacia
                      Corp., and G.D. Searle LLC

12

13

14

15      **PURSUANT TO THE TERMS SET FORTH IN THE PARTIES' STIPULATION,
IT IS SO ORDERED.**

16

17

18    Dated: March 28, 2007   _____

19                        Hon. Charles R. Breyer
                      United States Di...

20

21                 UNITED STATES DISTRICT COURT
                    IT IS SO ORDERED
                    Judge Charles R. Breyer
               NORTHERN DISTRICT OF CALIFORNIA

22

23

24

25

26

27

28

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

JANE A. GAGLIARDO                              :
As Executrix of the Estate of                  :
JOHN B. GAGLIARDO,                             :
And in her own right                           :
113 W. Broad Street                            :
East Stroudsburg, PA 18301                     :
                                               :    MDL Civil Action No.: 3:07-cv-0592-CRB
                                               :
                                               :
         Plaintiff                             :
                                               :    Transferred From:
                                               :    UNITED STATES DISTRICT COURT
v.                                             :    FOR THE EASTERN DISTRICT OF
                                               :    PENNSYLVANIA
                                               :    (Civil Action No.: 2:06-cv-04910-CMR)
PFIZER INC.                                    :
235 East 42nd Street                           :
New York, New York 10017                       :
                                               :
And                                            :
                                               :
PHARMACIA CORP.                                :
100 Route 206 North                            :    **FIRST AMENDED COMPLAINT AND**
Peapack, New Jersey, 07977                     :    **DEMAND FOR JURY TRIAL**
                                               :
And                                            :
                                               :
MONSANTO COMPANY                               :
800 North Lindbergh Boulevard                  :
St. Louis, Missouri 63167                      :
                                               :
And                                            :
                                               :
G.D. SEARLE, LLC                               :
4901 Searle Parkway                            :
Skokie, Illinois 60077                         :
                                               :
         Defendants

## FIRST AMENDED COMPLAINT

1

## JURISDICTION

1. This case is brought pursuant to 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest or costs.

2. Plaintiff's claims accrued in whole or in part in Monroe County, Pennsylvania. Plaintiff is a resident citizen of Monroe County, Pennsylvania. Defendant is a domestic corporation that is currently, and has been at all pertinent times, engaged in business, directly or by authorized agent, in Monroe County, Pennsylvania. Consequently, jurisdiction and venue are proper in this Court.

## PARTIES

3. Plaintiff Jane A. Gagliardo is an individual residing at 113 W. Broad Street, East Stroudsburg, PA 18301.

4. Plaintiff is the designated Executrix of the Estate of John B. Gagliardo and brings this action on behalf of the Estate of John B. Gagliardo. See Letters Testamentary attached hereto as Exhibit "A".

5. Defendant Pfizer Inc. (hereinafter "Pfizer") is a Delaware corporation with its address and principal place of business at 235 East 42nd Street, New York, New York 10017. Defendant Pfizer Inc. is authorized to do business and does do business in the State of Pennsylvania. At all times relevant hereto, Pfizer was and is in the business of developing, manufacturing, promoting, marketing and distributing, and/or selling in interstate commerce and the State of Pennsylvania, either directly or indirectly, pharmaceuticals and other products, including the product known as CELEBREX® (celecoxib)(hereinafter "Celebrex").

2

6. Defendant Pharmacia Corporation (hereinafter "Pharmacia") is a Delaware corporation with its address and its principal place of business at 100 Route 206 North, Peapack, New Jersey, 07977. On July 16, 2002 Pfizer announced its proposed acquisition of Pharmacia Corporation (hereinafter "Pharmacia"). On April 16, 2003, Pfizer completed its $60 billion acquisition of Pharmacia. As a wholly-owned subsidiary of Pfizer, Pharmacia acted in all aspects as Pfizer's agent and alter ego. Pharmacia is authorized to do business and does business in the State of Pennsylvania. At all times relevant hereto, Pharmacia was in the business of promoting, manufacturing, marketing, distributing, and/or selling in interstate commerce and the State of Pennsylvania, either directly or indirectly, Celebrex.

7. Defendant Monsanto Company (hereinafter "Monsanto") was the parent corporation of Pharmacia and is a Delaware corporation with its principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167. Monsanto is authorized to do business and does business in the State of Pennsylvania. At all times relevant hereto, Monsanto, through its subsidiary companies, was in the business of promoting, manufacturing, marketing, distributing, and/or selling in interstate commerce and the State of Pennsylvania, either directly or indirectly, Celebrex.

8. Defendant G.D. Searle LLC (hereinafter "Searle") was a subsidiary of Pharmacia Corporation and is, upon information, knowledge and belief, an Illinois Corporation with its address and its principal place of business at 4901 Searle Parkway, Skokie, Illinois 60077. In April 2000, Searle was acquired by Pharmacia, and became a wholly-owned subsidiary of Pharmacia. At the time of Pfizer's acquisition of Pharmacia, Searle was a wholly-owned subsidiary of Pharmacia, acting as its agent and alter ego in all matters alleged in this Complaint, and is now a wholly-owned subsidiary of Pfizer. Searle is authorized to do business and does do

3

business in the State of Pennsylvania. At all times relevant hereto, Searle was in the business of promoting, manufacturing, marketing, distributing, and/or selling in interstate commerce and the State of Pennsylvania, either directly or indirectly, Celebrex.

### FACTS COMMON TO ALL COUNTS

9.  This action arises from damages sustained by Plaintiff's Decedent which were caused by the pharmaceutical known as Celebrex® (hereinafter "Celebrex"), an osteoarthritis and pain-relief drug containing celecoxib, a member of a class of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDS").

10. Celebrex is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings as to the dangers associated with its use.

11. Plaintiff's Decedent, John B. Gagliardo, (hereinafter "Decedent") was provided with a prescription for Celebrex by his physician and consumed Celebrex in accordance with his physician's instructions on, about, and between approximately 2000 and August 18, 2004.

