Elizabeth J. Cabraser
ecabraser@lchb.com
Scott P. Nealey
snealey@lchb.com
LIEFF, CABRASER, HEIMANN, & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Plaintiffs' Liaison Counsel*

Steve W. Berman
steve@hbsslaw.com
Lisa Hasselman
lisah@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Plaintiffs' Purchaser Counsel*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING, SALES PRACTICES, AND PRODUCT LIABILITY LITIGATION | No. M:05-CV-01699-CRB <br><br> MDL No. 1699 |
| THIS RELATES TO: <br><br> ALL PURCHASER CASES | NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT <br><br> Date:  September 25, 2009 <br> Time:  10:00 a.m. <br> Judge:  Hon. Charles R. Breyer <br> Courtroom:  8, 19th Floor |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 25, 2009, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of The Honorable Charles R. Breyer, United States District Judge, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move the Court to finally approve the proposed class action settlement.

This application is based on this Notice of Motion and Motion and Motion for Final Approval of Class Action Settlement, the Memorandum of Points and Authorities in support thereof, the Settlement Agreement and Release, the Declaration of Steve W. Berman In Support of Motion for an Award of Attorney Fees, Reimbursement of Expenses and Compensation to Named Plaintiffs and Motion for Final Approval and Exhibits thereto ("Berman Decl."), the Declaration of Katherine Kinsella and Exhibits thereto, the Declaration of Eric Miller and Exhibits thereto, the pleadings and papers on file in this action, and such oral and documentary evidence as may be presented at the hearing on the Motion.

Dated:  August 14, 2009.                    HAGENS BERMAN SOBOL SHAPIRO LLP


By   /s/ Steve W. Berman
    Steve W. Berman
    steve@hbsslaw.com
    Lisa Hasselman
    lisah@hbsslaw.com
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone:  (206) 623-7292
    Facsimile:  (206) 623-0594

COTCHETT, PITRE & McCARTHY

Frank M. Pitre
fpitre@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

*Purchaser Plaintiffs' Counsel*

## MEMORANDUM OF POINTS AND AUTHORITIES

### TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ...................................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND .............................................. 1

    A.    Brief Summary of Facts and Claims ........................................................... 1

    B.    The Litigation .............................................................................................. 2

        1.    Pleading, Motion Practice and Discovery ....................................... 2

        2.    Mediation and Settlement ................................................................ 5

    C.    The Settlement Agreement .......................................................................... 7

    D.    Notice to Class Members ............................................................................. 8

    E.    Claims and Settlement Administration ........................................................ 9

III.   ARGUMENT ......................................................................................................... 10

    A.    The Settlement Should be Approved as Fair, Reasonable and Adequate ................. 10

        1.    The Strength of Plaintiffs' Case ..................................................... 11

        2.    The Risk, Expense, Complexity and Likely Duration of Further Litigation ............................................................................ 13

        3.    The Risk of Maintaining Class Action Status Throughout the Trial .............. 15

        4.    The Amount Offered in Settlement ................................................ 15

        5.    The Extent of Discovery Completed and the Stage of the Proceedings .......... 18

        6.    The Experience and Views of Counsel .......................................... 19

        7.    The Reaction of the Class Members to the Proposed Settlement ................... 20

        8.    Absence of Collusion in the Settlement Process ............................ 21

    B.    The Settlement Class Should be Finally Certified ...................................... 21

        1.    The Settlement Classes Satisfy the Prerequisites of Rule 23(a) ..................... 21

        2.    The Settlement Classes Satisfy the Prerequisites of Rule 23(b)(3) ................ 24

    C.    The Court Should Appoint Plaintiffs' Counsel as Class Counsel .............. 25

IV.    CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. v. Windsor, Inc.*,
   521 U.S. 591 (1997) ....................................................................................21

*American Booksellers Ass'n v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...................................................... 13

*In re Automotive Refinishing Paint Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 29161 (E.D. Pa. Sept. 27, 2004) ............................ 17

*In re Bextra & Celebrex Mktg., Sales & Prod. Liab. Litig.*,
   391 F. Supp. 2d 1377 (J.P.M.L. 2005) .......................................................... 2

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979) ..............................................................21

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .................................................................................... 13

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) ..............................................................23

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ........................................................................ 17

*Churchill Village, L.L.C. v. GE*,
   361 F.3d 566 (9th Cir. 2004) ....................................................................... 10

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ..................................................................... 10

*Fisher Brothers v. Mueller Brass Co.*,
   630 F. Supp. 493 (E.D. Pa. 1985).................................................................17

*Fisher Brothers v. Phelps Dodge Indus., Inc.*,
   604 F. Supp. 446 (E.D. Pa. 1985).................................................................17

*General Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) .....................................................................................23

*Glass v. UBS Fin. Servs., Inc.*,
   2007  WL 221862 (N.D. Cal. Jan. 26, 2007)................................................21

*Government Employees Hosp. Ass'n, et al. v. Serono*,
   C.A. No. 05-cv-11935 (D. Mass. Dec. 12, 2007)........................................ 18

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ..............................................................*passim*

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) .......................................................................23

*Hanrahan v. Britt,*
    174 F.R.D. 356 (E.D. Pa.1997) ...................................................................... 19

*Harris v. Palm Springs Alpine Estates, Inc.,*
    329 F.2d 909 (9th Cir. 1964) ........................................................................ 22

*In re Heritage Bond Litig.,*
    2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ............................ 10

*Hoorman v. SmithKline Beecham,*
    Case No. 04-L-715 (Madison County, IL) ..................................................... 18

*In re Linerboard Antitrust Litig.,*
    321 F. Supp. 2d 619 (E.D. Pa. 2004) ............................................................ 17

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    202 F.R.D. 12 (D.D.C. 2001) ......................................................................... 23

*In re Lupron Mktg. & Sales Practices Litig.,*
    228 F.R.D. 75 (D. Mass. 2005) ................................................................ 17, 22

*McGlinchy v. Shell Chem. Co.,*
    845 F.2d 802 (9th Cir. 1988) ........................................................................ 13

*McPhail v. First Command Finance Planning, Inc.,*
    2007 WL 2207761 (S.D. Ca. July 30, 2007) ............................................ 22, 23

*In re Mego Fin. Corp. Sec. Litig.,*
    213 F.3d 454 (9th Cir. 2000) ........................................................................ 15

*National Rural Telcoms Coop. v. DIRECTV,*
    221 F.R.D. 523 (C.D. Cal. 2004) ......................................................... 15, 19, 20

*In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.,*
    2009 U.S. Dist. LEXIS 65526 (D. Mass. May 13, 2009) .............................. 14

*Nichols v. SmithKline Beecham Corp. ("Paxil Litigation"),*
    2005 WL 950616 (E.D. Pa. Apr. 22, 2005) .............................................. 16, 17

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir. 1982) ................................................................ 10, 11, 18

*In re Pacific Enterprises Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) .......................................................................... 19

*Pennsylvania Employees Benefit Trust Fund v. AstraZeneca Pharms. LP,*
    2009 WL 2231686 (M.D. Fla. July 20, 2009) .......................................... 11, 12

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    No. 01-cv-12257-PBS (D. Mass. Aug. 7, 2007) ........................................... 18

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    No. 01-cv-12257-PBS (D. Mass. Oct. 7, 2008) ............................................ 18

*In re Plastic Tableware Antitrust Litig.*,
    1995 U.S. Dist. LEXIS 17014 (E.D. Pa. Oct. 25, 1995) (3.5% of sales) ......................... 17

*Rodriguez v. West Publ'g Co.*,
    563 F.3d 948 (9th Cir. 2009) ............................................................................. 13, 14, 15

*Rodriguez v. West Publ'g Corp.*,
    2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007), ) *aff'd in part, reversed in
    part on other grounds*, 2009 U.S. App. LEXIS 8680 (9th Cir. Apr. 23, 2009) ............... 15

*In re Rubber Chems. Antitrust Litig.*,
    No. C-04-1648 MJJ, Order, (N.D. Cal. Jan. 9, 2007) ........................................................ 17

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    2009 WL 2043604 (D.N.J. July 10, 2009) ........................................................................ 11

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................................ 23

*In re Synthroid Mktg. Litig.*,
    188 F.R.D. 287 (N.D. Ill. 1999) ....................................................................................... 18

