Elizabeth J. Cabraser
ecabraser@lchb.com
Scott P. Nealey
snealey@lchb.com
LIEFF, CABRASER, HEIMANN, & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Plaintiffs' Liaison Counsel*

Steve W. Berman
steve@hbsslaw.com
Lisa Hasselman
lisah@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Plaintiffs' Purchaser Counsel*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING, SALES PRACTICES, AND PRODUCT LIABILITY LITIGATION | No. M:05-CV-01699-CRB<br><br>MDL No. 1699 |
| THIS RELATES TO:<br><br>ALL PURCHASER CASES | NOTION OF MOTION AND MOTION FOR AN AWARD OF ATTORNEY FEES, REIMBURSEMENT OF EXPENSES AND COMPENSATION TO NAMED PLAINTIFFS<br><br>Date:         September 25, 2009<br>Time:         10:00 a.m.<br>Judge:        Hon. Charles R. Breyer<br>Courtroom: 8, 19th Floor |

1

## NOTICE OF MOTION AND MOTION

2 **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3        PLEASE TAKE NOTICE that on September 25, 2009, at 10:00 a.m., or as soon thereafter

4 as the matter may be heard, in the courtroom of The Honorable Charles R. Breyer, United States

5 District Judge, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do

6 move the Court for an award of attorneys' fees, reimbursement of expenses, and compensation to

7 the named plaintiffs in the above-captioned matter.

8        This application is based on this Notice of Motion and Motion for an Award of Attorney

9 Fees, Reimbursement of Expenses and Compensation to Named Plaintiffs, the Memorandum of

10 Points and Authorities in support thereof, the Settlement Agreement and Release, the Declaration

11 of Steve W. Berman and Exhibits thereto, the pleadings and papers on file in this action, and such

12 oral and documentary evidence as may be presented at the hearing on the Motion.

13 Dated:  August 14, 2009.                    HAGENS BERMAN SOBOL SHAPIRO LLP

14

15                                              By  /s/ Steve W. Berman
                                                   Steve W. Berman
16                                                 steve@hbsslaw.com
                                                   Lisa Hasselman
17                                                 lisah@hbsslaw.com
                                                   1301 Fifth Avenue, Suite 2900
18                                                 Seattle, WA  98101
                                                   Telephone:  (206) 623-7292
19                                                 Facsimile:  (206) 623-0594

20                                              COTCHETT, PITRE & McCARTHY

21                                                 Frank M. Pitre
                                                   fpitre@cpmlegal.com
22                                                 San Francisco Airport Office Center
                                                   840 Malcolm Road, Suite 200
23                                                 Burlingame, CA  94010
                                                   Telephone:  (650) 697-6000
24                                                 Facsimile:  (650) 697-0577

25                                                 *Purchaser Plaintiffs' Counsel*

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION .................................................................................................. 1

II.   HISTORY OF THE LITIGATION ...................................................................... 3

    A.    Pleading, Motion Practice and Discovery ................................................ 3

    B.    Mediation and Settlement ......................................................................... 6

III.  THE COURT SHOULD APPROVE THE FEE PETITION  AS FAIR AND REASONABLE ................................................................................................... 7

    A.    A 25% Fee Award Is Fair And Appropriate Under Ninth Circuit Law ....... 7

        1.    The Ninth Circuit Recognizes the Common Fund Doctrine ............. 8

        2.    Percentage-of-the-Recovery Approach is the Predominant Method for Determining Attorneys' Fees Under Ninth Circuit Law ............. 8

        3.    25% is the Benchmark in the Ninth Circuit, But Greater Awards are Frequent ....................................................................................... 9

        4.    A Cross Check Using Loadstar Supports the Reasonableness of the Award ....................................................................................... 10

    B.    The Relevant Factors Justify an Award of 25% in This Case .................. 11

        1.    The Result Achieved ...................................................................... 11

        2.    The Skill Required ......................................................................... 13

            a.    High caliber of opposing counsel ....................................... 13

            b.    Complexity and difficulty of issues .................................... 14

        3.    The Quality of Work Performed ..................................................... 14

            a.    Investigation and development of facts ............................... 14

            b.    Nearly four amended complaints and three rounds of motions to dismiss ............................................................ 15

            c.    Difficulties in obtaining discovery and discovery disputes ................. 15

            d.    Protracted settlement negotiations with defendants ........... 15

        4.    The Risks of this Litigation ............................................................ 15

            a.    The risk of not achieving class certification ....................... 16

            b.    The risk of not being able to establish causation ................ 16

            c.     The risk of not being able to establish injury to class members.......... 18

            d.     The risk of going to trial ..................................................................... 19

     5.     Contingent nature of the fee ................................................................. 19

     6.     The class' reaction supports the requested award ............................................ 20

IV.     COMPENSATION TO THE NAMED PLAINTIFFS IS APPROPRIATE ........................... 21

V.     CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*In re Activision Sec. Litig.*,
   723 F. Supp. 1373 (N.D. Cal. 1989)....................................................................10

*In re Aetna Inc. Sec. Litig.*,
   2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001)..............................................10

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
   421 U.S. 240 (1975)................................................................................................8

*American Booksellers Ass'n v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001)................................................................18

*In re Automotive Refinishing Paint Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 29161 (E.D. Pa. Sept. 27, 2004).....................................12

*In re Bextra & Celebrex Mktg., Sales & Prod. Liab. Litig.*,
   391 F. Supp. 2d 1377 (J.P.M.L. 2005)...................................................................3

*Blum v. Stenson*,
   465 U.S. 886 (1984) ...............................................................................................8

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ...............................................................................................8

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   186 F.3d 781 (7th Cir. 1999), *cert. denied*, 528 U.S. 1181 (2000) .......................19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)..............................................................................................18

*Brown v. Phillips Petroleum Co.*,
   838 F.2d 451 (10th Cir. 1988)................................................................................8

*In re Businessland Sec. Litig.*,
   1991 U.S. Dist. LEXIS 8962 (N.D. Cal. June 14, 1991).......................................9

*In re Buspirone Antitrust Litig.*,
   2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) ....................................9

*Camden I Condominium Ass'n v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991)................................................................................8

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) ...................................................................22

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) .................................................................................12

*In re Cendant Corp. Prides Litig.*,
   243 F.3d 722 (3d Cir. 2001)...................................................................................8

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
  216 F.R.D. 197 ( D. Me. 2003) ..................................................................................9

*Conley v. Sears, Roebuck & Co.,*
  222 B.R. 181 (D. Mass. 1998)....................................................................................9

*Cosgrove v. Sullivan,*
  759 F. Supp. 166 (S.D.N.Y. 1991) ...........................................................................11

*In re Equity Funding Corp. Sec. Litig.,*
  438 F. Supp. 1303 (C.D. Cal. 1977)..........................................................................13

*Fisher Brothers v. Mueller Brass Co.,*
  630 F. Supp. 493 (E.D. Pa. 1985)..............................................................................13

*Fisher Brothers v. Phelps Dodge Indus., Inc.,*
  604 F. Supp. 446 (E.D. Pa. 1985)..............................................................................12

*In re Fleet/Norstar Sec. Litig.,*
  935 F. Supp. 99 (D.R.I. 1996) .....................................................................................9

*Gaskill v. Gordon,*
  160 F.3d 361 (7th Cir. 1998) .......................................................................................9

*Government Employees Hosp. Ass'n, et al. v. Serono,*
  C.A. No. 05-cv-11935 (D. Mass. Dec. 12, 2007)......................................................13

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .....................................................................................9

*Harman v. Lyphomed, Inc.,*
  945 F.2d 969 (7th Cir. 1991) .......................................................................................8

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ...................................................................................................11

*Hoorman v. SmithKline Beecham,*
  Case No. 04-L-715 (Madison County, IL) ................................................................13

*Hughes v. Microsoft Corp.,*
  2001 U.S. Dist. LEXIS 5976 (W.D. Wash. Mar. 21, 2001).....................................22

*In re Immunex Sec. Litig.,*
  864 F. Supp. 142 (W.D. Wash. 1994) .......................................................................22

*J.N. Futia Co. v. Phelps Dodge Indus., Inc.,*
  1982 U.S. Dist. LEXIS 15261 (S.D.N.Y. Sept. 17, 1982) .......................................13