12. As a result, on or about August 18, 2004, Decedent suffered injuries, including but not limited to a heart attack, leading to Decedent's death that same day. See Death Certificate, attached hereto as Exhibit "B".

13. Defendants Pfizer, Pharmacia, Monsanto, and Searle (hereinafter "Defendants") were, at all times relevant hereto, engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical known as Celebrex.

4

14. Celecoxib was developed in 1986 by Searle and marketed jointly by Searle and Pfizer under the brand name Celebrex®. Searle was acquired by Pharmacia, which was then acquired by Pfizer, in part so that Pfizer could take control of Celebrex.

15. On June 29, 1998, Searle and Pfizer filed for FDA approval of celecoxib, its first major COX-2 inhibitor drug, under the trade name Celebrex. The FDA granted preliminary approval of the new drug on December 31, 1998, for the relief of signs and symptoms of adult osteoarthritis and rheumatoid arthritis. A year later, on December 23, 1999, the FDA granted accelerated approval of Celebrex for a second indication; the reduction of intestinal polyps as an adjunct to endoscopy and surgery in patients with familial adenomatous polyposis (FAP), a rare genetic disorder.

16. In late January 1999, following FDA approval, Pfizer publicly launched Celebrex, their new "blockbuster" drug, in one of the largest direct-to-consumer marketing campaigns ever undertaken for prescription drugs. Pfizer's massive marketing campaign fraudulently and misleadingly depicted Celebrex as a much safer and more effective pain reliever than traditional NSAIDs. Defendants and their representatives and agents misrepresented the safety profile of Celebrex to consumers, the medical community, healthcare providers, and third party payors.

17. Defendants sold Celebrex by misleading users about the product and by failing to adequately warn the public at large, including John B. Gagliardo, of the potential serious dangers which Defendants knew or should have known might result from consuming their product. Defendants widely and successfully marketed Celebrex through the United States, including to improper customers, by, among other things, conducting promotional campaigns, which misrepresented the efficacy of Celebrex in order to induce widespread use and consumption. Celebrex was represented to aid in relieving pain and discomfort of arthritis, osteoarthritis and

5

related problems. Defendants made misrepresentations by means of aggressive marketing to the consuming public, although only available through prescription, through the use of media including, but not limited to print and television advertisements as well as statements contained in sales literature provided to John B. Gagliardo's prescribing physician.

18. Defendants failed to perform adequate testing that would have shown Celebrex caused serious side effects. Defendants also failed to provide warnings that would accurately reflect the serious side effects caused by Celebrex.

19. Prior to the manufacturing, sale, and distribution of Celebrex, Defendants had notice and knowledge from several sources that Celebrex presented substantial and unreasonable risks of harm to consumers.

20. The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the FDA granted market approval in December 1998. By 1997, and prior to the submission of the New Drug Application (the "NDA") for Celebrex, Defendants were aware that, by selectively inhibiting only the COX-2 enzyme, Celebrex altered the homeostatic balance between prostacyclin synthesis and thromboxane and thereby increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *"Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* JAMA, August 22, 2001 at 954.

21. Pharmacologist Dr. Garrett Fitzgerald of the University of Pennsylvania reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that contemporaneous with Defendants' launch it was known that selective COX-2 inhibitors, such as Celebrex, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

Fitzgerald, G.A., Patrono C., *"The Coxibs, Selective Inhibitors of Cyclooxygenase-2,"* N Engl J
Med 2001;345:433-442.

22. Early FDA updates in March and April of 1999 similarly acknowledged this known
risk, but noted, based upon Pfizer's representations, that Celebrex "does not affect platelet
aggregation (clumping), an important part of the blood clotting process." *See* FDA Updates,
*"New Arthritis Drug May Have Fewer Side Effects,"* FDA Consumer March-April 1999.

23. Based on the studies performed on Celebrex, other COX-2 inhibitors, and basic
research on this type of selective inhibitor which had been widely conducted, Defendants knew
when Celebrex was being developed and tested that selective COX-2 inhibitors posed serious
cardiovascular risks for anyone who took them, and presented a specific additional threat to
anyone with existing heart disease or cardiovascular risk factors.

24. Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new
studies specifically analyzing the risks of Celebrex, Defendants failed to take any action to
protect the health and welfare of patients, opting instead to continue promoting the drug for sale
even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis
Drug Advisory Committee meetings.

25. In September 1998, Pharmacia sponsored an allegedly independent Celebrex Long-
Term Arthritis Safety Study ("CLASS"). The multicenter, double-blind, parallel group study
sought to compare the incidence of clinically significant upper gastrointestinal events between
Celebrex 400 mg BID and Ibuprofen 800 mg. (CLASS data is found in NDA 20-998/S-009
submitted to the FDA by Searle on June 12, 2000. CLASS was submitted to the FDA on June
12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20,
2000.)

7

26. On September 13, 2000, Defendants released the results of the CLASS study in the *Journal of The American Medical Association (JAMA)*.  Silverstein, F.E., *et al.*, *"Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial,"* 284 JAMA 1247 (2000).  Researchers enthusiastically reported a "lower incidence of symptomatic ulcers and ulcer complications combined, as well as other clinically supported toxic effects, compared with NSAIDs at standard doses."

27. Although Defendants touted the CLASS study as the primary evidence to support its theory that Celebrex was safer for consumers who could not tolerate traditional NSAIDs in their gastrointestinal system, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the results, risks and defects of the CLASS study.  Among other things, Defendants failed to release the study's complete twelve month results releasing only the first six months of trials, reported biased and misleading results, limited conclusions to upper gastrointestinal events despite other known risks factors, and understated known cardiovascular risks.