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ........................................................................................ 8, 10

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*,
    122 F.R.D. 251 (C.D. Cal. 1988) ...................................................................................... 24

*Van Bronkhorst v. Safeco Corp.*,
    529 F.2d 943 (9th Cir. 1976) ............................................................................... 14, 18, 19

*Vernon v. Southern Cal. Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) ......................................................................................... 13

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ............................................................................. 13, 18, 23

*Weinberger v. Jackson*,
    102 F.R.D. 839 (N.D. Cal. 1984) ..................................................................................... 24

*Westways World Travel, Inc. v. AMR Corp.*,
    218 F.R.D. 223 (C.D. Cal. 2003) ...................................................................................... 22

*Wilson v. Airborne, Inc.*,
    2008 WL 3854963 (C.D. Cal. Aug. 13, 2008) .................................................................. 20

## RULES

Fed. R. Civ. P. 23 .....................................................................................................*passim*

## MISCELLANEOUS

1 NEWBERG ON CLASS ACTIONS § 3:13 .................................................................................. 23

# I.   INTRODUCTION

Plaintiffs submit this motion for final approval of the purchaser class actions brought on behalf of nationwide consumers and third party payors who allege they paid for Bextra and/or Celebrex instead of less expensive alternatives because of Defendants' ("Pfizer's") false marketing. After months of intensive, arm's-length negotiations, conducted with the assistance of the Honorable Fern Smith (Ret.) and Professor Eric Green, the parties have agreed to a settlement of all claims asserted against Pfizer. The Settlement Agreement will produce real and substantial benefits for the affected class, and constitutes a satisfactory resolution of a case of substantial complexity.[1] Among other terms, the settlement provides for the payment of $89 million to the class (including $4 million for notice and claims administration costs).

Plaintiffs hereby move the Court for final approval of the settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The settlement is fair, reasonable and adequate, and was reached after over three years of litigation and months of intensive negotiations. Accordingly, Plaintiffs ask the Court to enter the Proposed Order filed concurrently (a) granting final approval of the proposed settlement; (b) certifying the proposed plaintiff classes pursuant to Rule 23(b)(3) for purposes of the settlement; and (c) appointing the Named Plaintiffs and their counsel as lead plaintiffs and class counsel, respectively.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Brief Summary of Facts and Claims

Non-steroidal anti-inflammatory drugs ("NSAIDs") have been widely used to treat arthritis, acute and chronic pain for decades. NSAIDs, however, have certain side effects, including gastrointestinal toxicity. Defendants ("Pfizer") developed Celebrex and Bextra as advanced NSAIDs called COX-2 inhibitors. The hope was that Celebrex and Bextra would have fewer gastrointestinal side effects than traditional NSAIDs because of their alleged COX-2 inhibition. Such a breakthrough would be worth billions in drug sales.

---

[1] "Settlement Agreement" refers to the agreement attached as Exhibit A to the Declaration of Steve W. Berman in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, filed March 13, 2009, Dkt. #2739-2. Unless otherwise indicated, all terms used herein shall have the same meaning as set forth in the Settlement Agreement.

1  Pfizer promoted the use of Celebrex and Bextra in information disseminated to doctors,

2  Pharmacy Benefit Managers ("PBMs"), third-party payors and consumers.  Pfizer promoted both

3  COX-2 drugs as "breakthroughs" providing important clinical advantages over older and less

4  expensive NSAIDs.  Plaintiffs allege, however, that Defendant was never able to establish that

5  Celebrex or Bextra was any more efficacious or safer than traditional NSAIDs.  As a result of

6  Defendants' scheme, they were able to create a market for both Celebrex and Bextra and to sell

7  each at a premium price over NSAIDs.  Plaintiffs alleged that if Defendants had not engaged in the

8  wrongful marketing, advertising and promotion of Bextra and Celebrex, Plaintiffs and Class

9  members would have paid for other, equally effective and less expensive medications or would

10  have purchased no medication at all.

11  **B.      The Litigation**

12  Purchaser Counsel's representation of the Class presented unique challenges to the

13  litigation, coordination, and settlement of the claims against Pfizer.  Purchaser Counsel

14  successfully addressed and resolved these challenges throughout the prosecution and settlement of

15  this litigation, resulting in an excellent recovery for the Class.

16  **1.      Pleading, Motion Practice and Discovery**

17  This litigation began in January 2005 when Hagens Berman Sobol Shapiro filed the first

18  class purchaser complaint.  Berman Decl. ¶ 13.  Multiple other class purchaser complaints were

19  filed in different jurisdictions by Purchaser Counsel.  *Id.*  All related actions were transferred to this

20  Court on September 6, 2005.  *In re Bextra & Celebrex Mktg., Sales & Prod. Liab. Litig.*, 391 F.

21  Supp. 2d 1377 (J.P.M.L. 2005).  Pursuant to the authority granted Pretrial Order No. 2, ¶ 22, a

22  Purchase Claims Committe was formed to manage and oversee the pending purchase claims.  Dkt.

23  #110.  Besides managing and participating in the Purchase Claims Committee, Purchaser Counsel

24  participated as members of the Plaintiffs Steering Committee, Science Committee and Discovery

25  Committee on issues relevant to the purchase claims.  Berman Decl. ¶ 13.

26  Purchaser Plaintiffs filed master complaints for Bextra and Celebrex alleging claims under

27  the Racketeer Influenced and Corrupt Organizations Act (RICO), state consumer protection laws,

28

unjust enrichment, and implied warranty.[2] Dkt. #s 192 and 193. On April 5, 2006, Defendants

moved to dismiss the complaints arguing that the claims were preempted by federal law, the

complaints failed to state claims and multiple other grounds.   Dkt. #s 222 and 225.  The Court

addressed only the preemption arguments, concluding,

> Plaintiffs' claims that Pfizer's promotion of Celebrex [and Bextra]
> was unlawful because it failed to warn of the drug's cardiovascular
> risk are preempted because they conflict with the FDA's
> determination of what warnings are substantiated by the scientific
> evidence.  Accordingly, the failure-to-warn of cardiovascular risk
> claims are dismissed with leave to amend.  Pfizer has not established
> that the FDA has determined that all of Pfizer's promotion martial
> strikes a 'fair balance' and are not false and misleading.
> Accordingly, Pfizer's motion to dismiss the false advertising claims
> on conflict preemption grounds is denied.

8/16/06 Memorandum and Order re Motion to Dismiss, Dkt. #497, *see also*, Dkt. #509.

Plaintiffs' first amended complaints, filed September 22, 2006, contained the four original

claims, but were amended according to the Court's motion to dismiss ruling.  Dkt. #s 588 and 589.

Defendant again responded with motions to dismiss.  Instead of an opposition motion, Plaintiffs

agreed to voluntarily withdraw without prejudice their claims under RICO.  Plaintiffs' second

amended master complaints, filed January 5, 2007, dropped the RICO.  Dkt. #s 858 and 859.

The Defendant filed its third and final round of motions to dismiss arguing standing, *res

judicata* and failure to state a claim.  This Court granted in part (dismissing claims of association

class reps who did not pay for Celebrex and Bextra, implied warranty and certain allegations under

state consumer protection statutes) and denied in part (complaints sufficiently plead causation and

injury in fact) the motion.   Dkt. #s 1498 and 1532.  Specifically, the Court concluded,

> [a] reasonable inference from the [Second Amended Complaints']
> allegations is that the consumer plaintiffs' physicians prescribed
> Celebrex [and Bextra], and the third-party payors paid for it, because
> of defendants' widespread alleged misrepresentations about its
> superiority to less expensive NSAIDs.  Accordingly, defendants'
> motion to dismiss the state consumer protection claims is DENIED
> as is the motion to dismiss the unjust enrichment claims.  As
> plaintiffs have not and cannot allege the manifestation of a defect

---

[2] Throughout the purchaser litigation, Hagens Berman Sobol Shapiro led the drafting of
pleadings and assigned portions of those tasks to co-counsel.  Having one firm responsible for all
aspects of the purchaser litigation prevented the duplication of work product and streamlined the
process for responding to emerging issues.  Berman Decl. ¶ 14.

defendants' motion to dismiss the breach of implied warranty claims is GRANTED without leave to amend.