*In re Linerboard Antitrust Litig.,*
  321 F. Supp. 2d 619 (E.D. Pa. 2004).........................................................................12

*In re Lorazepam & Chlorazepate Antitrust Litig.,*
  205 F.R.D. 369 (D.D.C. 2002) ..................................................................................21

*In re Lorazepam & Clorazepate Antitrust Litig.,*
  2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003)................................9, 19

*In re Lupron Mktg. & Sales Practices Litig.,*
  228 F.R.D. 75 (D. Mass. 2005) ....................................................13

*MCI Commc'ns Corp. v. American Tel. & Tel. Co.,*
  708 F.2d 1081 (7th Cir.), *cert. denied,* 464 U.S. 891 (1983) ......................19

*McGlinchy v. Shell Chem. Co.,*
  845 F.2d 802 (9th Cir. 1988) .....................................................19

*In re McKesson HBOC, Inc. ERISA Litig.,*
  391 F. Supp. 2d 844 (N.D. Cal. 2005)..............................................22

*In re Mego Fin. Corp. Sec. Litig.,*
  213 F.3d 454 (9th Cir. 2000) .....................................................22

*In re NASDAQ Market-Makers Antitrust Litig.,*
  187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................10

*In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.,*
  2009 U.S. Dist. LEXIS 65526 (D. Mass. May 13, 2009)...............................16

*Nichols v. SmithKline Beecham Corp. ("Paxil Litigation"),*
  2005 WL 950616 (E.D. Pa. Apr. 22, 2005)......................................11, 12

*In re Pacific Enters. Sec. Litig.,*
  47 F.3d 373 (9th Cir. 1995) .....................................................9, 15

*Paul, Johnson, Alston & Hunt v. Graulty,*
  886 F.2d 268 (9th Cir. 1989) ......................................................8

*Pennsylvania Employees Benefit Trust Fund v. AstraZeneca Pharms. LP,*
  2009 WL 2231686 (M.D. Fla. July 20, 2009) .......................................17

*In re Pharm. Indus. Average Wholesale Price Litig.,*
  No. 01-cv-12257-PBS (D. Mass. Aug. 7, 2007) ....................................13

*In re Pharm. Indus. Average Wholesale Price Litig.,*
  No. 01-cv-12257-PBS (D. Mass. Oct. 7, 2008 .....................................13

*In re Plastic Tableware Antitrust Litig.,*
  1995 U.S. Dist. LEXIS 17014 (E.D. Pa. Oct. 25, 1995) .............................12

*Presley v. Carter Hawley Hale Profit Sharing Plan,*
  2000 WL 16437 (N.D. Cal. 2000)...................................................21

*In re RJR Nabisco Sec. Litig.,*
  1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992).............................11

*In re Relafen Antitrust Litig.,*
  231 F.R.D. 52 (D. Mass. 2005) .....................................................9

*In re Remeron Direct Purchaser Antitrust Litig.,*
  2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) ..........................................21

*In re Rite Aid Corp. Secs. Litig.,*
  146 F. Supp. 2d 706 (E.D. Pa. 2001).................................................................10

*Roberts v. Texaco, Inc.,*
  979 F. Supp. 185 (S.D.N.Y. 1997) ....................................................................10

*In re Rubber Chemicals Antitrust Litig.,*
  No. C-04-1648 MJJ, Order, (N.D. Cal. Jan. 9, 2007).......................................12

*In re Schering-Plough Corp. Intron/Temodar Consumer Class action,*
  2009 WL 2043604 (D.N.J. July 10, 2009) .......................................................17

*Shaw v. Toshiba Am. Info. Sys., Inc.,*
  91 F. Supp. 2d 942 (E.D. Tex. 2000) ..................................................................9

*In re Shopping Carts Antitrust Litig.,*
  1983 U.S. Dist. LEXIS 11555 (S.D.N.Y. Nov. 18, 1983).................................12

*Six Mexican Workers v. Arizona Citrus Growers,*
  904 F.2d 1301 (9th Cir. 1990) .............................................................................8

*In re Sorbates Direct Purchaser Antirust Litig.,*
  2002 U.S. Dist. LEXIS 23468 (N.D. Cal. Nov. 15, 2002) ................................22

*Swedish Hosp. Corp. v. Shalala,*
  1 F.3d 1261 (D.C. Cir. 1993)...............................................................................8

*In re Synthroid Mktg. Litig.,*
  188 F.R.D. 287 (N.D. Ill. 1999) ........................................................................13

*Torrisi v. Tucson Elec. Power Co.,*
  8 F.3d 1370 (9th Cir. 1993).................................................................................8

*Triangle Indus., Inc. S'holders Litig.,*
  1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991).......................................10

*United States Football League v. National Football League,*
  644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd,*
  842 F.2d 1335, 1377 (2d Cir. 1988), *cert. denied,* 493 U.S. 1071 (1990) ...........19

*Van Vraken v. Atlantic Richfield, Inc.,*
  901 F. Supp. 295 (N.D. Cal. 1995).....................................................................21

*Vernon v. Southern Cal. Edison Co.,*
  955 F.2d 1361 (9th Cir. 1992) ...........................................................................19

*Vincent v. Hughes Air West, Inc.,*
  557 F.2d 759 (9th Cir. 1977) ...............................................................................8

*In re Vitamins Antitrust Litig.,*
  2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001) ....................................10

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ..................................................................... 9, 10, 19

*Vizcaino v. Microsoft Corp.*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001) ........................................... *passim*

*In re WPPSS Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ...................................................................... 20

*Weddle v. Frito-Lay, Inc.*,
    2001 WL 182374 (N.D. Cal. Feb. 21, 2001) ........................................... 22

*Weiss v. Mercedes-Benz of N. Am.*,
    899 F. Supp. 1297 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995) ................... 10

*Yeagley v. Wells Fargo & Co.*,
    2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008) ......................... 9

**MISCELLANEOUS**

Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District*
    *Courts: Final Report to the Advisory Committee on Civil Rules*
    (Federal Judicial Center 1996) ................................................................... 9

## I.    INTRODUCTION

Counsel for Named Purchaser Plaintiffs and Class Counsel ("Purchaser Counsel") respectfully submit this Motion for an Award of Attorney Fees, Reimbursement of Expenses, and Compensation to the Named Plaintiffs. [1]  More specifically, and as set forth below, Purchaser Counsel asks that this Court to award fees and expenses in the amount of $22,250,000.  This figure represents 25% of the $89,000,000 common fund created for the Class.  Although contemplated by the Settlement, Purchaser Counsel is not requesting the Court approve a separate award of their litigation expenses in this matter.  Purchaser Counsel also request that the Court approve compensation from the Settlement Fund in the total amount of $125,000 to 25 Third-Party Payor ("TPP") Named Plaintiffs ($5,000 each), and $36,000 in total for 18 Named Consumer Plaintiffs ($2,000 each). [2]

The settlement of this litigation provides real, immediate, and substantial cash benefits to the Class.  The proposed 25% fee award is reasonable as Purchaser Counsel have expended a total

---

[1] The Named Plaintiffs are ASEA/AFSCME Local 52 Health Benefits Trust; Bricklayers of Indiana Welfare Fund; Commonwealth Care Alliance; Frankenmuth Financial Group, Inc.; IBEW 673 Fringe Benefit Fund; IBEW Local 129 Fringe Benefit Funds; IBEW Local 683 Fringe Benefit Funds; IBEW Local 32 Health and Welfare Fund; Indiana Carpenters Health and Welfare Fund; Indiana Electrical Workers Local 481 Benefit Trust; Indiana State Council of Roofers Health and Welfare Fund; Indiana State District Council of Laborers and Hod Carriers Welfare Fund; Michiana Area Electrical Workers Health and Welfare Fund; New England Carpenters Health Benefits Fund; Painters Local No. 469 Health and Welfare Fund; Painting Industry Insurance and Annuity Funds; Pipe Trades Industry Health and Welfare Plan; Plumbers and Steamfitters Local No. 166 Health and Welfare Plan; Plumbers and Steamfitters Local 42 Health & Welfare Plan; Plumbers Local No. 210 Health and Welfare Fund; Service Employee International Union Local No. 3 Health & Welfare Fund; Sheet Metal Workers Local No. 20 Welfare and Benefit Fund; Sheet Metal Workers' International Association Local No. 28 of Metropolitan New York & Long Island; Southern Ohio Painters Health and Welfare Fund; Watters, Linda A., Offices of Financial and Insurance Services for the State of Michigan in her capacity as Rehabilitator of The Wellness Plan and in her capacity as Liquidator of Michigan Health Maintenance Organization Plans, Inc., formerly known as Omnicare Health Plan, Inc.; Nancy Ayers; Aurora Balloveras; Clara Fontanilles; Dorothy Greaves; Sarah Hare; Ronnie L. Hatcher; Beatrice Howard; Georgia Katsanos; Stephen Keisker; Rose Lohman; Michelle Madoff; Helen Marconi; Robert Marconi; Evelyne Mayes; Judith C. Meredith; Nancy Milano; Mary Morris; and June Swan, (collectively, "Plaintiffs" or "Named Plaintiffs").