28. Despite Defendants' favorable CLASS Study conclusions, no other reviewing or administrative body was able to substantiate those findings.  The FDA Medical Officer Review of the CLASS data found Celebrex to be no more efficacious than other traditional NSAIDS comparators.  *See generally*, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by Searle on June 12, 2000.  According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE

8

(Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib." (FDA CLASS Review).

29. The FDA Arthritis Advisory Committee similarly found no "clinically meaningful" safety advantage of Celebrex over older NSAIDs. (FDA CDER Arthritis Advisory Committee, February 7th and 8th, 2001, Gaithersburg, Maryland). The CLASS Study failed to demonstrate a superior safety record over ibuprofen or pooled NSAID data. Based on this information, the Committee advised that further studies be done to assess the risk of COX-2 drugs and NSAIDS when taken with aspirin.

30. In a June 2002 editorial, the *British Medical Journal* chastised the Study's "misleading" and "seriously biased" nature; noting that the complete results "clearly contradict[ed] the published conclusions," and warning against the dangers of "overoptimistic," "short-term" data and "post hoc changes to the protocol." Juni, Peter, *et. at., "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?"* BMJ 2002;324:1287-1288. Most noticeably, the CLASS study considered only six months of data despite the fact that researchers at that point had 12 months of data that, when analyzed as a whole, showed no significant difference. Instead of releasing the complete 12-month results from CLASS, Pfizer relied on and published only the first six months of data. JAMA 2000, 48:1455-1460. The results of the completed study revealed the real truth: Celebrex offered no gastrointestinal (GI) benefit. Almost all ulcer-related complications that had occurred during the second half of the CLASS trials were in users of Celebrex. These results clearly contradict the published CLASS conclusions.

31. Editors of the Journal of the American Medical Association (JAMA) and other medical experts were reportedly "flabbergasted" when they realized they had been "duped" by

9

only being provided with the first six months of CLASS data. Okie S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5; Sect A:11. The *Washington Post* reported JAMA editors noting: "When all of the data were considered, most of Celebrex's apparent [GI] safety advantage disappeared."

32. Institutional bias also appeared to play a role in the Study's biased conclusions. According to the *Washington Post*, all sixteen CLASS authors were either employees of Pharmacia or paid consultants of the company. Okie, S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5; Sect A:11. Moreover, at least one author, Dr. M. Michael Wolfe, a gastroenterologist from Boston University, admits he was duped by Pharmacia. In the summer of 2000, *The Journal of the American Medical Association* asked Wolfe to participate in the "six-month" trial. Wolfe found the study, tracking 8,000 patients over a six-month period, persuasive, and penned a favorable review, which helped to drive up Celebrex sales. It was not until early the next year, while serving on the FDA's Arthritis Advisory Committee, that Wolfe learned the study had run for one year, not six months, as the company had originally led both Wolfe and the *Journal* to believe. *Id.* Here again, when the complete data was considered, most of Celebrex advantages disappeared.

33. Defendants also limited conclusions of the CLASS study to upper gastrointestinal events, despite other known risks factors, and understated known cardiovascular risks. A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies, including CLASS, funded by the drug companies and two smaller ones—all for cardiovascular risks. Debabrata Mukherjee, *et al., "Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors,"* 286 JAMA 954 (2001).) The metastudy found that Pharmacia failed to identify and study cardiovascular risks for their products. The

10

annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

34. "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group .... Most deaths were cardiovascular in nature." FDA CLASS Review at 54. The increased number of adverse cardiovascular events in the Celebrex group was not surprising, as they were also revealed in the original New Drug Application (NDA) submitted for Celebrex. "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any dose was cardiovascular." FDA CLASS Review at 78.

35. Public Citizen, a public watchdog organization, also reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in the Celebrex group versus 1.0% in either NSAID group. Specifically, the rate of heart attack in the Celebrex was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

36. Eric Topol of the Cleveland Clinic reached a similar conclusion, noting that the CLASS trial MI rate was 1.6% in the Celebrex group (at a dosage of 400 mg twice a day) and 1.2% in the ibuprofen group for the 1739 patients taking low-dose aspirin. Topol noted that this numerical excess, albeit not statistically signification, was also found in the 6229 patients not taking aspirin in the trial. Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Based on this data, Topol and his colleagues concluded: "It is mandatory to conduct a trial specifically assessing cardiovascular morbidity." *Id.*

11

Unfortunately, no such trials were ever initiated, delaying the official warnings of Celebrex and jeopardizing countless lives in the process.

37. The CLASS data proves that Pfizer knew that its first generation COX-2 inhibitor, Celebrex, caused a disproportionately and statistically significant high number of adverse cardiovascular events before it was introduced to the market in January 1999. According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the cardiovascular risks of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of Celebrex.

38. In early 2000, the National Cancer Institute (NCI), in collaboration with Searle and Pfizer, initiated the Adenoma Prevention with Celecoxib (APC) trial, a randomized, double-blind, placebo-controlled study to discover the efficacy of Celebrex in preventing the growth of pre-cancerous colon polyps. N.ENG. J. MED. 352;11 at 1072. The trial involved 2026 patients across the country with randomization to one of three groups: (1) placebo; (2) 200 mg Celebrex twice daily; and (3) 400 mg Celebrex twice daily. The patients, each of whom had an adenomatous polyp removed before enrollment, were followed up for a mean of 33 months while taking the study drug, with the primary objective of limiting the development of colorectal cancer.

39. On December 17, 2004, the National Cancer Institute suspended the use of Celebrex for all participants in the APC trial due to "significant excess of cardiovascular death, myocardial infarction (MI) and stroke." Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366. Analysis by an independent Data Safety Monitoring Board (DSMB) showed a two to three fold increased risk of major fatal and non-fatal cardiovascular

12

events for participants taking the drug compared to those on a placebo with a secondary dose-response effect.