Dkt. #1532.  On July 24, 2007, Plaintiffs filed the currently operative Third Amended Master Complaints alleging claims under state consumer protection laws and unjust enrichment.  Dkt. #s 1586 and 1587.  On August 31, 2007, Defendant filed answers.  Dkt. #s 1804 and 1805.

Throughout this briefing process, the parties were involved in extensive discovery.  Berman Decl. ¶15. Purchaser Counsel were instrumental in the review of millions of documents produced by the Defendants, including participation in the oversight of the document review process, training and supervision of document reviewers, document preparation for depositions, and organization of document collections.  *Id.*  Purchaser Counsel participated in multiple discovery disputes regarding Defendant's production.  *Id.*

Purchaser Counsel participated in the over forty common liability depositions of Pfizer's corporate witnesses, either as one of the questioning attorneys or in preparation for the deposition. *Id.* at ¶ 16.  The majority of these depositions lasted two to three days and involved tremendous amounts of preparatory document review because of the large custodial files produced by the defendant for most of the witnesses.[3]

In November 2006, the Court held a science tutorial.  *Id.* at ¶ 17.  Purchaser Counsel participated in preparing an expert, Dr. John Abramson, for the tutorial on the efficacy and gastrointestinal risks of Bextra and Celebrex.   Purchaser Counsel further provided document support to other presenting experts.  *Id.*  Purchaser Counsel played a supportive role throughout the litigation to the expert committee and specific experts, including in preparation for the Daubert proceeding in October 2007, providing documents and information regarding the Defendants' studies in order to understand the science behind Bextra and Celebrex.  This process was relevant to the purchaser litigation in order to prove that Defendants' claims about the drugs were false and that they had knowledge of this falsity.  *Id.*

---

[3] Pfizer regularly produced custodial files that contained millions of pages, including 3,910,899 pages for Gail Cawkwell, 4,456,563 pages for Kenneth Verburg, and 3,919,042 pages for Mona Wahba.  The sheer volume of information provided made deposition preparation time extensive. *Id*.

In February 2007, Pfizer served extensive written discovery requests on the Named Plaintiffs. *Id*. at ¶ 18. Plaintiffs agreed to begin providing responses to the requests on a rolling basis. Responding to the discovery included many hours of document review, redaction of private healthcare information and collection on behalf of the Named Plaintiffs and multiple consultations with counsel to respond to interrogatories. *Id*. Many Plaintiffs collected information from third parties with relevant information. This discovery process risked exposure of confidential and proprietary information and required negotiation every step of the way, despite Plaintiffs position that the vast majority of information sought by Pfizer was irrelevant. *Id*.

Pfizer repeatedly challenged the amount and scope of discovery being produced. *Id*. at ¶ 19. Purchaser Plaintiffs counsel attempted to limit the amount of time and costs in responding by coordinating responses on behalf of all Named Plaintiffs. *Id*. Pfizer's challenges escalated to a motion to compel in March of 2008. The parties were in the midst of this production dispute when the parties agreed to stay discovery for mediation. *Id*.

In an effort to speed resolution of the claims, Purchaser Counsel sought to litigate a bellwether trial with a representative plaintiff. *Id*. at ¶ 20. Although the Special Master eventually, after multiple rounds of correspondence and briefing, recommended against the bellwether, the strategy helped to focus the issues that needed to be addressed at class certification. *Id*. On May 19, 2008, the parties filed a stipulation which would have required Plaintiffs to file their motion for class certification on June 18, 2008. The parties, however, agreed to mediate shortly before that deadline and the Court agreed to stay all further discovery and briefing pending those mediation efforts. *See* Stipulation and Order filed June 20, 2008, Dkt. #2503.

### 2.    Mediation and Settlement

The parties began mediation in earnest in July 2008 under the guidance of two experienced mediators, the Honorable Fern Smith (Ret.) and Professor Eric Green. The mediation process involved three in-person mediation sessions with the mediators and multiple rounds of correspondence. Berman Decl. ¶ 21. Plaintiffs provided an early stage expert opinion on their damages model which estimated Plaintiffs damages at $2.67 billion based on the difference between the price paid for Bextra and the price that would have been paid for much less expensive

naproxen.[4] *Id*. at ¶ 7.  This damages model, however, had yet to be refined and tested and was in its early stages of development.  *Id*. at ¶ 8.  It assumes that all class members would have purchased an inexpensive, non-branded form of naproxen.  This is unlikely as Defendants presented evidence that the biggest increase in sales after Bextra was withdrawn from the market was for a branded prescription drug which was actually more expensive than Bextra.  The damages model further does not account for the benefits that the class received from taking Bextra.  Defendants argued that class members received the benefit of the bargain when they purchased Bextra because it is in fact an effective pain reliever.  The damages model therefore did not take into account the full economic reality of the pharmaceutical market, nor did it account for the substantial risks, as described in detail below, facing the legal and factual underpinnings of Plaintiffs' claims.  There is no question had the case proceeded further that number would have been reduced to account for the issues described above.  *Id*.

Defendants agreed that the Plaintiffs damages model relied on many difficult to prove assumptions.  *Id*. at ¶ 9.  Defendants proposed an alternative damages model arguing that most patients would have purchased a different brand name drug instead of Bextra and because brand name drugs are sold at higher prices (some even higher than Bextra), Plaintiffs' damages were really only between $25 million and $57 million at most.  Based on this estimate of damages, the settlement amount was up to 356% of the damages suffered by the Class.  The settlement amount therefore reflects somewhere between 3.33% and 356% of Plaintiffs' damages.  *Id*.

The arm's-length negotiations culminated in an agreement in principal in October 2008.  After this preliminary settlement was reached, the parties continued to negotiate the terms of the agreement.  This process lasted multiple months with many contested issues relating to the specifics of the agreement including the language of the release and the description of the case to the Class in the notice.  *Id*.

Multiple negotiation sessions were conducted between Purchaser Plaintiffs counsel on behalf of the proposed subclasses.  Separate Plaintiffs' counsel was appointed to represent each

---

[4] Although the mediation involved the claims of both drugs, because of the significant barriers to claims regarding Celebrex, the damages models and discussions focused solely on Bextra.

1  particular subclass to negotiate a Plan of Allocation.  *See* Declarations of Lance Harke, William

2  Riley and Jason Thompson, ¶¶ 4-5, filed in support of Plaintiffs Response to Objections Dkt. #s

3  3103, 3104, and 3105.  Each allocation counsel represented members of their appointed subclass.

4  *Id*.  The negotiations were conducted at arm's-length and multiple issues were contested,

5  compromised and resolved with each subclass being vigorously represented.  *Id*. at ¶ 6.

6  After reaching final agreements on the terms of the settlement and on the plan of allocation,

7  the final settlement agreement and motion for preliminary approval were filed on March 13, 2009.

8  Dkt. #2738.  On March 23, 2009, the Court entered an Order granting preliminary approval of the

9  Settlement, certifying three separate subclasses for settlement purposes and appointing Class

10  Counsel.  Dkt. #2926.

11  **C.     The Settlement Agreement**

12  This settlement is laudable because of the substantial amount of monetary relief,

13  notwithstanding the difficulty of proving damages.  In exchange for said monetary relief, members

14  of the Settlement Class will release all "Released Claims" relating to or arising from the purchase

15  of Bextra and Celebrex during the Class Period.

16  Subject to the Court's approval, the settlement class is defined by its combined three

17  subclasses (collectively, the "Settlement Class"):

18      (1)   <u>Bextra or Bextra and Celebrex Consumer Subclass</u>.  All consumers located in the
19           United States who purchased or paid for prescriptions of Bextra or both Bextra and
         Celebrex.  Class members who purchased or paid for both Bextra and Celebrex will
20           receive compensation based on their Bextra purchases only, in exchange for
         releasing their claims for both Bextra and Celebrex purchases.

21      (2)   <u>Celebrex ONLY Consumer Subclass</u>.  All consumers located in the United States
22           who purchased or paid for prescriptions of Celebrex, but not Bextra, prior to July
         29, 2005.  This class and subclass does not include individuals who only purchased
23           or paid for Celebrex after July 29, 2005.