[2] Plaintiffs are only seeking incentive awards on behalf of Named Plaintiffs who were not dismissed from the litigation and who participated in discovery.

of 19,622 hours in this case, a lodestar totaling $6,974,785 at historical billing rates, as well as $707,212 in total expenses.[3]

An award of 25% of the Class Settlement Fund is reasonable in light not only of the satisfactory result achieved for the Class (which is described in Plaintiffs' Motion for Final Approval of Settlement filed concurrently) but also due to the risks involved in undertaking this relatively complex matter as well as the immense effort required in litigating the claims and the subsequent settlement negotiations.  From its inception, this case has been intensely litigated, as Pfizer challenged discovery and liability.  The parties fought each other virtually every step of the way.  Litigating this case, therefore, has required immense time, energy and resources from Purchaser Counsel.  Furthermore, as the Court is well aware, this case involved complex and challenging issues of fact and law.  Negotiation and achievement of a settlement between parties so far apart on liability and damages was a daunting task requiring further time, energy and resources. The settlement was reached only after many months of arduous negotiations which were conducted in person, by telephone, and in writing with the assistance of two nationally known mediators, Judge Fern Smith (Ret.) and Professor Eric Green.

The result in this complex litigation and the effort required well supports the requested attorney fee and expense award of 25% of the Settlement Fund.  As explained below, this percentage is the benchmark in the Ninth Circuit, has been approved by federal courts throughout the United States, is justified by relevant factors considered by courts in this Circuit and others, and is in line with the fees that Purchaser Counsel could have obtained at arm's length in the open market.  Therefore, Purchaser Counsel respectfully request that the Court grant this motion.

---

[3] The Declaration of Steve W. Berman In Support of Motion for an Award of Attorney Fees, Reimbursement of Expenses and Compensation to Named Plaintiffs and Motion for Final Approval ("Berman Decl."), submitted herewith, sets forth the breakdown of total unaudited attorney hours, fees and expenses incurred.  Berman Decl. ¶ 41.  Each firm who participated in the purchaser litigation and settlement has submitted a declaration documenting their fees and costs.  Berman Decl. Exs. B-M.  Each firm has been asked to use historical billing rates and to only submit costs which do not conflict with the limitations in PTO 8.  Berman Decl. ¶ 40.

## II.     HISTORY OF THE LITIGATION

Purchaser Counsel's representation of the proposed Class, comprised of nationwide consumers and third-party payors who paid for prescriptions of Bextra and/or Celebrex, presented unique challenges to the litigation, coordination, and settlement of the claims against Pfizer. Purchaser Counsel successfully addressed and resolved these challenges throughout the prosecution and settlement of this litigation, resulting in an excellent recovery for the Class.

### A.     Pleading, Motion Practice and Discovery

This litigation began in January 2005 when Hagens Berman Sobol Shapiro filed the first class purchaser complaint.  Berman Decl. ¶ 13.  Multiple other class purchaser complaints were filed in different jurisdictions by Purchaser Counsel.  *Id.*  All related actions were transferred to this Court by order of the Judicial Panel on Multidistrict Litigation on September 6, 2005.  *In re Bextra & Celebrex Mktg., Sales & Prod. Liab. Litig.*, 391 F. Supp. 2d 1377 (J.P.M.L. 2005).  Pursuant to the authority granted Pretrial Order No. 2, paragraph 22, a Purchase Claims Committe was formed to manage and oversee the pending purchase claims.  Dkt #110.  Besides managing and participating in the Purchase Claims Committee, Purchaser Counsel participated as members of the Plaintiffs Steering Committee, Science Committee and Discovery Committee on issues relevant to both the personal injury cases and the purchase claims.  Berman Decl. ¶ 13.

The Court permitted over Defendants' objection, the Purchaser Plaintiffs to file master complaints for Bextra and Celebrex alleging claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), state consumer protection laws, unjust enrichment, and implied warranty.[4] Dkt. #192 and #193. On April 5, 2006, Defendants moved to dismiss the master complaints arguing that the claims were preempted by federal law, the complaints failed to state claims and multiple other grounds.  Dkt. #222 and #225.  The Court addressed only the preemption arguments, concluding,

---

[4] Throughout the purchaser litigation, Hagens Berman Sobol Shapiro as head of the Purchase Claims Committee led the drafting of pleadings and assigned portions of those tasks to co-counsel. Having one firm responsible for all aspects of the purchaser litigation prevented the duplication of work product and streamlined the process for responding to emerging issues.  Berman Decl. ¶ 14.

> Plaintiffs' claims that Pfizer's promotion of Celebrex [and Bextra] was unlawful because it failed to warn of the drug's cardiovascular risk are preempted because they conflict with the FDA's determination of what warnings are substantiated by the scientific evidence.  Accordingly, the failure-to-warn of cardiovascular risk claims are dismissed with leave to amend.  Pfizer has not established that the FDA has determined that all of Pfizer's promotion martial strikes a 'fair balance' and are not false and misleading.  Accordingly, Pfizer's motion to dismiss the false advertising claims on conflict preemption grounds is denied.

8/16/06 Memorandum and Order re Motion to Dismiss, Dkt. #497, *see also* Dkt. #509.

Plaintiffs' first amended master complaints, filed September 22, 2006, contained the same four original claims, but were amended according to the Court's motion to dismiss ruling.  Dkt. #588 and #589.  Defendants again responded with motions to dismiss.  Instead of an opposition motion, Plaintiffs agreed to voluntarily withdraw without prejudice their claims under RICO.  Plaintiffs' second amended master complaints, filed January 5, 2007, dropped the RICO claim but maintained the other three claims.  Dkt. #858 and #859.

The Defendants filed their third and final round of motions to dismiss arguing standing, *res judicata* and failure to state a claim.  This court granted in part (dismissing claims of association class reps who did not pay for Celebrex and Bextra, implied warranty and certain allegations under state consumer protection statutes) and denied in part (complaints sufficiently plead causation and injury in fact) the motion.  Dkt. #1498 and 1532.  Specifically, the Court concluded,

> [a] reasonable inference from the [Second Amended Complaints'] allegations is that the consumer plaintiffs' physicians prescribed Celebrex [and Bextra], and the third-party payors paid for it, because of defendants' widespread alleged misrepresentations about its superiority to less expensive NSAIDs.  Accordingly, defendants' motion to dismiss the state consumer protection claims is DENIED as is the motion to dismiss the unjust enrichment claims.  As plaintiffs have not and cannot allege the manifestation of a defect defendants' motion to dismiss the breach of implied warranty claims is GRANTED without leave to amend.

Dkt. #1532.

On July 24, 2007, Plaintiffs filed the currently operative Third Amended Master Complaints alleging claims under state consumer protection laws and unjust enrichment.  Dkt. #1586 and #1587.  On August 31, 2007, Defendantd filed answers to the Third Amended Complaints.  Dkt. #1804 and #1805.