40. The absolute excess of major cardiovascular events of 13/1000 patients at the 800 mg dose (400 mg 2x day) was strikingly similar to the results of trials with rofecoxib and valdecoxib, both selective NSAID COX-2 inhibitors removed for the market for their significant cardiovascular risks. Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366.

41. The FDA reported similar results, noting:

> In the National Cancer Institute's Adenoma Prevention with Celecoxib (APC) trial in patients at risk for recurrent colon polyps, a 2-3 fold increased risk of serious adverse CV events was seen for Celebrex compared to placebo after a mean duration of treatment of 33 months. There appeared to be a dose response relationship, with a hazard ratio of 2.5 for Celebrex 200 mg twice daily and 3.4 Celebrex 400 mg twice daily for the composite endpoint of death from CV causes, myocardial infarction (MI), or stroke.

April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/Celebrex/Celebrex-hcp.htm.

42. The dosage noted in the study is itself important for two reasons: first, there appears to be an association between dosage and the increase in adverse cardiovascular events; second, most patients increase dosage. Pfizer knew patients were increasing their dosages as noted in the CLASS Study: "Interestingly ... up to 70% of patients increased their dose for celecoxib." FDA CLASS Review at 74. Thus, Pfizer was aware of "dosage creep."

43. Several other Celebrex trials also gave Defendants insight into the cardiovascular risks presented by Celebrex. The Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as 3.6% with Celebrex as compared to 2.7% for placebo.

13

44. Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which reflected "the combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib. (p=0.03)." *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe. According to Dr. Sidney Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo." Id.

45. Pfizer also had access to other data, which indicated a cardiovascular risk with its drugs. Specifically, Pfizer had knowledge of two studies conducted by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

46. In 2000, The FDA Medical Officer Review of CLASS specifically noted the VIGOR trial and the concern over serious adverse cardiovascular events. FDA CLASS Review at 78.

47. According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

48. The VIGOR study comprised the most definitive scientific evidence ever obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold standard of medical research. It was a safety study with endpoints set in advance. As Merck stated many times, it was designed to provide definite proof of safety, convincing enough to silence the most

14

skeptical critics. In medical terms, the VIGOR results raised the question of whether selective inhibition of COX-2 was a monumental mistake from the start. While the NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the cardiovascular risks of the arthritis population that needed these drugs on a daily basis. All makers of NSAIDs, including Defendants, were aware of these results.

49. Anxious to put safety questions surrounding Vioxx to rest, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack)[1]. *Public Citizen*, January 24, 2005, at 15. Despite the available Celebrex data and other information related to Vioxx, Pfizer never paused to reevaluate the Celebrex data and studies.

50. The scientific data available during and after Celebrex's approval process made clear to Defendants that their formulation of Celebrex would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Celebrex consumers, alerting them to the need to do additional and adequate safety studies.

51. As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans, "it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established

---

[1] Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase in risk of heart attack was evident in as little as 4 months time.

15

coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

52. Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

53. Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of Celebrex did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take Celebrex. Therefore, Defendants' testing and studies were grossly inadequate.

54. Had Defendants done adequate testing prior to approval and market launch, rather than the extremely short duration studies done on the small size patient base that was actually done, the Defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects.

55. In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

56. Defendants' failure to conduct adequate testing and/or additional testing prior to market launch was based upon their desire to generate maximum financial gains for themselves

16

and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

57. As is detailed herein, at the time Defendants manufactured, advertised, and distributed Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAIDs. Defendants' conduct was therefore wanton and willful, and displayed a conscious disregard for Decedent's safety, in particular, and the public in general, entitling Plaintiff and the statutory beneficiaries stated herein to exemplary damages.

58. Defendants widely and successfully marketed Celebrex throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Celebrex in order to induce a widespread use and consumption. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Decedent's prescribing physicians.

59. Despite knowledge of the dangers presented by Celebrex, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Celebrex and failed to warn the public, including Decedent, of the serious risk of injury occasioned by the defects inherent in Celebrex. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Celebrex, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants'

17

conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Decedent.

60. Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Decedent, would not have purchased Celebrex, a more costly prescriptive drug, ineffective for its intended purposes.

61. Defendant's marketing was so fraudulent that the FDA issued three Warning Letters to Defendants in October 1999, April 2000, and November 2000, all finding that Defendants were unlawfully making false or misleading statements concerning the safety and/or efficacy of Celebrex. The November letter cited two direct-to-consumer television advertisements that overstated the efficacy of Celebrex. The FDA ordered that Searle immediately cease distribution of the misleading ads.

62. On February 2001, the FDA issued a Warning Letter to Pharmacia stating that promotional activities from marketing Celebrex were unlawful because they were "false, lacking in fair balance, or otherwise misleading." The FDA found that Celebrex had been promoted for unapproved uses, in unapproved dosing regiments, and that the marketers had made unsupportable claims that Celebrex was safer and more effective than other NSAIDs.

63. In August 2001, it was revealed that Pharmacia had misrepresented the results of a post-marketing clinical study of Celebrex when submitting it for publication. Pharmacia selectively omitted portions of the data relating to adverse effects. The *Washington Post* reported on August 5, 2001 that, "the study had lasted a year, not six months as . . .thought. Almost all of the ulcer complications that occurred during the second half of the study were in

18

Celebrex users. When all of the data were considered, most of Celebrex's apparent safety advantage [as compared to traditional NSAIDs] disappeared."

64. On January 10, 2005 the FDA again issued Pfizer a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2 Bextra] variously: omit material facts ... and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims." Amid continued frustration with Pfizer's continually misleading marketing strategy and ever surmounting evidence of cardiovascular dangers, the FDA Advisory Panel voted overwhelmingly that the company should never again advertise the drug [Celebrex]."

65. At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Celebrex as a safer and better drug than its other NSAIDs and, therefore, purchase Celebrex.