24      (3)   <u>Bextra and Celebrex Third Party Payor ("TPP") Subclass</u>.  All TPPs, defined as all
         entities that:  (a) provide, sponsor or insure a healthcare plan, which includes
25           prescription drug coverage to natural persons, and (b) purchase, pay or insure all or
         part of the cost of prescription drugs prescribed and dispensed to those persons
26           pursuant to a health plan, located in the United States who reimbursed or paid for
         Bextra and/or Celebrex.  Class members who purchased or paid for both Bextra and
27           Celebrex will receive compensation based on their Bextra purchases only, in
28           exchange for releasing their claims for both Bextra and Celebrex purchases.

Excluded from the proposed Class are Defendants, any entity in which Defendants have a controlling interest or which have a controlling interest in Defendants, and Defendants' legal representatives, predecessors, successors and assigns; the judicial officers to whom this case is assigned; any member of the immediate families of excluded persons; governmental agencies and those who resold Celebrex and/or Bextra, and any consumer who has released his/her claims against Pfizer related to Celebrex and/or Bextra.

Those entities that own or operate businesses referred to commonly as pharmacy benefit managers ("PBMs") or third party administrators ("TPAs") and who as part of their business operation contract with ultimate TPPs of a prescription pharmaceutical benefit to perform certain services in the administration and management of that prescription pharmaceutical benefit for those ultimate TPPs are not Class members under the Settlement Class definition.  The Settlement Class, specifically the Bextra and Celebrex TPP subclass, includes the ultimate TPPs providing the prescription pharmaceutical benefit and not the PBMs or TPAs with which those TPPs contract to administer or manage that prescription benefit on behalf of the Class members, unless such PBMs or TPAs are the fiduciary of the TPPs or by contract assumed, in whole or in party, the insurance risk of that prescription pharmaceutical benefit during the Class Period.

**D.      Notice to Class Members**

Notice by U.S. mail and summary publication on Television, the Internet, and the Wall Street Journal among other print media, as preliminarily approved by this Court, satisfies the requirements of due process.  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75 (9th Cir. 1993).  The Plaintiffs hired a leading expert on class notice, Katherine Kinsella of Kinsella Novak Communications ("Kinsella"), to design a notice program.  Defendant originally disputed various aspects of the notice program and the parties sought the guidance of Judge Smith to resolve the disputes.  Berman Decl. ¶ 26.  After a series of negotiations and informal hearings, Plaintiffs submitted an unopposed Notice Plan to the Court.  The Notice Plan called for direct mail to TPPs, television advertisements to reach consumers, as well as placement of the Notice in multiple national publications and newspapers, the establishment of a settlement telephone hotline to take

calls and answer questions by Class members and the establishment of a settlement website to provide both consumers and TPPs another avenue to gain information about the settlement and file claims. *Id.* at ¶ 27. The Court granted the motion for approval of notice program on April 9, 2009. Dkt. #3030.

As detailed in the Declaration of Katherine Kinsella and the Declaration of Eric Miller of Rust Consulting, both filed herewith, the Notice Plan was effectuated as approved by the Court.

On July 17, 2009, Plaintiffs filed a Motion to Supplement the Notice Program the purpose of which is to provide direct payments to Bextra consumer Class members. Dkt. #3076. According to the claims administer, as of July 15, 2009, Bextra consumers had only submitted claims totaling $1.9 million of the potential $20.4 million that had been allocated to them in the settlement agreement. *See* Plan of Allocation, filed March 13, 2009, as Exhibit 10 to the Settlement Agreement, Dkt. #2739-2 (allocated 24% of the $85 million settlement fund or up to $20,400,000 to the Bextra consumer subclass). Due to this gap between the amount allocated to Bextra consumers and how much has been claimed; due to the fact that the television advertisements have ended and Class members who respond to television normally do so quickly; and due to the historically low claim rates in consumer class settlements; Plaintiffs argued that the supplement notice program would be a prudent supplement to the Notice Program previously approved by the Court. Defendants filed a response on July 31, 2009, that it "does not object to the proposal." Dkt. #3099. Whether or not the Supplement is approved and effectuated, the Notice to the class was more than sufficient to provide notice to the class. *See* Kinsella Decl. ¶ 26.

**E.     Claims and Settlement Administration**

The response from Class members has been overwhelmingly positive. Out of the 40,000 plus notices sent, only five total objections to the settlement were filed.[5] The fact that only five objections have been received in response to the extensive notice sent to Class members and appearing on television is an incredibly favorable result and demonstrates that the Class

---

[5] The objection of the County of Suffolk, NY has been resolved. The County along with the settling parties agree that the Settlement does include the County's claims to the extent it seeks damages based solely on amounts paid for its employees as a self insured employer and not on its Medicaid/Medicare expenditures. Berman Decl. ¶ 29.

overwhelmingly supports Class Counsels' requests.  Berman Decl. ¶ 30.  Furthermore, only one

objection is from a TPP Class member, the sophisticated business entities that would be expected

to oppose a settlement or fee request if they thought it unreasonable.  *Id*.  The absence of those

types of objections further confirms the reasonableness of the settlement.

### III.    ARGUMENT

**A.    The Settlement Should be Approved as Fair, Reasonable and Adequate**

The Ninth Circuit has a "strong judicial policy that favors settlements, particularly where

complex class action litigation is concerned." *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th

Cir. 1992).  Fed. R. Civ. P. 23(e) dictates that a court should consider the fairness, adequacy and

reasonableness of a settlement by balancing many factors, which include:  (1) the strength of the

plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the

risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5)

the extent of discovery completed and the stage of the proceedings; (6) the experience and views of

counsel; and (7) the reaction of the class members to the proposed settlement. *Churchill Vill.,*

*L.L.C. v. GE*, 361 F.3d 566, 576 (9th Cir. 2004).[6]  The Court may also consider the absence of

collusion in the settlement process.  *Id.* at 575.  This list is not exclusive and different factors may

predominate in different factual contexts. *Torrisi*, 8 F.3d at 1376.  The relative degree of

importance of each of these factors varies according to the circumstances of each case and is

dictated by the nature of the claim and the type of the relief sought. *See Hanlon v. Chrysler Corp.*,

150 F.3d 1011, 1026 (9th Cir. 1998).

When reviewing these factors, the settlement is entitled to a ***presumption of fairness***

because it was negotiated at arm's length by experienced counsel after significant discovery, a

mediation and months of intense settlement discussions. *See In re Heritage Bond Litig.,* 2005 U.S.

Dist. LEXIS 13555, at *11 (C.D. Cal. June 10, 2005).  A proposed settlement shall not "be judged

against a hypothetical or speculative measure of what might have been achieved by the

negotiators." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  The

---

[6] A separate factor is the presence of a governmental participant, which is not relevant here. *Id.*

1    Court must consider the settlement terms "as is" and cannot rewrite terms or conditions drafted by

2    the parties.  *Id.* at 630; *see also Hanlon*, 150 F.3d at 1026 ("The settlement must stand or fall in its

3    entirety.").

4           As described above, the settlement was reached only after extensive discovery had been

5    conducted.  Negotiations occurred at arm's length over four months with the assistance of the

6    Honorable Fern Smith (Ret.) and Professor Eric Green.  Class Counsel are experienced in class

7    actions.  Berman Decl. ¶ 43.  Thus, the Settlement Agreement enjoys a presumption of fairness.

8           **1.      The Strength of Plaintiffs' Case**

9           Although Plaintiffs largely prevailed on Defendants' motions to dismiss and believe they

10   would prevail on any future dispositive motion filed by Defendants, whether Plaintiffs would

11   obtain a favorable unanimous jury verdict was far from guaranteed.

12          Significant obstacles existed to any recovery.  Plaintiffs' claims required them to establish

13   that Defendants' marketing of Bextra and Celebrex caused Class members to purchase the drugs.

14   Although Plaintiffs were confident that such causation could be established, the Defendants had

15   multiple defenses that other causes led to the purchases or that purchasers would have paid for the

16   drugs whether the false claims were made or not.  A recent decision from New Jersey District

17   Court highlights the difficulty of establishing causation on a class wide basis.  In *In re Schering-*

18   *Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604 (D.N.J. July 10, 2009),

19   the court rejected plaintiffs' argument that they could prove causation in an off-label marketing

20   case through expert testimony and a statistical analysis of the defendants' data.  *See id.* at *23-25.