Throughout this briefing process, the parties were involved in extensive discovery.  Berman Decl. ¶¶ 12-20.  Purchaser Counsel were instrumental in the review of millions of documents produced by the Defendants, including participation in the oversight of the document review process, training and supervision of document reviewers, document preparation for depositions, and organization of document collections.  *Id.*  Purchaser Counsel participated in multiple discovery disputes regarding Defendants' production.  *Id.*

Purchaser Counsel participated in the over forty common liability depositions of Pfizer's corporate witnesses, either as one of the questioning attorneys or in preparation for the deposition. Berman Decl. ¶ 16.  The majority of these depositions lasted two to three days and involved tremendous amounts of preparatory document review because of the large custodial files produced by the Defendants for most of the witnesses.[5] *Id.*

In November 2006, the Court held a science tutorial.  Purchaser Counsel participated in preparing an expert, Dr. John Abramson, for the tutorial on the efficacy and gastrointestinal risks of Bextra and Celebrex.  *Id.* ¶ 17.  Purchaser Counsel further provided document support to other presenting experts.  Purchaser Counsel played a supportive role throughout the litigation to the expert committee and specific experts, including in preparation for the Daubert proceeding in October 2007, providing documents and information regarding the Defendants' studies in order to understand the science behind Bextra and Celebrex.  This process was relevant to the purchaser litigation in order to prove that Defendants' claims about the drugs were false and that they had knowledge of this falsity.  *Id.*

In February 2007, Pfizer served extensive written discovery requests on the Named Plaintiffs.  *Id.* ¶ 18.  Plaintiffs agreed to begin providing responses to the requests on a rolling basis.  Responding to the discovery included many hours of document review, redaction of private healthcare information and collection on behalf of the Named Plaintiffs and multiple consultations with counsel to respond to interrogatories.  *Id.*  Many Plaintiffs collected information from third

---

[5] Pfizer regularly produced custodial files that contained millions of pages, including 3,910,899 pages for Gail Cawkwell, 4,456,563 pages for Kenneth Verburg, and 3,919,042 pages for Mona Wahba.  The sheer volume of information provided made deposition preparation time extensive. *Id.*

1    parties with relevant information.  This discovery process risked exposure of confidential and

2    proprietary information and required negotiation every step of the way, despite Plaintiffs position

3    that the vast majority of information sought by Pfizer was irrelevant.  *Id.*

4           Pfizer repeatedly challenged the amount and scope of discovery being produced.  *Id.* at

5    ¶ 19.  Purchaser Plaintiffs counsel attempted to limit the amount of time and costs in responding by

6    coordinated responses on behalf of all Named Plaintiffs.  Pfizer's challenges escalated to a motion

7    to compel in March 2008.  The parties were in the midst of this production dispute when the parties

8    agreed to stay discovery for mediation.  *Id.*

9           In an effort to speed resolution of the claims, Purchaser Counsel sought to litigate a

10   bellwether trial with a representative plaintiff.  *Id.* at ¶ 20.  Although the Special Master eventually,

11   after multiple rounds of correspondence and briefing, recommended against the bellwether, the

12   strategy helped to focus the issues that needed to be addressed at class certification.  On May 19,

13   2008, the parties filed a stipulation which would have required Plaintiffs to file their motion for

14   class certification on June 18, 2008.  The parties, however, agreed to mediate shortly before that

15   deadline and the Court agreed to stay all further discovery and briefing pending those mediation

16   efforts.  *See* Stipulation and Order Regarding Schedule for Bextra Purchase Claims Class

17   Certification Proceedings filed June 20, 2008, Dkt. #2503.

18   **B.     Mediation and Settlement**

19          The parties began mediation in earnest in July 2008 under the guidance of two experienced

20   mediators, the Honorable Fern Smith (Ret.) and Professor Eric Green.  The mediation process

21   involved three in-person mediation sessions with the mediators and multiple rounds of

22   correspondence.  Berman Decl. ¶ 21.  A major issue of debate was the calculation of damages.  *Id.*

23   ¶¶ 22-23.  Plaintiffs provided expert opinion on their damages model which estimated Plaintiffs

24   damages at $2.67 billion based on the difference between the price paid for Bextra and the price

25   that would have been paid for naproxen.[6]  Defendants challenged that model and provided a

26

27          _____

28          [6] Although the mediation involved the claims of both drugs, because of the significant barriers
     to claims regarding Celebrex, the damages models and discussions focused on Bextra.  *Id.*

contradictory model which calculated damages, if liability was established, at only $25 million to $57 million.  *Id.*

The arm's-length negotiations culminated in an agreement in principal in October 2008.  *Id.* at ¶ 24.  After this preliminary settlement was reached, the parties continued to negotiate the terms of the agreement.  This process lasted multiple months with many contested issues relating to the specifics of the agreement, including the language of the release and the description of the case to the class in the notice.  *Id.*

Multiple negotiation sessions were also conducted between Purchaser Plaintiffs' counsel on behalf of the proposed subclasses.  Separate Plaintiffs' counsel was appointed to represent each particular subclass to negotiate a Plan of Allocation.  *See* Declarations of Lance Harke, William Riley and Jason Thompson, ¶¶ 4-5, filed in support of Plaintiffs Response to Objections, DKt. #s 3103, 3104, and 3105.  Each allocation counsel represented members of their appointed subclass. *Id.*  The negotiations were conducted at arm's-length and multiple issues were contested, compromised and resolved with each subclass being vigorously represented.  *Id.* ¶ 6.

After reaching final agreements on the terms of the settlement and on the plan of allocation, the final settlement agreement and motion for preliminary approval were filed on March 13, 2009. Dkt. #2738.  On March 23, 2009, the Court entered an Order granting preliminary approval of the Settlement, certifying three separate subclasses for settlement purposes and appointing Class Counsel.  Dkt. #2926.

### III.    THE COURT SHOULD APPROVE THE FEE PETITION AS FAIR AND REASONABLE

**A.    A 25% Fee Award Is Fair And Appropriate Under Ninth Circuit Law**

For their efforts in recovering $89 million from the Defendants, Purchaser Counsel are seeking an award of attorneys' fees in the amount of 25% of the Settlement Fund, plus interest. For the following reasons, this request is fair and appropriate under Ninth Circuit law and should be approved:

### 1.     The Ninth Circuit Recognizes the Common Fund Doctrine

The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975) (common fund doctrine permits recovery of attorneys' fees and costs from money obtained from defendants). Ninth Circuit courts affirm the importance of the common fund doctrine. *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) (well-settled that lawyer who helps create common fund should be allowed to share in the award); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977) ("a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees"). Here, through the efforts of Purchaser Counsel, a common fund (the Settlement Fund) of $89 million has been created for the benefit of the Class. It is fair and appropriate that Purchaser Counsel should be compensated for their work in creating this fund.

### 2.     Percentage-of-the-Recovery Approach is the Predominant Method for Determining Attorneys' Fees Under Ninth Circuit Law

In *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), the Supreme Court explained that under the common fund doctrine, a reasonable fee may be based "on a percentage of the fund bestowed on the class." The Ninth Circuit has repeatedly endorsed the use of this percentage method in common fund cases. *See Paul, Johnson,* 886 F.2d at 272; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993).[7] Ninth Circuit courts often use a lodestar-times-multiplier analysis to "cross-check" the

---

[7] In fact, two circuits have ruled that the percentage method is ***mandatory*** in common-fund cases. *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991). Other circuits and commentators have expressly approved the use of the percentage method. *See, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *In re Cendant Corp. Prides Litig.*, 243 F.3d 722 (3d Cir. 2001).

1   reasonableness of the percentage-of-the-recovery award.  *See Vizcaino v. Microsoft Corp.*, 142 F.

2   Supp. 2d 1299, 1302 (W.D. Wash. 2001).

3       **3.     25% is the Benchmark in the Ninth Circuit, But Greater Awards are Frequent**

4       "In cases in which the percentage-of-the recovery method is used, the Ninth Circuit has

5   adopted a 25 percent benchmark for an award of fees." *Yeagley v. Wells Fargo & Co.*, 2008 U.S.

6   Dist. LEXIS 5040, at *17 (N.D. Cal. Jan. 18, 2008) (citing *Powers v. Eichen*, 229 F.3d 1249, 1256

7   (9th Cir. 2000)); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) (Ninth Circuit

8   surveyed fee awards from dozens of large common fund settlements, finding many in which fees of

9   20-30% were awarded); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (referring

10  to 25% in attorneys' fees as a "benchmark award"); *In re Businessland Sec. Litig.*, 1991 U.S. Dist.