66. In an elaborate and sophisticated manner, Defendants aggressively marketed Celebrex directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Celebrex on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add Celebrex to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Celebrex.

67. Defendants represented that Celebrex was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated

19

with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). Defendants promoted Celebrex as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

68. Yet, Celebrex possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Celebrex, which is significantly more expensive than traditional NSAIDs[2], was actually no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Yet, Defendants chose not to warn about these risks and dangers.

69. Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved Celebrex for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Celebrex. Defendants' omission, suppression, and concealment of this important information enabled Celebrex to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

70. Consequently, Celebrex captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone, sales of Celebrex exceeded $2 billion, despite the significantly higher cost of Celebrex as compared to other pain relievers in the same family of drugs.

71. Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, and that touted Celebrex as a safer drug than

---

[2] The cost of Celebrex is at least $3-$6 per day, while an over-the-counter NSAID can cost $.50 or less per day.

other drugs in its class, while uniformly failing to disclose the health risks of Celebrex,

Defendants were able to justify pricing Celebrex significantly higher than the cost of generic

aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth

about Celebrex, Defendants would not and could not have reaped the billions of dollars in

Celebrex sales that were achieved as a direct result of the concealment, omission, suppression,

and obfuscation of the truth.

72. The Defendants intentionally, deliberately, knowingly, and actively concealed,

omitted, suppressed, and obfuscated important and material information regarding the risks,

dangers, defects, and disadvantages of Celebrex from Decedent, the public, the medical

community, and the regulators. This concealment and omission was deliberate, knowing, active,

and uniform, was intended to induce and maximize sales and purchases of Celebrex, and

prevented Decedent from obtaining all the material information that would be important to his

decision as a reasonable person to purchase, pay for, and/or use Celebrex.

73. Defendants' systematic, active, knowing, deliberate, and uniform concealment,

omissions, suppression, and conduct caused Decedent to purchase, pay for, and/or use Celebrex;

and caused Decedent's losses and damages as asserted herein.

74. Had Defendants done adequate testing prior to approval and "market launch," the

Defendants' scientific data would have revealed significant increases in stroke and myocardial

infarction amongst the intended population of Celebrex consumers. Adequate testing would

have shown that Celebrex possessed serious side effects. Defendants should have taken

appropriate measures to ensure that their defectively designed product would not be placed in the

stream of commerce and/or should have provided full and proper warnings accurately and fully

reflecting the scope and severity of symptoms of those side effects.

21

75. In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

76. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch," and active concealment and failure to warn the medical community and general public of the known cardiovascular risks of Celebrex was particularly negligent, reckless and/or malicious given the drug's known target market. Defendants were well aware that most patients taking Celebrex are elderly and have higher risk of developing cardiovascular risks to begin with. Nearly half of the patients with arthritis have coexisting cardiovascular disease, and most patients, as discovered in the CLASS study, were prone to higher dosing.

77. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

78. At the time Defendants manufactured, advertised, and distributed Celebrex to consumers including Decedent, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarction because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAID drugs.

79. At the time Decedent was given Celebrex, he was not warned or aware of the serious and debilitating health effects of taking Celebrex because no warnings were communicated to him or to his physician by Defendants.

22

80. Defendants acted with conscious and wanton disregard for the health and safety of John B. Gagliardo, in particular, and the public in general. Therefore, Plaintiff and the statutory beneficiaries stated herein are entitled to an award of additional damages for the sake of example and for the purpose of punishing defendants for the conduct, in an amount sufficiently large to be an example to others and to deter defendants and others from engaging in similar conduct in the future. The above-described wrongful conduct was done with knowledge, authorization and ratification of the officers, directors, managing agents and/or employees of defendants.

<u>COUNT I</u>

<u>NEGLIGENCE</u>

81. Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

82. Defendants owed all individuals purchasing Celebrex in the ordinary stream of commerce, including Decedent, the duty of reasonable care and safety. Defendants' duties included but were not limited to taking all reasonable and necessary care to 1) properly design, test and manufacture Celebrex; 2) safeguard individuals from hazards of Celebrex it knew or should have known about; 3) discover latent defects or hazards of the product; 4) ensure the drug was safe and effective; 4) inform the public and those prescribing Celebrex of the potential hazards of the drug, including the risk of cardiovascular accidents.

83. Defendants breached said duties in that Celebrex was defective, unreasonably dangerous and hazardous in one or more of the following ways:

   (a)   The drug failed to include adequate warnings that would alert consumers and physicians to the potential risks and serious side effects of the drug;

23

    (b)    Defendants failed to adequately and properly test the drug before placing the drug on the market;

    (c)    Defendants failed to conduct sufficient testing on the drug, which, if properly performed, would have showed that the drug had serious side effects including, but not limited to, adverse cardiac and cardiovascular events;

    (d)    Defendants failed to adequately warn Decedent that the testing that was done revealed an increased risk of adverse cardiac and cardiovascular events related to this class of drugs;

    (e)    Defendants failed to adequately warn Decedent that the use of the drug carried a risk of temporary or permanent disability or death due to adverse cardiovascular events and other serious side effects;

    (f)    Defendants failed to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the drug;

    (g)    Defendants encouraged misuse and overuse of the drug while downplaying the side effects to doctors and the public and by overstating the benefits of Celebrex in order to make a profit from its sale.

84. Defendants knew or should have known that the drug caused unreasonably dangerous risks and serious side effects of which the Decedent would not be aware. Defendants nevertheless advertised, marketed, sold and distributed the drug knowing that there were safer methods for treatment.

85. Defendants knew or should have known that consumers, like Decedent, would suffer injury as a result of their failure to exercise ordinary care as described above.

24

86. As a direct and proximate result of the negligence of Defendants, Decedent, with no contributory negligence on his part, suffered serious and permanent injuries including, but not limited to, a heart attack, and death.