21   Holding that the plaintiffs could "not prove causation by way of generalized allegations and

22   aggregate proof," *id.* at *25, the court explained that "a court or jury would have to determine

23   whether each prescribing physician received fraudulent marketing information from the

24   [d]efendants and whether each physician was influenced to prescribe the Subject Drugs on account

25   of [defendants'] conduct."  *Id.* at *26, *see also Pennsylvania Employees Benefit Trust Fund v.*

26   *AstraZeneca Pharms. LP*, 2009 WL 2231686, at *5 (M.D. Fla. July 20, 2009) (noting the court's

27   "serious concerns about the difficulties inherent in determining, on a transaction-by-transaction

28

basis, whether and to what extent, Defendants' unlawful conduct caused each Seroquel prescription to be written by [plaintiff's] members' physicians").

Here, Plaintiffs were intending to submit expert testimony that would establish causation though such aggregate proof.  Berman Decl. ¶ 34. The alternative of proving causation on a case by case basis for each prescription is untenable.  The risk that the court or jury would not accept the expert aggregate proof was substantial.  *Id.*

Plaintiffs would also have to establish that the claims made regarding Bextra or Celebrex were in fact false.  *Id.* at ¶ 35.  This was a shaping up to be a hotly disputed issue with expert testimony on both sides regarding the benefits of Bextra and Celebrex in comparison to their lower priced alternatives.  This issue was further complicated by the presence of the FDA's labeling and evaluations of the drugs.  The FDA issued opinions regarding the efficacy and safety of both drugs and those opinions, in some cases, could arguably support Defendants marketing of the drugs.  *Id.*

The Celebrex claims included substantial additional obstacles above the obstacles faced by the Bextra claims.  *Id.* at ¶ 36.  These obstacles included that Celebrex is still on the market and many consumers and TPPs continue to pay prices for it above lower priced alternatives.  These factors and others made the potential for recovery for Celebrex claims significantly less than Bextra claims and likely would bar any recovery by Celebrex purchasers had they not been brought in conjunction with Bextra.  *Id.*

Perhaps the greatest risk faced by Purchaser Counsel was calculation of damages.  *Id.* at ¶ 37.  Plaintiffs sought to establish that all Bextra and Celebrex purchasers would either have purchased a lower priced alternative or nothing at all in the absence of Defendants' false claims.  Plaintiffs intended to do so in the aggregate through expert testimony based on national sales data and prescribing patterns.  An early stage damages model for Bextra, estimated that damages would equal the amount of money paid for Bextra minus the amount that would have been paid for a lower priced alternative.  *Id.* at ¶ 8.  This estimate presented obstacles such as defining which lower priced alternative would have been purchased and for how much.  A significant assumption underlying this damages theory is that all Class members would have spent less money if they did not pay for Bextra.  *Id.*

1    The Defendants argued that a large number of purchasers would have purchased a different

2    brand name drug, some of which were more expensive than Bextra.  *Id*. at ¶ 9.  Defendants

3    calculated that Plaintiffs damages were really only $25 million to $57 million.  There was therefore

4    a substantial risk that even if liability was established, Plaintiffs would only be able to recover a

5    much smaller damages amount than their best case scenario model.  *Id*.

6    Adding to this risk was the likely Daubert attacks on Plaintiffs' experts.  *Id*. at ¶ 38.  Under

7    Ninth Circuit case law, a flawed damage analysis can be fatal to a case.  *See Brooke Group Ltd. v.*

8    *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not

9    supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts

10   contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.")

11   (citation omitted); *American Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031,

12   1041-43 (N.D. Cal. 2001) ("Plaintiffs cannot prove causation of actual injury without ... expert

13   testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused

14   by defendants' unlawful conduct, and not because of lawful competition or other factors.");

15   *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming summary judgment

16   for the defendants because district court properly excluded "hopelessly flawed" damages studies

17   that rested "on unsupported assumptions"); *Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361,

18   1371-73 (9th Cir. 1992) (affirming summary judgment for the defendant where the plaintiff

19   submitted flawed damages model).

20   Here, if Plaintiffs' expert testimony was precluded at trial, the possibility of a jury verdict

21   in Plaintiffs' favor would have been severely diminished, if not completely obliterated.

22       **2.      The Risk, Expense, Complexity and Likely Duration of Further Litigation**

23   The risk, expense, complexity and duration of continued litigation also favors settlement.

24   The Court should consider "the probable costs, in both time and money, of continued litigation."

25   *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254 (D. Del. 2002).  "[A] court is not

26   required to 'reach any ultimate conclusions on the contested issues of fact and law which underlie

27   the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of

28   wasteful and expensive litigation that induce consensual settlements.'"  *Rodriguez v. West Publ'g*

1   *Co.*, 563 F.3d 948, 964 (9th Cir. 2009) (quoting *Officers for Justice*, 688 F.2d at 625).  Indeed, the

2   Ninth Circuit has noted settlement is encouraged in class actions:  "there is an overriding public

3   interest in settling and quieting litigation ... particularly ... in class action suits which are now an

4   ever increasing burden to so many federal courts and which frequently present serious problems of

5   management and expense."  *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

6          If not for this settlement, the case would likely continue through class certification, further

7   discovery, summary judgment and trial.  Class certification was potentially an uphill battle.

8   Berman Decl. ¶ 31.  Few such classes have been certified and the potential for denial of class

9   certification and the multiple state by state actions which would necessarily follow was substantial.

10  *See In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 65526

11  (D. Mass. May 13, 2009) (denying class certification of class of nationwide consumers and TPPs

12  alleging fraudulent advertising of drug Neurontin).

13         Purchaser plaintiffs engaged four experts to support their motion for class certification.

14  Berman Decl. ¶ 32.  Although Purchaser Plaintiffs had hired experts to opine on class wide impact

15  and injury, a model for valuing a drug, explaining the prescription drug marketplace and Celebrex

16  and Bextra's positioning in that marketplace and the scientific evidence supporting or conflicting

17  with the promotion of the drugs, these experts had yet to be challenged on their opinions.  The

18  likely battle of experts and conflicting legal authority made the outcome of an expensive and

19  fiercely contested class certification motion uncertain.  *Id.*

20         While counsel for Plaintiffs believe they have a reasonable chance of prevailing on the

21  merits of Plaintiffs' claims, the incursion of additional and very substantial expenses due to

22  extensive and technical discovery, retention of experts, summary judgment and trial would severely

23  deplete even the best-case recovery.  Berman Decl. ¶ 10.  Defendants are represented by nationally-

24  recognized and prestigious law firms that would mount a vigorous and thorough defense.  *Id.* ¶ 47.

25  Defendants are a well-capitalized, public company and one of the largest pharmaceutical

26  companies in the world.  The cost to litigate against such a capable and well-funded Defendants

27  would unquestionably be large.

28

MOTION FOR FINAL APPROVAL OF SETTLEMENT          - 14 -
M:05-CV-01699-CRB
001682-15  316592 V1

1      If litigation continues, Plaintiffs reasonably anticipate a hotly-contested motion for class

2  certification, expensive and protracted discovery, competing motions for summary judgment and a

3  lengthy trial.  Appeals could potentially follow, thereby causing further expense, delays and the

4  uncertainties which are inherent in litigating an appeal.  Settlement of the litigation at this time,

5  under the proposed terms, will ensure an immediate recovery for the Settlement Classes, and

6  immediate and ongoing benefits from Defendants' operational reforms, without any further

7  expense incurred on behalf of the Settlement Classes.  *Id.* at ¶ 11.  Accordingly, final approval of

8  the settlement is warranted.  *See National Rural Telcoms Coop. v. DIRECTV*, 221 F.R.D. 523, 527

9  (C.D. Cal. 2004) ("Avoiding such a trial and the subsequent appeals in this complex case strongly

10  militates in favor of settlement rather than further protracted and uncertain litigation.").

11      **3.      The Risk of Maintaining Class Action Status Throughout the Trial**

12      As part of the settlement, the parties have agreed to stipulate to certification of three

13  settlement subclasses.  *See* Settlement Agreement, p. 3.  Should the settlement not be approved,

14  however, no doubt exists that any future certification effort would be a vigorously and highly

15  contested battle.  Berman Decl. ¶ 31.  While Plaintiffs are confident that they would eventually

16  succeed on certification, even if a class were certified and the matter proceeded to trial there is no

17  guarantee that Defendants would not move for and obtain decertification of the classes before or

18  during trial.  "A district court may decertify a class at any time."  *Rodriguez*, 563 F.3d at 966.