11  LEXIS 8962, at *8 (N.D. Cal. June 14, 1991) (granting fee award of 30% of net settlement fund

12  plus expenses of $90,574.78, citing several cases from this and other circuits that held similarly).[8]

13      Courts have approved fee awards in common fund cases in the range of 25-45%.  *See, e.g.*,

14  *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (awarding class counsel $22,311,000

15  in fees or 33% of class fund of $67,000,000, plus a separate award of litigation expenses in the

16  amount of $1,297,301); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 109 (D.R.I. 1996); *Conley*

17  *v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998); *In re Compact Disc Minimum*

18  *Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 216 n.45 (D. Me. 2003); *Gaskill v. Gordon*, 160

19  F.3d 361, 363-64 (7th Cir. 1998) (affirming award of 38% of class action settlement fund); *In re*

20  *Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common

21  settlement fund); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y.

22  Apr. 11, 2003) (awarding fees of 33⅓% of $220 million common fund to Direct Purchaser

23  Plaintiff's Class Counsel); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS

24  ────────────────
        [8] Courts in other circuits and numerous commentators have also affirmed the reasonableness of
25  fees in the range of 25%-30%.  *See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942,
    972 (E.D. Tex. 2000) ("[B]ased on the opinions of other courts and the available studies of class
26  action attorneys' fees awards … this Court concludes that attorneys' fees in the range from …
    (25%) to … (33.34%) have been routinely awarded in class actions."); *see also* Thomas E.
27  Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts:  Final Report to
    the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996) (1996 study found that
28  the median percentage for attorneys' fees "ranged from 27% to 30%").

1  12344 (D.D.C. June 16, 2003) (awarding class counsel 30% of the common fund); *In re Vitamins*

2  *Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *57 (D.D.C. July 13, 2001) (determining that the

3  one-third award was reasonable and granting class counsel fee petition in the amount of

4  $123,188,032 plus interest, or approximately 34% of the total estimated settlement amount, in

5  antitrust price fixing litigation); *In re Activision Sec. Litig.*, 723 F. Supp 1373, 1375 (N.D. Cal.

6  1989) (awarding a 32.8% fee and adopting a "policy of awarding approximately 30% of the fund as

7  attorneys' fees in the ordinary case," as "well-justified in light of the lengthy line of cases which

8  find such an award appropriate and reasonable….").

9        Here, Purchaser Counsels' request of a 25% of the recovery fee award is quite reasonable,

10  falling on the low end of fees commonly awarded by Ninth Circuit courts and elsewhere.  The

11  settlement agreement signed with the Defendant provides that "Pfizer will not object to Class

12  Counsel's request for an attorneys' fee not to exceed the sum of 30% of the Settlement Fund, plus

13  expenses."  Settlement Agreement, Exhibit A to the Declaration of Steve Berman in Support of

14  Motion for Preliminary Approval of Settlement, p. 25 (Dkt. #2739-2 filed 3/13/09).  While a fee

15  award of one third of the settlement fund is justified in this case due to the satisfactory result

16  achieved, Purchaser Counsel have voluntarily reduced their request to 25%.

17        **4.      A Cross Check Using Loadstar Supports the Reasonableness of the Award**

18        A loadstar cross check of the requested fee award amounts to a 3.19 multiplier.  The Ninth

19  Circuit noted in *Vizcaino*, 290 F.3d at 1053-54, that most multipliers range between 1.0 and 4.0.

20  Multipliers of between 3 and 4.5 have been common.  *See, e.g., Vizcaino*, 142 F. Supp. 2d at 1305-

21  06 (approving multiplier of 3.67); *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 (E.D.

22  Pa. 2001) (recognizing that a "lodestar multiple in the range of 4.5 to 8.5" is "unquestionably

23  reasonable" under the cross-check approach); *Weiss v. Mercedes-Benz of N. Am.,* 899 F. Supp.

24  1297, 1304 (D.N.J. 1995) (awarding fee that resulted in a multiplier of 9.3 times hourly rate), *aff'd*,

25  66 F.3d 314 (3d Cir. 1995); *Roberts v. Texaco, Inc.,* 979 F. Supp. 185, 198 (S.D.N.Y. 1997)

26  (awarding a 5.5 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465

27  (S.D.N.Y. 1998) (awarding a multiplier of 3.97); *In re Aetna Inc. Sec. Litig.,* 2001 U.S. Dist.

28  LEXIS 68 (E.D. Pa. Jan. 4, 2001) (awarding a multiplier of 3.6); *Triangle Indus., Inc. S'holders*

1  *Litig.*, 1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991) (awarding fee equal to 6.6 multiplier on

2  $70 million recovery); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (awarding fee

3  equal to a multiplier of 8.84); *In re RJR Nabisco Sec. Litig.*, 1992 U.S. Dist. LEXIS 12702, at *16

4  (S.D.N.Y. Aug. 24, 1992) (6 multiplier).  The 3.19 multiplier determined as a loadstar cross check

5  of the 25% fee award, falls squarely within the ranges surveyed for this district.  This multiplier is

6  reasonable compared with the range of implied multipliers that have been found to be reasonable

7  for cross-check purposes in other class actions.

8  **B.     The Relevant Factors Justify an Award of 25% in This Case**

9  **  1.     The Result Achieved**

10      Courts have consistently recognized that the result achieved is a major factor to be

11  considered in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical

12  factor is the degree of success obtained").  In making this assessment, Courts have compared "the

13  present value of the damages plaintiffs would likely recover if successful, appropriately discounted

14  for the risk for not prevailing with the amount of the proposed settlement."  *Nichols v. SmithKline*

15  *Beecham Corp.* ("*Paxil Litigation*"), 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) (quoting *In re*

16  *General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir.

17  1995) (quoting *Manual for Complex Litigation* 2d § 30.44 at 252)).  "The Court must … recognize

18  that settlement represents a compromise in which the highest hopes for recovery are yielded in

19  exchange for certainty and resolution and guard against demanding too large a settlement."  *Id*.

20  (internal quotations omitted).

21      Here, the result achieved – of $89 million for the Class – is a satisfactory result.  Plaintiffs

22  sought to establish that all Bextra purchasers would either have purchased a lower priced

23  alternative or nothing at all in the absence of Defendants' false claims.  Berman Decl. ¶¶ 21-23.

24  Damages would equal the amount of money paid for Bextra minus the amount that would have

25  been paid for a lower priced alternative which Plaintiffs' damages expert calculated to be

26  approximately $2.67 billion. [9]  Based on this best case scenario damage model which presupposes

27  ───────────────

28  [9] Plaintiffs acknowledged that there was so little chance of a Celebrex only recovery that
potential Celebrex damages were not relevant to the settlement negotiations.  Berman Decl. ¶ 21.

that every class member would have purchased much lower priced naproxen had it not been for Defendants marketing, the $89 million settlement amount represents 3.33% of Plaintiffs total damages. *Id.*

Defendants, however, argued that patients would have purchased a different brand name drug instead of Bextra and because brand name drugs are sold at higher prices, Plaintiffs' damages were really only between $25 million and $57 million. *Id.* Based on this estimate of damages, the settlement amount was up to 356% of the damages suffered by the Class.

The settlement amount therefore reflects somewhere between 3.33% and 356% of Plaintiffs actual damages. Taking all of the risks of the litigation into consideration, this damages recovery is within the range of reasonableness. This percentage is consistent with those approved in other complex class action cases. *See Nichols (Paxil Litigation)*, 2005 WL 950616, at *16 (concluding that the $65 million Settlement Fund which represents between 9.3% and 13.9% of damages as within the range of reasonableness); *In re Cendant Corp. Litig.*, 264 F.3d 201, 241 (3d Cir. 2001) (approving settlement for 36% recovery and noting that typical recoveries in securities class actions range from 1.6% to 14%).

The $89 million settlement amount represents 4% of Pfizer's Bextra sales during the Class Period. The percentage recovery compares very favorably with other settlements in this district. For example, in *In re Rubber Chemicals Antitrust Litig.*, No. C-04-1648 MJJ, Order, (N.D. Cal. Jan. 9, 2007) (attached hereto as Exhibit A), a horizontal price-fixing case in which some of the defendants had entered guilty pleas in related criminal proceedings, Judge Jenkins characterized a settlement payment of 4% of a defendant's sales as an "excellent recovery." *Id.* at 2; *see also, e.g.,* *In re Plastic Tableware Antitrust Litig.*, 1995 U.S. Dist. LEXIS 17014, at *4 (E.D. Pa. Oct. 25, 1995) (3.5% of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (1.62% of sales); *In re Shopping Carts Antitrust Litig.*, 1983 U.S. Dist. LEXIS 11555, at *24 (S.D.N.Y. Nov. 18, 1983) (5.5% of sales); *In re Automotive Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29161, at *22 (E.D. Pa. Sept. 27, 2004) (recovery represented 2% of sales); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 451 (E.D. Pa. 1985) (recovery

1    represented 2.4% of sales); *Fisher Bros. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa.