87. As a further direct and proximate result of Defendants' negligence, Decedent, with no contributory negligence on his part, was caused to suffer severe physical and emotional pain and suffering, mental anguish, loss of capacity for the enjoyment of life, fear of death, and death.

88. At all times relevant hereto, Defendants actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits a wanton or reckless disregard for human life and public safety and such an entire want of care as to establish that their actions were a result of fraud, actual malice, and the conscious and deliberate disregard of foreseeable harm to consumers, including Decedent. Therefore, Plaintiff and the statutory beneficiaries stated herein are entitled to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.   For $10,000,000 in compensatory damages;

B.   For $20,000,000 in punitive damages;

C.   For compensation for medical, incidental and hospital expenses;

D.   For compensation for funeral and other Estate expenses;

E.   For interest and costs;

F.   For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff and the statutory beneficiaries stated herein have an effective remedy; and

25

G.    For such further relief as this Court deems necessary, just and proper.

## COUNT II

### (Strict Products Liability -- Failure To Warn)

89. Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

90. Celebrex was defective and unreasonably dangerous when they left the possession of Defendants in that it contained warnings insufficient to alert consumers, including Plaintiff's Decedent, to the dangerous risks and reactions associated with the drug including, but not limited to, adverse cardiac events, cerebrovascular accidents and other serious and life-threatening side effects.

91. Plaintiff's Decedent used the drug for its intended purposes in a manner reasonably anticipated without knowledge of its defective and dangerous characteristics.

92. Decedent was an ordinary consumer and user of the product sold, distributed, supplied, manufactured, designed, developed, marketed and/or promoted by Defendants and, therefore, it was foreseeable that Plaintiff's Decedent would purchase and use the product as indicated herein.

93. The warnings that were given by Defendants were not accurate or clear, but were inadequate as to the frequency, character, severity, and spectrum of injuries caused by Celebrex.

94. Defendants had a continuing duty to warn Plaintiff's Decedent of the dangers associated with the drug.

95. As a direct and proximate result of the Defendants' failure to warn, Plaintiff's Decedent sustained serious and permanent injuries including, but not limited to heart attack and other physical injuries; mental anguish, severe pain and suffering, fear of death; and death.

26

```
**********************
***   TX REPORT   ***
**********************

TRANSMISSION OK

TX/RX NO               2420
RECIPIENT ADDRESS      12027393001
DESTINATION ID
ST. TIME               03/22 13:33
TIME USE               01'08
PAGES SENT              2
RESULT                 OK
```

This telecopy transmission contains confidential information belonging to the Law Offices of Peter G. Angelos, P.C. that is intended solely for the recipient named above. The Law Offices of Peter G. Angelos HEREBY EXPRESSLY PRESERVES AND ASSERTS ALL PRIVILEGES AND IMMUNITIES APPLICABLE TO THIS TRANSMISSION. If you are not either the intended recipient or an agent or employee of the intended recipient, this transmission was sent to you in error. Any review, examination, use, disclosure, reproduction, or distribution of this transmission or the information herein stated by anyone other than the intended recipient is STRICTLY PROHIBITED. If you have received this transmission in error, please read no further than this cover sheet and immediately telephone the sender to arrange for the return of this transmission to the Law Offices of Peter G. Angelos, P.C.

## Confidentiality Notice

*Please call*

COMMENTS:

Pages          :  _2_   Including cover sheet

Fax No. :

Date:          3-22-07

From:          *Samuel Vagt*

To:            *Bruce Rheedie*
               *for Stephen*

F A X

S H E E T

96. At all times relevant hereto, Defendants actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the products so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff's Decedent. Therefore, Plaintiff and the statutory beneficiaries stated herein are entitled to punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.   For $10,000,000 in compensatory damages;

B.   For $20,000,000 in punitive damages;

C.   For compensation for medical, incidental and hospital expenses;

D.   For compensation for funeral and other Estate expenses;

E.   For interest and costs;

F.   For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff and the statutory beneficiaries stated herein have an effective remedy; and

G.   For such further relief as this Court deems necessary, just and proper.

## COUNT III

### (Strict Product Liability Design Defect)

97. Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

27

98. At all times material hereto, Defendants engaged in the business of selling, distributing, supplying, marketing, manufacturing, developing, designing and promoting the drug Celebrex in the course of Defendants' businesses.

99. Defendants sold the product Celebrex, which was ingested by Plaintiff's Decedent, as described in this Complaint.

100. Celebrex, as manufactured by Defendants, was defective at the time it was sold by the defendants and/or left Defendants' control.

101. The Celebrex ingested by Plaintiff's Decedent, was expected to and did reach the user, Decedent without substantial change from how it was sold.

102. Plaintiff's Decedent was a person who would be reasonably expected to consume the product and who did consume the product in a manner reasonable anticipated by Defendants.

103. Celebrex when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendants was unreasonably dangerous when put to a reasonably anticipated use as said product causes or contributes to serious adverse cardiac and cerebrovascular events including, but not limited to heart attack, cerebrovascular accident and hypertension.

104. Celebrex, when sold, distributed, supplied, manufactured, designed, developed, marketed and promoted by Defendants was defective when it left the hands of the Defendants in that said product was more dangerous than the ordinary user or consumer would expect.

105. At all times material hereto, Celebrex was sold, distributed, supplied, manufactured, designed, developed, marketed and/or promoted by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following particulars:

28

    (a)    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and were not reasonably safe as intended to be used, subjecting Decedent to risks which exceeded the benefits of the drug;

    (b)    When placed in the stream of commerce, the drug was defective in design and formulation, making its use more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with other treatments for pain relief that were available;

    (c)    The drug was insufficiently tested;

    (d)    The drug caused harmful side effects which outweighed any potential utility;

    (e)    The drug was not accompanied by adequate instructions and/or warnings to fully apprise the consumers, including Decedent, of the full nature or extent of the risks and side effects associated with its use.