19      Finally, even if the Class remained certified throughout the trial and Plaintiffs prevailed,

20  Defendants would surely challenge class certification on appeal.  "If at any point the Class were

21  decertified or certification were reversed on appeal, the Class would recover nothing."  *Rodriguez*

22  *v. West Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74767, at *29 (C.D. Cal. Sept. 10, 2007) *aff'd in*

23  *part, reversed in part on other grounds*, 2009 U.S. App. LEXIS 8680 (9th Cir. Apr. 23, 2009).

24  Thus, this factor also weighs in favor of approving the settlement.

25      **4.      The Amount Offered in Settlement**

26      In considering the amount offered in settlement, the Court may also look at the difficulties

27  Plaintiffs would face if litigation proceeds.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459

28  (9th Cir. 2000).  In making this assessment, Courts have compared "the present value of the

1   damages plaintiffs would likely recover if successful, appropriately discounted for the risk for not

2   prevailing with the amount of the proposed settlement."  *Nichols v. SmithKline Beecham Corp.*

3   ("*Paxil Litigation*"), 2005 WL 950616, at *15 (E.D. Pa. Apr. 22, 2005) (quoting *In re General*

4   *Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995)

5   (quoting MANUAL FOR COMPLEX LITIGATION 2d § 30.44 at 252)).

6          Here, the result achieved – of $89 million for the Class – is a satisfactory result.  Plaintiffs

7   sought to establish that all Bextra and Celebrex purchasers would either have purchased a lower

8   priced alternative or nothing at all in the absence of Defendants' false claims.  Berman Decl. ¶ 7.

9   Damages would equal the amount of money paid for Bextra and Celebrex minus the amount that

10  would have been paid for a lower priced alternative which Plaintiffs damages expert calculated to

11  be approximately $2.67 billion.  Based on this best case scenario damage model which presupposes

12  that every Class member would have purchased much lower priced naproxen had it not been for

13  Defendants' marketing, the $89 million settlement amount represents 3.33% of Plaintiffs total

14  damages.  *Id*.

15         This damages model, however, had yet to be refined and tested and was in its early stages

16  of development.  *Id*. at ¶ 8.  It assumes that all Class members would have purchased an

17  inexpensive, non-branded form of naproxen.  *Id*.  This is unlikely as Defendants presented

18  evidence that the biggest increase in sales after Bextra was withdrawn from the market was for a

19  branded prescription drug which was actually more expensive than Bextra.  The damages model

20  further does not account for the benefits that the Class received from taking Bextra.  Defendants

21  argued that Class members received the benefit of the bargain when they purchased Bextra because

22  it is in fact an effective pain reliever.  *Id*.  The damages model therefore did not take into account

23  the full economic reality of the pharmaceutical market, nor did it account for the substantial risks,

24  as described in detail below, facing the legal and factual underpinnings of Plaintiffs claims.  There

25  is no question had the case proceeded further that number would have been reduced to account for

26  the issues described above.  *Id*.

27         Defendants agreed that the Plaintiffs' damages model relied on many difficult to prove

28  assumptions.  *Id*. at ¶ 9.  Defendants proposed an alternative damages model arguing that most

patients would have purchased a different brand name drug instead of Bextra and because brand name drugs are sold at higher prices (some even higher than Bextra), Plaintiffs' damages were really only between $25 million and $57 million at most. *Id.* Based on this estimate of damages, the settlement amount was up to 356% of the damages suffered by the Class. The settlement amount therefore reflects somewhere between 3.33% and 356% of Plaintiffs damages. *Id.*

Taking all of the risks of the litigation into consideration, the damages recovery is within the range of reasonableness. *Id.* at ¶ 10. This percentage is consistent with those approved in other complex class action cases. *See Nichols (Paxil Litigation)*, 2005 WL 950616, at *16 (concluding that the $65 million Settlement Fund which represents between 9.3% and 13.9% of damages as within the range of reasonableness); *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (approving settlement for 36% recovery and noting that typical recoveries in securities class actions range from 1.6% to 14%).

The $89 million settlement amount represents 4% of Pfizer's Bextra sales during the Class Period.[7] The percentage recovery compares very favorably with other settlements in this district. For example, in *In re Rubber Chemicals Antitrust Litig.*, No. C-04-1648 MJJ, Order, (N.D. Cal. Jan. 9, 2007) (attached as Exhibit A hereto), a horizontal price-fixing case in which some of the defendants had entered guilty pleas in related criminal proceedings, Judge Jenkins characterized a settlement payment of 4% of a defendant's sales as an "excellent recovery." *Id.* at 2; *see also*, *e.g.*, *In re Plastic Tableware Antitrust Litig.*, 1995 U.S. Dist. LEXIS 17014, at *4 (E.D. Pa. Oct. 25, 1995) (3.5% of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (1.62% of sales); *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29161, at *22 (E.D. Pa. Sept. 27, 2004) (recovery represented 2% of sales); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 451 (E.D. Pa. 1985) (recovery represented 2.4% of sales); *Fisher Bros. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (recoveries equal to .1%, .2%, 2%, .3%, .65%, .88%, and 2.4% of defendants' total sales).

---

[7] Plaintiffs acknowledged that there was so little chance of a Celebrex only recovery that settlement negotiations regarding damages should focus on Bextra. Berman Decl. ¶ 6.

1    This compares very favorably with similar class action settlements finally approved in other

2    consumer fraud cases.  *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D.

3    Mass. 2005) ($150 million settlement on behalf of TPPs and Consumers); *In re Pharm. Indus.*

4    *Average Wholesale Price Litigation ("AWP") (GlaxoSmithKline Settlement)*, No. 01-cv-12257-

5    PBS (D. Mass. Aug. 7, 2007) ($70 million settlement) (Exhibit B hereto); *AWP AstraZeneca Class*

6    *I Settlement*, No. 01-cv-12257-PBS (D. Mass. Oct. 2, 2008) ($34 million settlement) (Exhibit C

7    hereto); *AWP BMS – Class I Settlement*, No. 01-cv-12257-PBS (D. Mass.) (hearing on motion for

8    preliminary approval held Aug. 10, 2009) ($13 million settlement); *In re Synthroid Marketing*

9    *Litig.*, 188 F.R.D. 287 (N.D. Ill. 1999) ($134 million settlement); *Government Employees Hosp.*

10   *Ass'n, et al. v. Serono*, C.A. No. 05-cv-11935 (D. Mass. Dec. 12, 2007) ($24 million settlement)

11   (Exhibit D hereto); *Hoorman v. SmithKline Beecham* ("*Paxil Pediatric Litigation*"), Case No. 04-

12   L-715 (Madison County, IL) ($64 million settlement).

13   The potential risks Plaintiffs faced in proving damages certainly underscore the good result

14   Plaintiffs achieved in negotiating a settlement fund which creates an $89 million cash settlement.

15   In light of the difficulties Plaintiffs would face if litigation proceeded, the consideration offered

16   here is clearly adequate and fair.  Berman Decl. ¶ 11.  "[S]ettlement is a compromise, a yielding of

17   the highest hopes in exchange for certainty and resolution."  *In re Warfarin*, 212 F.R.D. at 257

18   (finding settlement amount representing 33% of maximum possible recovery was well within a

19   reasonable range when compared with recovery percentages in other class action settlements); s*ee*

20   *also Officers for Justice*, 688 F.2d at 624 ("the very essence of a settlement is compromise, 'a

21   yielding of absolutes and an abandoning of highest hopes'").

22       **5.       The Extent of Discovery Completed and the Stage of the Proceedings**

23   Significant discovery was conducted in this action up to and through the point where

24   settlement was reached.  Berman Decl. ¶¶ 15-19.  Since January 2005, Purchaser Counsel have

25   prosecuted this case on behalf of the Class.  This work involved multiple rounds of motions to

26   dismiss, nearly four amended master complaints for each drug, extensive discovery, including

27   review of millions of produced documents, over forty depositions of Defendant witnesses,

28   production of documents by the class representatives and third party subpoenas.  *Id.* ¶¶ 12-20.