2    1985) (recoveries equal to .1%, .2%, 2%, .3%, .65%, .88%, and 2.4% of defendants' total sales).

3           The Settlement is comparable to other class action settlements achieved nationwide in this

4    area of consumer fraud litigation.  *See*, *e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 228

5    F.R.D. 75 (D. Mass. 2005) ($150 million settlement on behalf of TPPs and Consumers); *In re*

6    *Pharm. Indus. Average Wholesale Price Litigation ("AWP") (GlaxoSmithKline Settlement)*,

7    No. 01-cv-12257-PBS (D. Mass. Aug. 7, 2007) ($70 million settlement) (Exhibit B hereto); *AWP*

8    *AstraZeneca Class I Settlement*, No. 01-cv-12257-PBS (D. Mass. Oct. 2, 2008) ($34 million

9    settlement) (Exhibit C hereto); *AWP BMS – Class I Settlement*, No. 01-cv-12257-PBS (D. Mass.)

10   (hearing on motion for preliminary approval held Aug. 10, 2009) ($13 million settlement); *In re*

11   *Synthroid Marketing Litig.*, 188 F.R.D. 287 (N.D. Ill. 1999) ($134 million settlement); *Government*

12   *Employees Hosp. Ass'n, et al. v. Serono*, C.A. No. 05-cv-11935 (D. Mass. Dec. 12, 2007)

13   ($24 million settlement) (Exhibit D hereto); *Hoorman v. SmithKline Beecham* ("*Paxil Pediatric*

14   *Litigation*"), Case No. 04-L-715 (Madison County, IL) ($64 million settlement).  Thus, the

15   settlement amount is reasonable in light of the similar amounts reached for similar cases.

16           **2.      The Skill Required**

17                   **a.      High caliber of opposing counsel**

18           The caliber of opposing counsel is another important factor in assessing the quality of

19   Purchaser Counsels' work.  *Vizcaino*, 142 F. Supp. 2d at 1303; *In re Equity Funding Corp. Sec.*

20   *Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977).  The quality of Purchaser Counsel's work, and

21   the efficacy and dedication with which it was performed, should be compensated.  *See*, *e.g.*, *J.N.*

22   *Futia Co. v. Phelps Dodge Indus., Inc.*, 1982 U.S. Dist. LEXIS 15261 (S.D.N.Y. Sept. 17, 1982).

23   Here, Purchaser Counsel were opposed by attorneys from some of the largest firms in the country

24   with near limitless resources at their disposal.  Berman Decl. ¶ 47.  Despite facing such worthy

25   adversaries, Purchaser Counsel achieved an good result for the Class.  From the very beginning,

26   Purchaser Counsel have litigated this action vigorously and skillfully, with an eye toward

27   maximizing any recovery, and should be compensated for their efforts.  *Id.* at ¶¶ 10-11.

28

**b.      Complexity and difficulty of issues**

This was a complex case which required Purchaser Counsel to confront many difficult legal and factual issues. *Id*. at ¶ 12. There were two drugs involved that were marketed nationally by at least four separate corporations that later merged. *Id*.  The consumer protection act claims were based on the laws of multiple states and all of their variations, although not an insurmountable barrier to class certification provided substantial obstacles to the successful litigation of the claims. Courts have recognized that the novelty and difficulty of issues in a case are significant factors to be considered in making a fee award. *See, e.g., Vizcaino*, 142 F. Supp. 2d at 1306.  Here, not only did Purchaser Counsel effectively manage the logistics of litigating such a complex case, with more than sixteen purchaser plaintiffs' firms, scores of able defense counsel, but as described in detail below, they successfully tackled many difficult legal and factual issues presented by this case.

**3.      The Quality of Work Performed**

**a.      Investigation and development of facts**

From the outset, Purchaser Counsel took pains to develop the facts to support a convincing case.  Before the initial complaints were filed, Purchaser Counsel began investigating what claims, if any, could be brought against the Defendants.  Berman Decl. ¶ 12.  As Purchaser Counsel quickly learned, the factual scope of the litigation was enormous, and replete with difficult factual issues to master.  For example, Purchaser Counsel had to learn the complexities of the pharmaceutical industry, the federal regulatory governance of that industry and its products.  *Id*. Further, Purchaser Counsel had to learn the intricacies of each Defendant.  *Id*.  The Defendant is a multibillion dollar company which is the result of at least four major corporate mergers during the lifetime of Bextra and Celebrex, with countless employees spread throughout the world, and each with their own organizational systems and procedures.  Purchaser Counsel had to learn each's record keeping systems, sales structure, marketing practices, cultural norms for Defendants' operations, and the lingo used in the emails that were sent internally by Defendants, and across Defendants, in the industry.  *Id*.

1

   **b.    Nearly four amended complaints and three rounds of motions to dismiss**

2      The briefing in this litigation was extensive.  *Id*. at ¶ 4.  The multiple amendments to

3   complaints and multiple rounds of motions to dismiss evidence the complexity of the legal issues

4   being litigated.  Purchaser Counsel needed to have familiarity with similar class cases nationwide

5   and with the complex interactions of the various state consumer protection laws.  Counsel was able

6   to successfully defend against these multiple rounds of motions to dismiss without losing

7   significant portions of their original claims.

8
   **c.    Difficulties in obtaining discovery and discovery disputes**

9      Purchaser Counsel participated in multiple discovery disputes with the Defendants.  *Id*. at ¶

10  15.  Purchaser Counsel was involved in the day to day oversight of the document depository, a

11  database system to house the documents, assisted in the develop of an intricate coding system to

12  make those documents useful, and participated heavily the full-scale review of over 3,450,002

13  million documents the majority of which were multiple pages.  *Id*.  This review led to disputes over

14  the number of duplicate documents produced, the absence of particular categories of documents,

15  and the particular custodians which were and were not produced.  Purchaser Counsel engaged in

16  numerous "meet and confer" sessions with Defendants' counsel to come to agreements on these

17  issues.  In most cases, discovery disputes were handled without the need for Court intervention,

18  however, on several occasions, Purchaser Counsel participated in disputes before Special Master

19  Fern Smith.  *Id*.

20
   **d.    Protracted settlement negotiations with defendants**

21     Purchaser Counsels' efforts during the course of this litigation, led to extensive and lengthy

22  settlement negotiations.  In preparation for all settlement negotiations, Purchaser Counsel prepared

23  and presented a detailed analysis of the evidence against the Defendants and a damage

24  computation.  *Id*. at ¶ 21.

25  **4.    The Risks of this Litigation**

26     Risk is an important factor in determining a fair fee award.  *Vizcaino*, 142 F. Supp. 2d at

27  1303-04.  In fact, Ninth Circuit courts have recognized that a high risk factor is one reason for

28  increasing attorneys' fee awards above the 25% benchmark fee.  *Id*.; *see also In re Pacific Enters.*

1  *Sec. Litig.*, 47 F.3d at 379 (33% of the common fund as attorneys fees was justified because of the

2  complexity of the issues and the risks).  In *Vizcaino*, the Court explained that the case was

3  extremely risky for class counsel to pursue because of negative facts, the lack of controlling law,

4  and the vigorous defense of the case.  *Vizcaino*, 142 F. Supp. 2d at 1303.  The *Vizcaino* court

5  further noted that class counsel's risk in that case was even greater, and their work made more

6  difficult, because the defendant, Microsoft, was one of the nation's largest and most formidable

7  companies and it, and several law firms, defended the case vigorously for several years.  *Id.*  Here,

8  Purhcaser Counsel faced many risks, including:

9     **a.**  **The risk of not achieving class certification**

10    Here, class certification was potentially an uphill battle.  Berman Decl. ¶ 31.  Few such

11  classes have been certified and the potential for denial of class certification and the multiple state

12  by state actions which would necessarily follow was substantial.  *See In re Neurontin Mktg., Sales*

13  *Practices & Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 65526 (D. Mass. May 13, 2009) (denying

14  class certification of class of nationwide consumers and TPPs alleging fraudulent advertising of

15  drug Neurontin).