106.    As a direct and proximate result of the defective design of Defendants' product, Plaintiff's Decedent sustained serious injuries, including, but not limited to, heart attack and other physical injuries; mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses, physicians, hospitals, medical and nursing care and treatment; and death.

107.    At all times relevant hereto, Defendants actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product

so as to maximize sales and profits at the expense of public health and safety. Defendants'

conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as

to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious

and deliberate disregard of foreseeable harm to the Plaintiff's Decedent. Therefore, Plaintiff and

the statutory beneficiaries stated herein are entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants Pfizer, Pharmacia,

Monsanto, and Searle and prays for relief as follows:

     A.  For $10,000,000 in compensatory damages;

     B.  For $20,000,000 in punitive damages;

     C.  For compensation for medical, incidental and hospital expenses;

     D.  For compensation for funeral and other Estate expenses;

     E.  For interest and costs;

     F.  For such other extraordinary, declaratory and/or injunctive relief as permitted

        by law as necessary to assure that Plaintiff and the statutory beneficiaries

        stated herein have an effective remedy; and

     G.  For such further relief as this Court deems necessary, just and proper.

## COUNT IV

### (Fraud)

108.    Plaintiff repeats and incorporates by reference all other paragraphs of the

Complaint as if fully set forth herein.

109.    Defendants concealed facts regarding Celebrex from the consuming public,

including Plaintiff's Decedent, which they had a duty to disclose.

30

110.    The facts concealed and not disclosed include, but are not limited to, those set forth in the general allegations of this Complaint.

111.    Each of the facts concealed and not disclosed was material.

112.    Defendants concealed material facts to the consuming public with the intent that the consuming public, like Plaintiff's Decedent, would take a course of action that it would otherwise not have taken if it had been informed of the actual facts known to Defendants, including, but not limited to, the totality of the risks associated with the ingestion of Celebrex.

113.    Plaintiff's Decedent and her prescribing physician's reliance upon Defendants' misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Celebrex.  Defendants aggressively marketed the use of Celebrex and concomitantly downplayed the risks, inducing her physician to prescribe the drug and inducing Plaintiff's Decedent to use the drug.

114.    Plaintiff's Decedent took such action relying on the assumption that the undisclosed facts did not exist and/or were different than they actually were.

115.    As a direct and proximate result of Plaintiff's Decedent's reliance on the incomplete and inaccurate information communicated by Defendants, and his assumption that the non-disclosed facts about the risks associated with the use of Celebrex did not exist, Plaintiff's Decedent sustained serious and permanent injuries including, but not limited to heart attack and other physical injuries; disability, mental anguish, severe pain and suffering; fear of death, loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

31

116.    At all times relevant hereto, Defendants actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety.  Defendants' conduct exhibits a wanton or reckless disregard for human life and such an entire want of care as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable harm to Plaintiff's Decedent.  Therefore, Plaintiff and the statutory beneficiaries stated herein are entitled to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.    For $10,000,000 in compensatory damages;

B.    For $20,000,000 in punitive damages;

C.    For compensation for medical, incidental and hospital expenses;

D.    For compensation for funeral and other Estate expenses;

E.    For interest and costs;

F.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff and the statutory beneficiaries stated herein have an effective remedy; and

H.  For such further relief as this Court deems necessary, just and proper.

## COUNT V

### (Breach of Express Warranties)

117.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

32

118.    Celebrex, which was designed, tested, manufactured, distributed, promoted and sold by Defendants, were expected to, and did, reach Plaintiff's Decedent, without a substantial change in its condition.

119.    Defendants, through, but not limited to, their labeling, package inserts, submissions to the FDA, advertising and promotional materials, expressly warranted that Celebrex was safe for the use for which it was intended, namely as a pain relief medication.

120.    Defendants breached said express warranties in that Celebrex was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, adverse cardiac events and cerebrovascular accidents.

121.    Plaintiff's Decedent relied to his detriment on the express warranties of Defendants.

122.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiff's Decedent sustained serious injuries including, but not limited to, heart attack and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

WHEREFORE, Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.    For $10,000,000 in compensatory damages;

B.    For compensation for medical, incidental and hospital expenses;

C.    For compensation for funeral and other Estate expenses;

D.    For interest and costs;

33

E.      For such other extraordinary, declaratory and/or injunctive relief as

permitted by law as necessary to assure that Plaintiff and the statutory

beneficiaries stated herein have an effective remedy; and

F.      For such further relief as this Court deems necessary, just and proper.

### COUNT VI

### (Breach of Implied Warranties)

123.    Plaintiff repeats and incorporates by reference all other paragraphs of the

Complaint as if fully set forth herein.

124.    Celebrex, which was designed, tested, manufactured, distributed, promoted and

sold by Defendants, was expected to, and did, reach Plaintiff's Decedent, without a substantial

change in its condition.

125.    Defendants, through, but not limited to, their labeling, package inserts,

submissions to the FDA, advertising and promotional materials, impliedly warranted that

Celebrex was of merchantable quality and safe for the use for which it was intended, namely as a

pain relief medication.

126.    Defendants breached said implied warranties in that Celebrex was unsafe in light

of the risk of life-threatening side effects associated with its use, including, but not limited to,

adverse cardiac events and cerebrovascular accidents.

127.    Plaintiff's Decedent reasonably relied, to his detriment, on the implied warranties

of Defendants.