1   Purchaser counsel were about to file their motion for class certification when the parties

2   agreed to mediate.  *Id.* at ¶ 20.  After months of mediation with the assistance of two experienced

3   mediators, the parties reached an $89 million settlement amount.  Months of additional negotiation

4   regarding the terms of that settlement and the dissemination of notice to the Class ensued.

5   "[T]here is an overriding public interest in settling and quieting litigation," and this is

6   "particularly true in class action suits."  *Van Bronkhorst*, 529 F.2d at 950.  Settlement spares the

7   parties the costs of protracted litigation and eases the congestion of judicial calendars.  *See id.* at

8   943.  In light of the extensive discovery and independent factual research conducted by Plaintiffs,

9   and the public policy favoring resolution of class actions by settlement to avoid protracted

10   litigation, this factor also weighs in support of approval.

11   **6.      The Experience and Views of Counsel**

12   Plaintiffs have considerable experience in litigating class actions, and other complex

13   litigation.  Berman Decl. ¶ 43.  Counsel Hagens Berman Sobol Shapiro LLP has a strong history of

14   success in consumer class actions and complex litigation, and has numerous multi-million dollar

15   settlements similar to this case.  *Id.*

16   In assessing the adequacy of the terms of a settlement, the trial court is entitled to, and

17   should, rely upon the judgment of experienced counsel for the parties.  *See DIRECTV*, 221 F.R.D.

18   at 528 ("Great weight 'is accorded to the recommendation of counsel, who are most closely

19   acquainted with the facts of the underlying litigation'").  The basis for such reliance is that

20   "[p]arties represented by competent counsel are better positioned than courts to produce a

21   settlement that fairly reflects each party's expected outcome in litigation."  *In re Pacific Enters.*

22   *Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Indeed, when evaluating a proposed settlement, the

23   trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for

24   that of counsel.  *See Hanrahan v. Britt*, 174 F.R.D. 356, 366-368 (E.D. Pa.1997) (finding that a

25   presumption of correctness applies to a class action settlement reached in arm's length negotiations

26   between experienced, capable counsel after meaningful discovery).

27   Purchaser Counsel fully support the settlement, and it is their informed opinion that, given

28   the uncertainty and expense of pursuing Defendants through trial, the settlement is fair, reasonable

and adequate and in the best interests of the Settlement Class.  Berman Decl. ¶ 11.  The settlement

is the product of a mediation conducted by two qualified and experienced mediators.  Based on

months of litigating the cases and engaging in formal and informal discovery, the parties

understood the strengths and weaknesses of their cases and had sufficient information to support a

decision regarding the fairness of the Settlement Agreement.  *Id*.  Approval of the settlement will

mean a present recovery for Class members.

### 7.     The Reaction of the Class Members to the Proposed Settlement

The response from Class members has been overwhelmingly positive.  Out of the 40,000

plus notices sent, only 5 total objections to the settlement were filed, one of which has since been

resolved.  *Id*. at ¶ 30.  The fact that only four objections remain in response to the extensive notice

sent to class members and appearing on television is an incredibly favorable result and

demonstrates that the Class overwhelmingly supports Class Counsels' requests.  Furthermore, only

one objection is from a TPP Class member, the sophisticated business entities that would be

expected to oppose a settlement or fee request if they thought it unreasonable.  The absence of

those types of objections further confirms the reasonableness of the Settlement.

As of August 11, 2009, there have been approximately 30 requests for exclusion.[8]  Miller

Decl. ¶¶ 18-19.  The fact that the Settlement Agreement enjoys support from the Class supports a

finding that the Settlement Agreement is fair, adequate and reasonable.  *See Wilson v. Airborne,*

*Inc.*, 2008 WL 3854963, at *7 (C.D. Cal. Aug. 13, 2008) (230 opt-outs and 17 objections out of a

class of 419,606 weighs in favor of approval); *DIRECTV*, 221 F.R.D. at 529 ("It is established that

the absence of a large number of objections to a proposed class action settlement raises a strong

presumption that the terms of a proposed class settlement action are favorable to the class

members").  The relatively low number of objectors supports a finding that the settlement is

---

[8] According to the Claims Administrator, "[o]f the 20 TPP Requests for Exclusion, 1 is from a Third Party Administrator ("TPA") that represents self-administered health plans and purports to have the authority to request exclusion on behalf of the plans.  We have not independently verified the TPA's authority or the number of plans that it purports to exclude.  Our analysis shows that the TPA has requested exclusion for an additional 50,580 plans; however, some of the 'account name' fields are blank, so this figure could be as low as 49,330."  Miller Decl. ¶ 18.  The Settling parties are investigating the validity of this opt out.

1    adequate.  The objection rate here is exceedingly small when compared with objections rates in

2    other class actions.  *See*, *e.g.*, *Boyd v. Bechtel Corp.,* 485 F. Supp. 610, 624 (N.D. Cal. 1979)

3    (finding that objections from only 16% of the class was persuasive that the settlement was

4    adequate); *Glass v. UBS Fin. Services, Inc.,* 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007)

5    (approving settlement with opt-out rate of approximately 2%).

6              **8.      Absence of Collusion in the Settlement Process**

7              There was no collusion in the settlement of this action.  The parties entered into the

8    Settlement Agreement in good faith, following arms-length negotiation by counsel, including a

9    mediation session with the assistance of two nationally known mediators.  Negotiations took place

10   over many months, were fervent and exhaustive.  Berman Decl. ¶¶ 21, 24.  As a result, this factor

11   also supports approval of the settlement.

12   **B.      The Settlement Class Should be Finally Certified**

13            **1.      The Settlement Classes Satisfy the Prerequisites of Rule 23(a)**

14            In order to grant final certification of a settlement class, the requirements of Rule 23 must

15   generally be satisfied.  *See* Fed. R. Civ. P. 23; *Hanlon,* 150 F.3d at 1019.  As the Court

16   preliminarily found with respect to approval of the Settlement Class and Subclasses, certification is

17   warranted where, as here, it is demonstrated that the four prerequisites of Rule 23(a), numerosity,

18   commonality, typicality, and adequacy of representation, and one of three requirements of Rule

19   23(b), are satisfied.  *Id.*  In certifying a settlement class, the Court is not required to determine

20   whether the action, if tried, would present intractable management problems.  *Amchem Prods. v.*

21   *Windsor, Inc.*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class

22   certification, a district court need not inquire whether the case, if tried, would present intractable

23   management problems ... for the proposal is that there be no trial.").  Rather, the Court has great

24   discretion in determining whether to certify a settlement class.  *Id.* at 624.  The proposed

25   Settlement Subclasses satisfy the requisite elements of Rule 23(a) – numerosity, commonality,

26   typicality and adequacy of representation.

27            Plaintiffs of each subclass easily satisfy the ***numerosity*** requirement.  Fed. R. Civ. P.

28   23(a)(1).  There are hundreds of thousands of consumer subclass members.  Bextra sales totaled

over $3 billion during its nearly 3½ years on the market.  According to IMS data, 30.155 million Bextra prescriptions had been written by the time Bextra was withdrawn from the market. Similarly, there are thousands of third party payers in the United States.  *See*, *e.g.*, *In re Lupron Mktg. & Sales Practices Litig*., 228 F.R.D. at 88 ("the class includes thousands of TPPs").  Given the overwhelming number of Bextra prescriptions during the Class Period, it stands to reason that most, if not all, TPPs have paid or reimbursed the cost of Bextra.  Accordingly, the numerosity requirement is easily satisfied.

Each subclass of Plaintiffs also meets the ***commonality*** requirement.  Fed. R. Civ. P. 23(a)(2).  Rule 23(a)(2) does not mandate that each member of the class be identically situated. *Hanlon*, 150 F.3d at 1019.  Rather, the Rule merely requires that there be substantial questions of law or fact to each one of the class members claims.  *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909, 914 (9th Cir. 1964).  For example, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon*, 150 F.3d at 1019.  Simply put, the necessary showing to satisfy commonality is "minimal."  *Id*. at 1020.