16    Purchaser Plaintiffs engaged four experts to support their motion for class certification.

17  Berman Decl. ¶ 32.  Although Purchaser Plaintiffs had hired experts to opine on class wide impact

18  and injury, a model for valuing a drug, explaining the prescription drug marketplace and Celebrex

19  and Bextra's positioning in that marketplace and the scientific evidence supporting or conflicting

20  with the promotion of the drugs, these experts had yet to be challenged on their opinions.  *Id.*  The

21  likely battle of experts and conflicting legal authority made the outcome of an expensive and

22  fiercely contested class certification motion uncertain.  *Id.*

23     **b.**  **The risk of not being able to establish causation**

24    Plaintiffs' claims required them to establish that Defendants marketing of Bextra and

25  Celebrex caused Class members to purchase the drugs.  Although Plaintiffs were confident that

26  such causation could be established, Defendants had multiple defenses that other causes led to the

27  purchases or that purchasers would have paid for the drugs whether the false claims were made or

28  not.  Berman Decl. ¶ 33. A recent decision from New Jersey District Court highlights the difficulty

MOTION FOR AWARD OF ATTORNEY FEES       - 16 -
 - M:05-CV-01699-CRB
001682-15 299808 V1

of establishing causation on a class wide basis.  In *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604 (D.N.J. July 10, 2009), the court rejected plaintiffs' argument that they could prove causation in an off-label marketing case through expert testimony and a statistical analysis of the defendants' data.  *See id.* at *23-25.  Holding that the plaintiffs could "not prove causation by way of generalized allegations and aggregate proof," *id.* at *25, the court explained that "a court or jury would have to determine whether each prescribing physician received fraudulent marketing information from the [d]efendants and whether each physician was influenced to prescribe the Subject Drugs on account of [defendants'] conduct."  *Id.* at *26, *see also, Pennsylvania Employees Benefit Trust Fund v. AstraZeneca Pharms. LP*, 2009 WL 2231686, at *5 (M.D. Fla. July 20, 2009) (noting the court's "serious concerns about the difficulties inherent in determining, on a transaction-by-transaction basis, whether and to what extent, Defendants' unlawful conduct caused each Seroquel prescription to be written by [plaintiff's] members' physicians").

    Here Plaintiffs were intending to submit expert testimony that would establish causation though such aggregate proof.  Berman Decl. ¶ 34.  The alternative of proving causation on a case by case basis for each prescription is untenable.  The risk that the court or jury would not accept the expert aggregate proof was substantial.  *Id.*

    Plaintiffs would also have to establish that the claims made regarding Bextra or Celebrex were in fact false.  This was a shaping up to be a hotly disputed issue with expert testimony on both sides regarding the benefits of Bextra and Celebrex in comparison to their lower priced alternatives.  *Id.* at ¶ 35.  This issue was further complicated by the presence of the FDA's labeling and evaluations of the drugs.  The FDA issued opinions regarding the efficacy and safety of both drugs and those opinions, in some cases, could arguably support Defendants marketing of the drugs.  *Id.*

    The Celebrex claims included substantial additional obstacles above the obstacles faced by the Bextra claims.  *Id.* at ¶ 36.  These obstacles included that Celebrex is still on the market and many consumers and TPPs continue to pay prices for it above lower priced alternatives.  These factors and others made the potential for recovery for Celebrex claims significantly less than

1    Bextra claims and likely would bar any recovery by Celebrex purchasers had they not been brought

2    in conjunction with Bextra.  *Id.*

3            c.        **The risk of not being able to establish injury to class members**

4            Perhaps the greatest risk faced by Purchaser Counsel was the fact that even if they could

5    establish that Defendants falsely advertised Bextra and Celebrex, and that the false marketing

6    caused class members to pay for prescriptions of Bextra and Celebrex, the Class had the burden to

7    show that Plaintiffs suffered damages as a result.  *Id.* at ¶ 37.  Plaintiffs sought to establish that all

8    Bextra and Celebrex purchasers would either have purchased a lower priced alternative or nothing

9    at all in the absence of Defendants' false claims.  Plaintiffs intended to do so in the aggregate

10   through expert testimony based on national sales data and prescribing patterns.  *Id.* at ¶¶ 21-23.

11   Damages would equal the amount of money paid for Bextra and Celebrex minus the amount that

12   would have been paid for a lower priced alternative.  This estimate presented obstacles such as

13   defining which lower priced alternative would have been purchased and for how much.  A

14   significant assumption underlying this damages theory is that all Class members would have spent

15   less money if they did not pay for Bextra or Celebrex.  *Id.*  The Defendants argued that a large

16   number of purchasers would have purchased a different brand name drug, some of which were

17   more expensive than Bextra or Celebrex, instead of Bextra or Celebrex.  Defendants calculated that

18   Plaintiffs damages were really only $25 million to $57 million.  There was therefore a substantial

19   risk that even if liability was established, Plaintiffs would only be able to recover this much smaller

20   damages amount.  *Id.*

21           Adding to this risk was the likely Daubert attacks of Plaintiffs' experts.  *Id.* at ¶ 38.  Under

22   Ninth Circuit case law, a flawed damage analysis can be fatal to a case.  *See Brooke Group Ltd. v.*

23   *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not

24   supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts

25   contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.")

26   (citation omitted); *American Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031,

27   1041-43 (N.D. Cal. 2001) ("Plaintiffs cannot prove causation of actual injury without ... expert

28   testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused

by defendants' unlawful conduct, and not because of lawful competition or other factors."); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming summary judgment for the defendants because district court properly excluded "hopelessly flawed" damages studies that rested "on unsupported assumptions"); *Vernon v. Southern Cal. Edison Co.*, 955 F.2d 1361, 1371-73 (9th Cir. 1992) (affirming summary judgment for the defendant where the plaintiff submitted flawed damages model). Here, not only did Purchaser Counsel have to contend with the negative facts regarding damages, but if Plaintiffs' expert testimony was precluded at trial, the possibility of a jury verdict in Plaintiffs' favor would have been severely diminished, if not completely obliterated. Berman Decl. ¶ 38.

### d. The risk of going to trial

Going to trial in any case is a risk. *Id.* at ¶ 39. In fact, the records of federal courts are filled with complex cases such as this one that have been unsuccessful. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785-87 (7th Cir. 1999), *cert. denied*, 528 U.S. 1181 (2000) (affirming, in large part, a directed verdict during a trial held after plaintiffs obtained a reversal of summary judgments in favor of defendant pharmaceutical manufacturers); *MCI Commc'ns Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-69 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983) (remanding massive antitrust judgment for a new trial and damages); *United States Football League v. National Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988), *cert. denied*, 493 U.S. 1071 (1990) (culminating in a verdict of $1 before trebling after a lengthy trial).

### 5. Contingent nature of the fee

The Ninth Circuit has confirmed that a fair fee award must include consideration of the contingent nature of the fee, where there is no assurance of attorneys' fees or reimbursement of expenses. *See, e.g.*, *Vizcaino*, 290 F.3d at 1049-50 (approving an award of 28% of the recovery). Fee awards must be sufficient to encourage the most skilled and determined counsel to take on difficult cases and see them through to completion, which could take years. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344, at *28. As noted by the court in *In*

1    *re WPPSS Sec. Litig.*, it is an established practice to reward attorneys who take on the added risk of

2    a contingency case:

> It is an established practice in the private legal market to reward
> attorneys for taking the risk of non-payment by paying them a
> premium over their normal hourly rates for winning contingency
> cases. *See* Richard Posner, *Economic Analysis of Law* §21.9, at 534-
> 35 (3d ed. 1986). Contingent fees that may far exceed the market
> value of the services if rendered on a non-contingent basis are
> accepted in the legal profession as a legitimate way of assuring
> competent representation for plaintiffs who could not afford to pay
> on an hourly basis regardless whether they win or lose.

8    *In re WPPSS Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994).