128.    As a direct and proximate result of Defendants' breach of implied warranties,

Plaintiff's Decedent sustained serious injuries including, but not limited to, heart attack and other

physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the

34

enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

WHEREFORE, Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.  For $10,000,000 in compensatory damages;

B.  For compensation for medical, incidental and hospital expenses;

C.  For compensation for funeral and other Estate expenses;

D.  For interest and costs;

E.  For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff and the statutory beneficiaries stated herein have an effective remedy; and

F.  For such further relief as this Court deems necessary, just and proper.

## COUNT VII

### (Unfair Trade Practices)

129.  Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein.

130.  Defendants actions as stated herein violated and continue to violate the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*

131.  Plaintiff's Decedent was a purchasing consumer of Celebrex, and was entitled to protection under the Unfair Trade Practices and Consumer Protection Law 73 P.S. § 201-1 *et seq.*

132.  Plaintiff is entitled to bring this private action in accordance with 73 P.S. §201-9.2.

35

133.   Defendants advertised, marketed, distributed, and sold Celebrex by misrepresenting its safety and concealing the risks of adverse cerebrovascular and cardiac events associated with their product, which were known to Defendants.

134.   Defendants failure to disclose the risks associated with the drug while continuing to market and sell Celebrex amounts to unfair, deceptive, and fraudulent conduct which they knew would create a likelihood of confusion and misunderstanding, thereby misleading consumers like Plaintiff's Decedent and inducing them to purchase Celebrex in reliance on such deception.

135.   As a direct and proximate result of Defendants' violation of the Unfair Trade Practices and Consumer Protection Law, Plaintiff's Decedent sustained serious injuries including, but not limited to, heart attack, and other physical injuries; disability, mental anguish, severe pain and suffering; loss of capacity for the enjoyment of life; expenses of medication, physicians, hospitals, medical and nursing care and treatment; and death.

136.   At all times relevant hereto, Defendants actually knew of the defective nature of the product as herein set forth and continued to design, manufacture, market and sell the product so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct exhibits a wanton or reckless disregard for human life and public safety and such an entire want of care as to establish that their actions were a result of fraud, actual malice, and the conscious and deliberate disregard of foreseeable harm to consumers, including Decedent. Therefore, Decedent is entitled to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.   For $10,000,000 in compensatory damages;

36

B.    For $20,000,000 in punitive damages;

C.    For compensation for medical, incidental and hospital expenses;

D.    For compensation for funeral and other Estate expenses;

E.    For interest, costs, and reasonable attorneys fees recoverable under 73 PS §201.9.2;

F.    For such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that that Plaintiff and the statutory beneficiaries stated herein have an effective remedy including but not limited to treble damages as is provided by 73 PS §201.9.2;

G. For such further relief as this Court deems necessary, just and proper.

## COUNT VIII

### (Wrongful Death)

137.    Plaintiff repeats and incorporates by reference all other paragraphs of the Complaint as if fully set forth herein. By doing so, Plaintiff incorporates the counts of Negligence, Strict Liability, and Fraud pursuant to the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301 *et seq.*

138.    As a direct and proximate result of Defendants' Acts, omissions, failures, breaches of warranty, duty and law as alleged above, Plaintiff's Decedent developed acute cardiovascular problems and conditions which caused him extreme pain, suffering, mental anguish, and death on September 27, 2005.

139. Plaintiff is the Executrix of the Estate of John B. Gagliardo, deceased, having been duly appointed as such by the Register of Wills in and for the Monroe County, Stroudsburg, Pennsylvania on March 1, 2005.

37

140. Plaintiff brings this civil action pursuant to the Pennsylvania Wrongful Death Act, 42 Pa.S.C. § 8301, et seq. on behalf of the statutory beneficiaries set forth in paragraph 134 below.

 141. Decedent did not bring any action for the damages and injuries alleged in this cause of action during his lifetime.

142. Decedent, John B. Gagliardo, was survived by the following statutory beneficiaries:

| Name | Address | Relationship |
|---|---|---|
| Jane A. Gagliardo | 113 W. Broad Street<br>Estbg, PA 18301 | spouse |
| Joseph Gagliardo | 10807 Marot Field<br>Helotes, Texas 78023 | son |
| John Gagliardo | 117 Ward Street<br>Watertown, New York 13601 | son |
| Anthony Gagliardo | 824 Park Avenue, Apt. 1<br>Hoboken, New Jersey 07030 | son |

 143. More than six months have elapsed since decedent's death and no other action for wrongful death of the decedent has been commenced against Defendants.

 144. This action is brought to recover, on behalf of the said statutory beneficiaries, all damages legally available under the Pennsylvania Wrongful Death Act.

 145. As a direct, foreseeable and proximate result of the wrongful death of Plaintiff's Decedent, the statutory beneficiaries set forth herein have suffered pecuniary losses including but not limited to loss of society and have incurred medical bills and funeral expenses.

 146. As a direct, foreseeable and proximate result of the wrongful death of Plaintiff's Decedent and his resulting loss of income, the statutory beneficiaries have suffered pecuniary losses and loss of financial benefits.

**WHEREFORE**, Plaintiff, on behalf of the statutory beneficiaries, demands judgment against Defendants Pfizer, Pharmacia, Monsanto, and Searle and prays for relief as follows:

A.  For $20,000,000 in compensatory damages;

B   For compensation for medical, incidental and hospital expenses;

C   For compensation for funeral and other Estate expenses;

D   For interest and costs;

E.  Such other extraordinary, declaratory and/or injunctive relief as permitted by law as necessary to assure that Plaintiff and the statutory beneficiaries stated herein have an effective remedy; and

F. For such further relief as this Court deems necessary, just and proper.

James T. Fitzgerald (Fed Bar # 43178)

**LAW OFFICES OF PETER G. ANGELOS, P.C.**
100 North Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: 410-649-2000
Facsimile: 410-649-2101
Attorneys for Plaintiff

## REQUEST FOR JURY TRIAL

Plaintiff, by undersigned counsel, hereby request a jury trial on all counts in this action.

James T. Fitzgerald

39