Commonality is readily satisfied because Plaintiffs' claims are based on a common core of material misrepresentations and omissions designed to convince doctors, managed care decision makers and consumers of Bextra's superiority, while masking its average efficacy and poor safety results.  *See*, *e.g.*, *McPhail v. First Command Fin. Planning, Inc.*, 2007 WL 2207761, at *9 (S.D. Ca. July 30, 2007) (Gonzalez, J.) (citing *Blackie v. Barrack*, 524 F.2d 891, 903-04 (9th Cir. 1975)) ("The Ninth Circuit applies a 'common course of conduct' test to determine whether to certify a class in a fraud case."); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 238-39 (C.D. Cal. 2003) (common questions include whether "the common omissions and misrepresentations made by the [defendants] were material").

The Named Plaintiffs' claims are also ***typical*** of those of their respective Settlement Classes because, like all members of the Settlement subclasses, they arise from a single course of conduct and are based on the same legal theories.  Fed. R. Civ. P. 23(a)(3).  The typicality requirement focuses on the similarity between the lead plaintiff's legal theories and those of the people he or

1    she purports to represent.  As such, "[t]he commonality and typicality requirements of Rule 23(a)

2    tend to merge."  *General Tel. Co. v. Falcon,* 457 U.S. 147, 158 n.13 (1982).  However, the test of

3    typicality is whether the claims and defenses are typical or stem from the same event, practice, or

4    course of conduct that forms the basis of the claims of the class and are based on the same legal or

5    remedial theory.  *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992); 1 NEWBERG ON

6    CLASS ACTIONS § 3:13 at 327.  The class representatives must at a minimum "be part of the class

7    and possess the same interest and suffer the same injury as the [other] class members."  *Falcon*,

8    457 U.S. at 156.  (citations and internal quotation marks omitted).

9         Typicality is satisfied where named plaintiffs' claims are "reasonably co-extensive" with

10   absent class members' claims, even if the claims are not "substantially identical."  *Hanlon*, 150

11   F.3d at 1020.  This is a permissive, liberally construed standard.  *Thomas & Thomas Rodmakers,*

12   *Inc. v. Newport Adhesive & Composites, Inc*., 209 F.R.D. 159, 164 (C.D. Cal. 2002).

13        Typicality is readily satisfied as Plaintiffs and the proposed Classes assert the same claims,

14   arising from the same alleged overarching fraudulent marketing campaign.  Indeed, "[t]he same

15   sales pitch, strategy, and scheme that injured the Named Plaintiffs likewise injured the absent class

16   members."  *McPhail*, 2007 WL 2007761, at *11.  It is well settled that "factual difference in the …

17   size or manner of purchase … and other such concerns will not defeat class action certification

18   when plaintiffs allege that he same unlawful course of conduct affected all members of the

19   proposed class."  *In re Sumitomo Copper Litig*., 182 F.R.D. 85, 92 (S.D.N.Y. 1998) (citing *Green*

20   *v. Wolf Corp*., 406 F.2d 291, 299-301 (2d Cir. 1968)); *see also In re Lorazepam & Clorazepate*

21   *Antitrust Litig*., 202 F.R.D. 12, 28 (D.D.C. 2001); *In re Cardizem CD Antitrust Litig*., 200 F.R.D.

22   326, 336-7 (E.D. Mich. 2001) (antitrust conspiracy to delay entry of generic drug onto the market

23   (citing cases)); *see also In re Warfarin Sodium Antitrust Litig*., 212 F.R.D. at 248 ("Several other

24   courts have recently certified nationwide or multi-state classes under federal or state law in actions

25   alleging overpayment for prescription drugs." (citing cases)).

26        Finally, the proposed Class Representatives have "fairly and adequately protect[ed] the

27   interests of the class."  Fed. R. Civ. P. 23(a)(4).  The proposed Class Representatives are the

28   Named Plaintiffs which have not been dismissed from the litigation and which participated in

discovery.  These Named Plaintiffs include consumer purchasers of both Bextra and Celebrex, Bextra only and Celebrex only and TPPs that paid for prescriptions of Bextra and Celebrex.[9]  The ***adequacy*** prong is satisfied where a "suit [is not] collusive and plaintiff's interests [are not] antagonistic to those of the remainder of the class."  *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D. 251, 257 (C.D. Cal. 1988).  Here, the proposed settlement does not present any antagonism or disabling conflict between the proposed representative plaintiffs and the absent Class members.  *See Weinberger v. Jackson*, 102 F.R.D. 839, 844-45 (N.D. Cal. 1984).  Each of the proposed class representatives has the same claims as the members of the settlement class they seek to represent.  Plaintiffs and their counsel have no conflicts of interest with the Class members.  To the contrary, Plaintiffs and the Class members share the interests of establishing Defendant's liability. Accordingly, Plaintiffs believe the interests of the Settlement Classes will be fairly and adequately protected.

> **2.      The Settlement Classes Satisfy the Prerequisites of Rule 23(b)(3)**

The class action device proposed here "is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As described above, common issues predominate throughout both of the settlement classes.  To determine superiority, pertinent factors for the court to consider include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Here, each Settlement Class is far too numerous, and the typical claim is likely too small for each individual member to maintain a separate action.  Further, the nationwide

---

[9] Named Plaintiffs are listed at p. 1, nt. 1 of the Motion for Award of Attorneys Fees, Reimbursement of Expenses and Compensation to Named Plaintiffs, filed concurrently.

1   geographical dispersion of class members makes it desirable that litigation of the claims involved

2   be concentrated in this forum to mitigate the risk of inconsistent judgments.

3         Employing the class device here will not only achieve economies of scale for Class

4   members, but will also conserve the resources of the judicial system and preserve public

5   confidence in the integrity of the system by avoiding the waste and delay of repetitive proceedings

6   and prevent the inconsistent adjudications of similar issues and claims.  *See Hanlon*, 150 F.3d at

7   1023.  There is no other mechanism by which all of the Settlement Class members' claims will be

8   as fairly, adequately and efficiently resolved as through a class action.

9   **C.     The Court Should Appoint Plaintiffs' Counsel as Class Counsel**

10        Under Rule 23, "a court that certifies a class must appoint class counsel ... [who] must fairly

11   and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(A), (B).  In making

12   this determination, the Court must consider:

> [W]ork counsel has done in identifying or investigating potential
> claims in the action; (2) counsel's experience in handling class
> actions, other complex litigation, and the types of claims asserted in
> the action; (3) counsel's knowledge of the applicable law; and (4) the
> resources that counsel will commit to representing the class.

16   Fed. R. Civ. P. 23(g)(1)(A).  As detailed in the firm resumes presented to the Court, Plaintiffs' co-

17   counsel have significant experience in litigating class actions.  *See* Berman Decl., Ex. A.  Class

18   Counsel, with the assistance of all Purchaser Counsel, have diligently investigated, prosecuted, and

19   settled this litigation, dedicated substantial resources to the investigation and prosecution of the

20   claims at issue in the litigation, and demonstrated their knowledge of the consumer protection laws

21   at issue.  Accordingly, Plaintiffs request that this Court appoint Hagens Berman Sobol Shapiro LLP

22   and Cotchett Pitre & McCarthy act as Class Counsel of the Settlement Subclasses.

### IV.     CONCLUSION

24        For all of the foregoing reasons, Plaintiffs respectfully request that this Court (a) grant final

25   approval of the proposed settlement, (b) certify the Settlement Subclasses for settlement purposes,

26   and (c) appoint the petitioning Plaintiffs and their Counsel as Lead Plaintiffs and Class Counsel,

27   respectively.

28

1    Dated:  August 14, 2009.                    HAGENS BERMAN SOBOL SHAPIRO LLP

2

3                                               By   /s/ Steve W. Berman
                                                    Steve W. Berman
4                                               steve@hbsslaw.com
                                                Lisa Hasselman
5                                               lisah@hbsslaw.com
                                                1301 Fifth Avenue, Suite 2900
6                                               Seattle, WA  98101
                                                Telephone:  (206) 623-7292
7                                               Facsimile:  (206) 623-0594

8                                               COTCHETT, PITRE & McCARTHY

9                                               Frank M. Pitre
                                                fpitre@cpmlegal.com
10                                              San Francisco Airport Office Center
                                                840 Malcolm Road, Suite 200
11                                              Burlingame, CA  94010
                                                Telephone:  (650) 697-6000
12                                              Facsimile:  (650) 697-0577

13                                              *Purchaser Plaintiffs' Counsel*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28