9        The commencement of a class action is no guarantee of success. Purchaser Counsel have

10   received no compensation during the four year course of the litigation and have incurred over

11   19,622 hours in time and $707,212 in expenses in litigating for the benefit of the Class. Berman

12   Decl. ¶ 41. Any fee award or reimbursement of expenses for Purchaser Counsel has always been a

13   substantial risk and ultimately any award is completely within the Court's discretion. Here, despite

14   the many risks faced, Purchaser Counsel committed their financial and human resources to

15   litigating this case and achieved a good result for the benefit of the Class. For this they should be

16   fairly compensated and reimbursed. *Id.* at ¶¶ 10-11.

17       In sum, given the good result achieved, the enormous amount of work performed, and the

18   high degree of risk in this case, Purchaser Counsel's request is merited and reasonable and

19   compares very favorably with fees awarded in similar class actions.

20       **6.    The class' reaction supports the requested award**

21       Notices of the Settlement were mailed to over 40,000 TPP Class Members, advertised on

22   television, published in the WALL STREET JOURNAL and posted on a website. Berman Decl. ¶ 27.

23   Class Members were informed in the settlement notice that Purchaser Counsel would apply for

24   attorneys' fees of up to 30% of the Settlement Fund and reimbursement of expenses and were

25   advised of their right to object to such requests. In this case, out of 40,000 notices sent, it is

26

27

28

1   remarkable that *only five* objections have been received.  One of these objections, on behalf of the

2   County of Suffolk, NY, has been resolved.[10]

3         The small number of objections is especially significant where, as here, the Class included

4   many large, sophisticated business entities.  "When a class is comprised of sophisticated business

5   entities that can be expected to oppose any request for attorney fees they find unreasonable, the

6   lack of objections 'indicates the appropriateness of the [fee] request.'"  *In re Remeron Direct*

7   *Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013, at *36 n.1 (D.N.J. Nov. 9, 2005)

8   (awarding fee of 33-1/3% of a $75 million settlement).

9         The remainder, as argued in plaintiffs Response to Objections, merely express disagreement

10  of the amounts allocated between Class members or inadequacy of the settlement amount in

11  general, all inadequate basis for overturning the settlement.  *See* Plaintiffs Response to Objections

12  and Berman Declaration in support thereof, Dkt. # 3101 and #3102.  These objections should be

13  overruled.

14      **IV.**    **COMPENSATION TO THE NAMED PLAINTIFFS IS APPROPRIATE**

15        Purchaser Counsel also request that the Court approve compensation from the Settlement

16  Fund in the total amount of $125,000 to 25 TPP Named Plaintiffs ($5,000 each), and $36,000 in

17  total for 18 Named Consumer Plaintiffs ($2,000 each).  By shouldering the burdens associated with

18  this litigation, each Class Representative has made a significant contribution to the recovery

19  obtained for the Class.  These Plaintiffs played an important role in this litigation – retaining

20  counsel, producing documents, responding to written discovery, and conferring with counsel on the

21  litigation.  Berman Decl. ¶¶ 18, 49-51.

22        Incentive awards of $2,000 and $5,000 per Class Representative is quite modest and is

23  within the amounts that Ninth Circuit courts find acceptable.  *See*, *e.g.*, *Presley v. Carter Hawley*

24  *Hale Profit Sharing Plan*, 2000 WL 16437, at *2 (N.D. Cal. 2000) (approving $25,000 incentive

25  awards); *Van Vraken v. Atlantic Richfield, Inc.*, 901 F. Supp. 295, 300 (N.D. Cal. 1995) (approving

26              [10] The objection of the County of Suffolk, NY has been resolved.  The County along with the

27  settling parties agree that the Settlement does include the County's claims to the extent it seeks
damages based solely on amounts paid for its employees as a self insured employer and not on its

28  Medicaid/Medicare expenditures. Berman Decl. ¶ 29.

$50,000 incentive award); *In re McKessonHBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 844, 851 (N.D. Cal. 2005) (approving $5,000 incentive awards); *In re Sorbates Direct Purchaser Antitrust Litig.*, 2002 U.S. Dist. LEXIS 23468, at *11 (N.D. Cal. Nov. 15, 2002); *Weddle v. Frito-Lay, Inc.*, 2001 WL 182374, at *3 (N.D. Cal. Feb. 21, 2001); *In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994) (awarding $25,000 to eleven class representatives).

Courts often make an award to class representatives for their service to the Class.  *In re Lorazepam & Chlorazepate Antitrust Litig*, 205 F.R.D. 369, 400 (D.D.C. 2002); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving incentive awards of $5,000 each to two class representatives of 5,400 potential class members in a settlement of $1.725 million); *see also Hughes v. Microsoft Corp.*, 2001 U.S. Dist. LEXIS 5976, at *34 (W.D. Wash. Mar. 21, 2001) ("Incentive awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 503-4 (N.D. Miss. 1996) (acknowledging the public benefits of private enforcement efforts in antitrust and similar types of class action litigation by rewarding representative plaintiffs who have been instrumental in obtaining relief on behalf of persons other than themselves).

The Notice to the Class advised Class members that Purchaser Counsel would apply for such compensation, and no Class member has to date objected to such an award.

In light of the benefits conferred by the settlements reached in this case, the role of the Class Representatives in this lawsuit should be acknowledged with a reasonable payment to compensate them for their time and expenses associated with actively participating in this litigation.

## V.   CONCLUSION

For the reasons set forth above, Purchaser Counsel respectfully request that the Court approve the fee and expense petition and enter an order awarding Purchaser Counsel attorney fees and expenses in the amount of 25% of the $89 million common fund or $22,250,000.00.  Purchaser Counsel also request that the named Plaintiffs be awarded a total of $161,000.00 as compensation for their participation in the prosecution of this action.

DATED:  August 14, 2009

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP


By _/s/ Steve W. Berman_____
    Steve W. Berman
    steve@hbsslaw.com
    Lisa Hasselman
    lisah@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Frank M. Pitre
COTCHETT, PITRE & McCARTHYLP
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA  94010
Telephone:  650-697-6000
Facsimile:  650-697-0577

Elizabeth J. Cabraser
Scott P. Nealey
LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Leonard Barrack
Robert Hoffman
Jeffrey Gittleman
Chad Carder
BARRACK, RODOS & BACINE
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA  19103
Telephone:  (215) 963-0600
Facsimile:  (215) 963-0838

Lance A. Harke
Howard M. Bushman
HARKE & CLASBY LLP
155 South Miami Avenue, Suite 600
Miami, Florida  33130
Telephone:  (305) 536-8219
Facsimile:  (305) 536-8229

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William N. Riley
Jaime R. Kendall
PRICE WAICUKAUSKI & RILEY, LLC
301 Massachusetts Avenue
Indianapolis, IN 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

Jason J. Thompson
SOMMERS SCHWARTZ P.C.
2000 Town Center, Suite 900
Southfield, MI  48075
Telephone: (248) 355-0300

L.S. Charfoos (N.Y Reg #2061406)
Ann K. Mandt (P46314)
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Ave.
Detroit, MI  48202
Telephone:  (313) 875-8080
Facsimile:  (313) 875-8522

Ronald S. Goldser
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:  (612) 341-0400
Facsimile:  (612) 341-0844

Jeffrey S. Goddess
ROSENTHAL, MONHAIT, GROSS & GODDESS
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899-1070
Telephone:  (302) 656-4433
Facsimile:  (302) 658-7567

Garve W. Ivey, Jr.
THE IVEY LAW FIRM
315 West 19th Street
P. O. Box 1349
Jasper, AL  35502-1349
Telephone:  (205) 221-4644
Facsimile:  (205) 252-8484

Jonathan B. Lowe
LOWE MOBLEY & LOWE
P. O. Box 576
Haleyville, AL  35575-0576
Telephone:  (205) 486-5296
Facsimile:  (205) 486-4531

MOTION FOR AWARD OF ATTORNEY FEES                    - 24 -
 - M:05-CV-01699-CRB
001682-15  299808 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey L. Kodroff
SPECTOR, ROSEMAN & KODROFF, PC
1818 Market Street, Suite 2500
Philadelphia, PA  19106
Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611

James R. Dugan, II, T.A. (LSBA No. 24785)
Douglas R. Plymale (LSBA No. 28409)
Stephen B. Murray, Jr. (LSBA No. 23877)
Stephen B. Murray, Sr. (LSBA No. 9858)
DUGAN LAW FIRM, PLC
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone:  (504) 648-0180
Facsimile:  (504) 648-0181

*Purchaser Counsel*