IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | Master Case No. 05-CV-01699 CRB<br>Individual Case No. 11-CV-00310 CRB<br>MDL No. 1699 |
| This Document Relates To:<br>HEALTH CARE SERVICE CORPORATION, a MUTUAL LEGAL RESERVE COMPANY,<br>  Plaintiff,<br>  v.<br>PHARMACIA & UPJOHN, INC., and PFIZER, INC.,<br>  Defendants. | **ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE** |

In the latest development in the Bextra-Celebrex MDL, Plaintiff health insurance provider Health Care Service Corporation ("HCSC" or "Plaintiff") brings suit against Defendant pharmaceutical manufacturers Pharmacia & Upjohn, Inc. and Pfizer, Inc. ("Defendants"),[1] alleging unlawful marketing of the drug Bextra for off-label uses,[2] which were unsafe and ineffective. Defendants move to dismiss Plaintiff's Second Amended Complaint (dkt. 37) on the grounds that: (1) Plaintiff has not properly alleged causation, (2)

---

[1] In its First Amended Complaint ("FAC"), Plaintiff had additionally named a number of Pfizer employees as individual defendants. FAC ¶¶ 5-9. Having withdrawn its claims against these individuals in the SAC, now only the two corporate entities remain as defendants.

[2] The term "off-label" refers to dosages or uses of a drug that have not been approved by the FDA. SAC ¶ 13.

Plaintiff has not properly alleged an economic injury, (3) Plaintiff's claims fail for various substantive reasons, and (4) Plaintiff's claims are untimely.[3] Because Plaintiff fails to adequately plead causation as instructed by the Court in a previous motion to dismiss hearing on March 22, 2012, the Court GRANTS Defendants' Motion. See Transcript of Proceedings at 14 (dkt. 41).

## I.   BACKGROUND

Plaintiff is a health insurance entity (of a type commonly referred to as a third-party payor, or "TPP") that processes insurance claims through its divisions in Illinois, New Mexico, Oklahoma, and Texas. SAC ¶ 4. Plaintiff is organized under the laws of Illinois, which is also its principal place of business. Id. Defendants Pfizer and Pharmacia are Delaware corporations in the business of developing, marketing, and selling pharmaceuticals. Id. ¶ 5. Pfizer acquired Pharmacia in 2003. Id.

Defendants developed Bextra, a type of drug known as a COX-2 inhibitor, as an alternative to non-steroidal anti-inflammatory ("NSAID") pain relievers, such as aspirin and ibuprofen. Id. ¶¶ 8-9. On November 16, 2001, the FDA approved small dosages of Bextra for treating the symptoms of a limited number of conditions but denied approval for the prevention and treatment of acute pain. Id. ¶ 17. After receiving (limited) FDA approval, Pharmacia marketed and sold Bextra throughout the United States until the drug was pulled from the market in 2005. Id. ¶¶ 7, 16, 75.

Plaintiff alleges that Defendants engaged in a deceptive marketing strategy for Bextra that involved (1) misrepresenting the drug's safety and efficacy, and (2) improperly marketing it for off-label uses, including treatment of acute pain. Id. ¶ 15.[4] Plaintiff alleges that Defendants promoted Bextra as a "superior alternative to traditional NSAIDs," both in

---

[3] Defendants asserted each of these challenges against Plaintiff's First Amended Complaint ("FAC") as well. Only causation and injury were discussed at the Motion to Dismiss hearing held on March 22, 2012, which resulted in dismissal of Plaintiff's FAC. See Transcript of Proceedings at 14 (dkt. 41).

[4] The pleadings originally included allegations against Defendants for the improper marketing of Celebrex, another COX-2 inhibitor drug. FAC ¶ 1. The Celebrex allegations have been withdrawn upon amendment, so only conduct surrounding Bextra remains at issue.

2

1  safety and effectiveness, despite the fact that the drug creates serious cardiovascular risks,
2  and studies allegedly have shown that they are no safer than NSAIDs. Id. ¶¶ 11, 20, 22.

3  According to the SAC, Pharmacia (and later Pfizer) carried on an extensive marketing
4  campaign to illegally promote off-label uses, which involved: (a) failing to disclose that the
5  FDA had declined to approve Bextra for the off-label uses, id. ¶ 22; (b) paying physicians to
6  attend presentations to induce them to promote and prescribe Bextra, id. ¶¶ 15, 33-35; (c)
7  training physicians identified as "advocates" to "serve as public relations spokespersons" for
8  Bextra and paying them to make presentations on the drug, id. ¶ 36; (d) drafting and
9  circulating "written protocols, pain management pathways, and standing orders for Bextra"
10 for off-label uses and dosages, id. ¶ 42; (e) sending unsolicited Medical Inquiry Letters to
11 high-volume prescribers for competitor brands, id. ¶¶ 54-56; (f) distributing samples in
12 unapproved doses to medical prescribers who had no FDA-approved use for the samples, id.
13 ¶ 57-61; (g) funding continuing medical education programs that were used to promote
14 Bextra for off-label uses, id. ¶¶ 62-65; and (h) sponsoring articles that promoted off-label
15 uses, id. ¶ 66.

16 Plaintiff claims that as a result of Defendants' fraudulent marketing scheme, it paid for
17 inappropriate, unsafe, and ineffective prescriptions of Bextra. Id. ¶ 88. Plaintiff also alleges
18 that by marketing Bextra as safer than alternative drugs, Defendants were able to charge a
19 much higher price. Id. ¶ 10. Consequently, Plaintiff alleges that it suffered economic injury
20 paying reimbursement costs for Bextra prescriptions in excess of payments for alternative
21 drugs that would have been equally or more effective, but less expensive. Id. ¶ 69.

22 In 2009, Pharmacia pled guilty to violating the Food, Drug, and Cosmetic Act for
23 "misbranding Bextra with the intent to defraud or mislead." Id. ¶ 3. The plea agreement did
24 not call for restitution to the victims of Pharmacia's crime. Id. ¶ 1. Additionally, Pharmacia
25 settled a civil class-action with consumers and TPPs on March 13, 2009. Id. ¶ 68 (settlement
26 approved September 28, 2009). Plaintiff opted out of the civil settlement seeking redress on
27 its own behalf and subsequently initiated the present case in federal court. Id. ¶ 1. Plaintiff
28 now wishes to take advantage of those prior judgments, claiming that Defendants should be

judicially estopped from denying their engagement in the fraudulent behavior described above. Id. ¶ 2.

On March 22, 2012, this Court dismissed Plaintiff's previous complaint. Plaintiff amended. The SAC now alleges four causes of action: (1) common law fraud; (2) violation of a provision in the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 510/2; (3) unjust enrichment; and (4) violations of 18 U.S.C. § 1962(c) (Racketeer Influenced Corrupt Organizations, or "RICO Act"). Id. ¶¶ 77–103.[5] Defendants move to dismiss.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in a complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199–1200 (9th Cir. 2003). "Detailed factual allegations" are not required, but the Rule does call for sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).

A complaint should not be dismissed without leave to amend unless it is clear that the claims could not be saved by amendment. Swartz v. KPMG LLP, 476 F.3d 756, 760 (9th Cir. 2007).

//

---

[5] The FAC also included a claim for negligence and negligence per se, which this Court dismissed with prejudice as a matter of law at the motion hearing on March 22, 2012. Transcript of the Proceedings at 14.

4

### B. Rule 9(b) Fraud Claims

Claims of fraud, as well as any factual allegations that sound in fraud, must satisfy the heightened pleading standard of Rule 9(b), which requires that the circumstances constituting fraud to be pled with particularity. Fed. R. Civ. P. 9(b); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106–07 (9th Cir. 2002). Rule 9(b) also "requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz, 476 F.3d at 764 (internal quotation marks omitted).

### C. RICO

The RICO Act provides that "any person injured in his business or property by reason of a violation of section 1962" may sue to recover the damages resulting from that injury. 18 U.S.C. § 1964(c). Section 1962(c), the relevant subsection in this case, prohibits conducting or participating in the conduct of an enterprise "through a pattern of racketeering activity." Id. § 1962(c). To prevail on a claim under Section 1962(c), a plaintiff must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). The plaintiff must allege all four elements in order to state a claim. Id.

The racketeering activity alleged by Plaintiff in this case includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct unlawful activity). SAC ¶ 95; see 18 U.S.C. §1961(1)(B).

## III. DISCUSSION

Defendants argue that all of Plaintiff's claims must be dismissed because the SAC suffers from the same defects as the previously dismissed FAC, primarily a failure to properly allege legally cognizable theories for causation and injury. Mot. at 1-2. Defendants also raise several additional arguments in support of their Motion.[6] The Court GRANTS

---

[6] Specifically Defendants argue that: (1) Plaintiff's claims fail to the extent that they are based solely on off-label marketing, (2) Plaintiff's fraud claim fails to the extent that it is based on fraudulent concealment because it does not allege that Defendants owed Plaintiff a fiduciary duty, (3) Plaintiff's RICO claim fails because it does not allege the existence of an "enterprise," and (4) Plaintiff's claims are barred because the statute of limitations for each cause of action has run. Mot. at 17-27.

5

Defendants' Motion on causation grounds, and therefore need not reach Defendants' additional arguments.

At the March 22, 2012 hearing, which resulted in dismissal of the FAC, the Court put Plaintiff on notice that any subsequent pleadings must properly allege causation and injury in order to survive a motion to dismiss. See Transcript of Proceedings at 14. Despite having been afforded the opportunity to amend its FAC for the sole purpose of establishing standing to bring the enumerated claims, the SAC's minimal amendment on this issue is insufficient. As such, the Court arrives at the same conclusion as it did in March.

At a hearing held on July 20, 2012, Plaintiff contested the Court's prior ruling on policy grounds, arguing that it would be unjust to hold that a complaint that alleges misconduct identical to that to which a defendant has already pled guilty does not state a plausible claim for relief. To be clear, the Court does not hold that a TPP could never state a plausible claim for relief. Rather, the Court holds that this particular complaint fails to meet the pleading requirements of Rule 8(a). Notably, Plaintiff opted out of the civil class-action settlement from 2009 on its own accord. In doing so, it assumed the burden of meeting the pleading requirements that govern federal complaints in federal court. As explained below, Plaintiff has not met its burden with respect to causation.

Defendants argue that each claim in the SAC warrants dismissal because Plaintiff has still not sufficiently alleged that its injuries of (1) overpaying for Bextra prescriptions and (2) paying for prescriptions for off-label uses of those drugs were proximately caused by Defendant's misleading marketing. Mot. at 5. The Court agrees.

In response to the Court's dismissal of the FAC for failure to plead causation, Plaintiff added one new paragraph on this issue, which signals an attempt to establish causation under a foreseeability theory:

> Defendants' conduct has injured TPPs, including HCSC, because they have paid for prescriptions of Bextra when they would have otherwise paid for a traditional NSAID instead. . . . It was foreseeable by Defendants and the intended consequence of their actions that doctors and pharmacists would prescribe Bextra for unsafe, ineffective, and unapproved uses. Defendants' unlawful marketing conduct caused injury to Plaintiff in the form of reimbursements . . . .

6

FAC ¶ 69. Plaintiff's supplemental briefs offer an alternative, so-called "quantity effect," theory, which attempts to create an inference of causation based on statistics showing the extent to which Defendants' alleged fraud pervaded total sales for Bextra. Opp'n at 11, 13-14 (citing a similar theory posited by plaintiffs but ultimately rejected in UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 135-36 (2nd Cir. 2010), cert. denied 131 S. Ct. 3062 (2011)); Sur-Reply at 5. Neither of Plaintiff's theories are viable.[7]

The Court will divide the causation inquiry into two parts – causation for RICO claims and causation for the state law claims – because different standards apply to these claims.

### A.     Causation Under RICO

A plaintiff has standing to sue under section 1964(c) only if the defendant's RICO violation proximately caused the plaintiff's injury. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis added). In addition to directness of the relationship, courts evaluating proximate cause should consider (1) whether allowing the claim to proceed will lead to difficulties ascertaining damages, (2) whether allowing the claim to proceed will lead to difficulties apportioning damages among directly and indirectly injured parties, or (3) whether the law could be vindicated by a more directly injured victim. Holmes, 503 U.S. at 269.[8]

---

[7] In its briefing and at the motion hearing, Plaintiff urged the Court to follow its ruling in 2007 on an earlier motion to dismiss in the same Bextra-Celebrex MDL, in which the Court found causation to have been properly alleged. See In re Bextra & Celebrex Mktg., Sales Practices & Product Liab. Litig., No. 05-1699, 2007 WL 2028408, at *2 (N.D. Cal. July 10, 2007). The Court need not follow that earlier ruling because specific allegations in that complaint were distinguishable. For example, that case involved allegations of first-party reliance, not misrepresentations made to third-party physicians. Id. Also, the Court in that case operated on the assumption that "there is no reason for physicians to prescribe and for consumers and TPPs to pay for [Bextra] other than defendant's false claims," whereas here, Plaintiff has alleged that approximately 35% of off-label uses were not caused by Defendants' misconduct. Id.; SAC ¶ 3.

[8] Several lower courts treated these policy reasons as a three-factor test to determine whether proximate cause exists. See, e.g., Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP, 585 F. Supp. 2d 1339, 1343–44 (M.D. Fla. 2008) (holding that even though the TPP plaintiff had successfully alleged third-party reliance by doctors, which led the TPP to pay for off-label prescriptions of an allegedly fraudulently marketed drug, proximate cause did not exist because the three Holmes "factors"

In cases where the RICO violation involves misrepresentations, such as in mail and wire fraud cases, courts often determine whether proximate cause exists by asking whether there was actual reliance on those misrepresentations. See, e.g., UFCW v. Eli Lilly, 620 F.3d at 132. Plaintiff correctly points out that the U.S. Supreme Court has ruled that first-party reliance is not an element of a civil RICO claim, and therefore not required to show proximate cause. See Opp'n at 10; Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 657–58 (2008). However, the Court did clarify that in most cases, some form of reliance must be shown. "None of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that someone relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." Id. at 658 (citations omitted).

Since Bridge, lower courts have consistently held that, in cases where TPPs allege injury in the form of payment for deceptively marketed pharmaceuticals, reliance on the part of some third party must be shown. See, e.g., UFCW v. Eli Lilly, 620 F.3d at 132 ("While reliance may not be an element of the cause of action, there is no question that in this case the plaintiffs allege, and must prove, third-party reliance as part of their chain of causation. Plaintiffs allege an injury that is caused by physicians relying on Lilly's misrepresentations and prescribing [the drug] accordingly. . . . [R]eliance is a necessary part of the causation theory advanced by the plaintiffs . . . ."); Dist. 1199P Health & Welfare Plan v. Janssen, LP, 784 F. Supp. 2d 508, 523 (D.N.J. 2011) (holding that first-party reliance was not required to show proximate cause in a civil RICO action alleging that TPPs had been injured by paying for off-label prescriptions of deceptively marketed drugs, but third-party reliance was required); See In re Actimmune Mktg. Litig., 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009)

---

had not been satisfied), aff'd on other grounds, 634 F.3d 1352 (11th Cir. 2011). However, because the U.S. Supreme Court has, since Holmes, relied on these policy concerns primarily for their illustrative value, and not as separate requirements, the Court does not agree that the Holmes court intended for its discussion of policy to become a three-factor test for proximate causation. See Anza, 547 U.S. at 459 (applying the Holmes policy concerns to "help to illustrate why [the plaintiff's] alleged injury was not the direct result of a RICO violation") (emphasis added).

8

(same).[9] Furthermore, allegations of any third-party reliance must be specific and factual in nature. See id., at 1052.

An illustrative case is Actimmune, which involved a pharmaceutical company that allegedly marketed a drug for off-label uses, causing TPPs to pay for off-label prescriptions "despite an absence of scientific proof to support its effectiveness." Id. at 1043–45. The court held that the TPP plaintiffs had not sufficiently alleged causation, even if third-party reliance is sufficient to satisfy the RICO proximate cause requirement, because "Plaintiffs have not put forth any specific allegations that anyone—the doctors, the plaintiffs themselves, or any other third party—relied on defendants' purportedly fraudulent misrepresentations to cause the injury." Id. at 1052 (emphasis added). In order to show that the defendants' misrepresentations had proximately caused the TPPs' injury of paying for off-label prescriptions, the TPPs would have to allege specific instances where the drug was prescribed and purchased as a result of those misrepresentations. See id. The court explained that to successfully allege proximate causation, the claim should have included allegations describing the "specific information the individual plaintiffs or their physicians had about the drug, the extent to which they relied upon that information, [the ways in which] the information relied upon was false, misleading or otherwise fraudulent," and the specific instances when the drug was prescribed, purchased, and administered as a result of the defendant's misrepresentations. Id.

Also notable is Health Care Serv. Corp. v. Pfizer ("Olivares II"), in which a district court in the Fifth Circuit dismissed Plaintiff's RICO and state law claims against Pfizer in a case nearly identical to this one. No. 10-0221, 2012 WL 2505555 (E.D. Tex. April 23, 2012), adopted by 2012 WL 2504884 (E.D. Tex. June 28, 2012) (dismissing Plaintiff's first amended complaint with prejudice for failure to cure the same injury and causation defects

---

[9] Although most of these cases are class actions involving putative classes comprising multiple TPPs, their causation analyses are salient here because the underlying causation issues are the same: namely, whether the pharmaceutical companies' misrepresentations caused physicians to write off-label prescriptions for which TPPs paid.

9

identified by this Court in Plaintiff's FAC).[10] In <u>Olivares II</u>, HCSC alleged that Pfizer improperly marketed three drugs for off-label uses, which unlawfully caused HCSC to pay for off-label prescriptions and to pay more for the drugs than it would have paid for safer, more effective alternatives. <u>Id.</u> at *1-2. In that case, the court dismissed because, upon amendment, "HCSC fail[ed] to allege what misrepresentations, if any, were made directly to it and upon which it relied or how these representations caused HCSC harm." <u>Id.</u> at *3. Thus, in contrast with <u>Actimunne</u> and other cases decided post-<u>Bridge</u>, the <u>Olivares II</u> court apparently required a showing of first-party reliance by the TPPs. Even if it had held that third-party reliance was sufficient, however, HCSC's claim would have failed, as the court also held that HCSC had failed to allege "that any doctors or other health care professional relied on any Pfizer misrepresentation promoting an off-label use, as opposed to relying on the professional's own judgment and expertise, when prescribing the drugs." <u>See id.</u> at *4.

As in <u>Actimmune</u> and <u>Olivares II</u>, Plaintiff here has not sufficiently alleged proximate causation for either of its injuries, regardless of the type of reliance required. The Court will address Plaintiff's causation theories as to each type of injury in turn.

### 1.   **Paying for "Unlawful" Prescriptions**

Plaintiff claims to have suffered economic injury by paying for off-label prescriptions that should not have been written in the first place and were more expensive than the traditional NSAIDs that would have been prescribed but for Defendants' misrepresentations about Bextra. SAC ¶ 69. However, the mere fact that prescriptions were written does not prove causation. As explained above, Plaintiff must make <u>specific</u> allegations that individual physicians actually relied on these misrepresentations in writing the challenged prescriptions. As Plaintiff has not alleged any first-party or third-party reliance, it has not shown that Defendants proximately caused this injury under the RICO standard. A conclusory statement that "HCSC, physicians, and patients relied on Defendants' deceptive trade practices" will

---

[10] The Court refers to this case and other related cases as "<u>Olivares</u>" because this litigation initially went by the name of the first named defendant, Efren Olivares, an employee of Pfizer. <u>See HCSC v. Olivares</u> ("<u>Olivares I</u>"), No. 10-0221, 2011 WL 4591913, at *1 (E.D. Tex. Sept. 2, 2011), <u>adopted by</u>, 2011 WL 4591915 (E.D. Tex. Sept. 30, 2011). In their briefing, both Plaintiff and Defendants use the name "<u>Olivares</u>" to refer to this case.

not suffice without further factual context. Id. ¶ 85 (reciting reliance as required by the IFCA to prove proximate causation under De Bouse v. Bayer AG, 922 N.E.2d 309, 316, 318 (Ill. 2009), discussed below in further detail).

Plaintiff argues first that the appropriate causation inquiry is foreseeability, which renders the physician's role in prescribing Bextra irrelevant. Opp'n at 11-12 (citing United States ex rel Franklin v. Parke-Davis, No. 96-11651, 2003 WL 22048255, at *4-5 (D. Mass. Aug. 22, 2003), which applied common law tort principles to a similar proximate causation analysis under the False Claims Act, 31 U.S.C. § 3729).  The SAC alleges that it was foreseeable that Defendants' marketing scheme would lead physicians to prescribe drugs that were not demonstrably more effective than the alternatives and that TPPs would ultimately pay for these prescriptions. SAC ¶¶ 69, 80; Opp'n at 11–12.  In addition, Plaintiff argues, the independent conduct of each prescribing physician cannot constitute an "intervening cause" because prescribing Bextra is itself foreseeable conduct. Opp'n at 12.

This argument must be rejected because it directly contradicts the relevant Supreme Court precedent.  The Court has stated that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," not on foreseeability. Hemi Group, LLC v. City of N.Y., 130 S. Ct. 983, 991 (2010). "Indeed, Anza and Holmes never even mention the concept of foreseeability." Id.; see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig. v. Bayer Healthcare Pharms. Inc., Nos. 09-2100, 09-20071, 2010 WL 3119499, at *7 (S.D. Ill. Aug. 5, 2010) (rejecting foreseeability as the test for proximate cause in a TPP's RICO claim against a pharmaceutical company that had allegedly engaged in fraudulent marketing of a drug, and instead requiring allegations of "the decision making process of the patient, the prescribing physician, and the third party payor").

Alternatively, Plaintiff submits that the factual allegations put forth in the SAC are sufficient to establish a causal correlation because reliance is not needed where there is a "reliable methodology to calculate the percentage of doctors who prescribed [the drugs]

11

based on Defendants' alleged fraud." Opp'n at 13.[11] Plaintiff's variation of a "quantity effect" theory is as follows: Defendants admitted that some prescriptions (amounting to approximately sixty-five percent of all off-label Bextra sales) were the result of fraud, and Plaintiffs paid for "millions" of dollars worth of Bextra prescriptions, so some of the prescriptions it paid for must have been the result of fraud. See SAC ¶¶ 3, 80; Opp'n at 5, 12-13.

Plaintiff's "quantity effect" theory for causation is unpersuasive because it requires too much speculation. Specifically, the sixty-five percent figure, even if accurate, offers no proof of causation because, as Defendants point out, the Court cannot extrapolate from it "the extent of any injury to Plaintiff." Mot. at 10 n.4. The figure pertains to all prescriptions of Bextra, not only to those paid for by Plaintiff. Without more specific allegations of reliance by physicians whose prescriptions Plaintiff reimbursed, there is no way to know if any of those prescriptions resulted from the deception. Nor can Plaintiff allege that every prescription it reimbursed was caused by Defendants' deceptive marketing practices, as only sixty-five percent of Bextra's off-label sales were attributable to fraud. SAC, Ex. E at 26 (U.S. Sentencing Memorandum explaining that the relevant figure was 65% and not 100% because "some physicians would have exercised their independent decision-making in prescribing Bextra even without being influenced by Pharmacia's marketing"). Because "at

---

[11] For this proposition, Plaintiff cites two cases, both problematic. First, in In re Neurontin Mtkg. & Sales Practices Litig. ("Neurontin I"), although the court entertained the possibility of establishing causation based on a "quantity effect" theory, it ultimately rejected a heavily-researched report based on aggregate data, which concluded that a high percentage of off-label sales resulted from the defendants' conduct, and ruled instead that reliance was required to prove causation. Neurontin I, 677 F. Supp. 2d 479, 494-96 (D. Mass. Jan. 8, 2010) (cited by Plaintiff as Harden Mfg. Corp. v. Pfizer, Inc., No. 04-10981 (Jan. 8, 2010 Mem. & Order at p. 27)) ("While Plaintiffs' position has strong intuitive appeal, trial courts have almost uniformly held that . . . a plaintiff TPP or class must prove through individualized evidence that the misrepresentation caused specific physicians, TPPs, or consumers to rely on the fraud, and cannot rely on aggregate or statistical proof."). As aggregate proof was not the "silver bullet to establish causation" in that case, Neurontin I does not support Plaintiff's position. Id. at 496.

Second, the case In re Neurontin Mktg. Sales Practices & Prods. Liab. Litig., 257 F.R.D. 315, 329-330 (D. Mass 2009), does not aid Plaintiff here. While the court in that case suggested that perhaps "an accurate methodology for calculating that, say, 85% of all Neurontin prescription for migraines resulted from a fraudulent marketing campaign [might lead to an inference that] 85% of [a TPP's] reimbursements for that indication were a result of the fraud," it explicitly rejected such a theory if the TPP is "unable to distinguish between payments for on- and off-label prescriptions . . . ." Id. at 331. There is no indication that such a distinction can be made here.

1 least some doctors were not misled by [Defendants'] alleged misrepresentations . . . . general
2 proof of but-for causation [is] impossible." UFCW v. Eli Lilly & Co., 620 F.3d at 135.

Furthermore, in UFCW v. Eli Lilly & Co., the case Plaintiff cites in support of its "quantity effect" theory, the Second Circuit explicitly rejected such a theory because the "nature of prescriptions . . . means that this theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized proof." 620 F.3d at 135 (listing additional variables that factor into prescription decisions, such as "an individual patient's diagnosis, past and current medications taken by the patient, the physician's own experience in prescribing [the drug], and the physician's knowledge of [its] side effects"). See also Olivares II, 2012 WL 2504884, at *1 (adopting the Magistrate Judge's report, 2012 WL 2505555 at *4, which concluded that plaintiff's "quantity effect" theory was not a viable theory of causation). Thus, contrary to Plaintiff's assertions, not only has it not "provide[d] a reliable methodology to calculate the percentage of doctors who prescribed [the drugs] based on Defendants' alleged fraud," but the entire "quantity effect" theory fails. See Opp'n at 13.

### 2. Overpayment

Plaintiff likewise fails to adequately allege causation as to its second injury, overpayment for Bextra. Plaintiff alleges that Defendants misrepresented the safety and efficacy of the drug, which allowed them to charge prices far in excess of the price of equally safe and effective alternatives. SAC ¶¶ 2, 69. Thus, the fraud created a demand that artificially inflated the price for the drugs, causing Plaintiff to pay more than it would have had the drugs been marketed truthfully.

Other courts have rejected similar causation arguments for "inflated price" injuries, for both RICO and state law claims, because they are too speculative and do not adequately connect the plaintiffs to the alleged misconduct. See, e.g. UFCW Local 1776, 620 F.3d at 133-34 (holding that (1) "reliance by doctors on misrepresentations as to the efficacy [of a drug was] not a but-for cause of the price that TPPs ultimately paid for each prescription" because "prescribing doctors do not generally consider the price of the medication when

13

deciding what to prescribe for an individual patient," and (2) there was no proximate causation because TPPs, who "were in a position to negotiate the price paid for [the drug]," had failed to allege that they had relied on the defendant's fraudulent conduct). In any case, "generalized proof of reliance by doctors cannot complete the causation chain." Id. Thus, Plaintiff's causation theory as to overpayment fails as to all claims.

### B. Causation Under Illinois State Law[12]

In addition to its RICO claim, Plaintiff alleges that Defendants are liable for common law fraud, deceptive trade practices in violation of 815 Ill. Comp. Stat. §510/2 (part of the ICFA), and unjust enrichment. SAC ¶¶ 77-87. As with its RICO claim, Plaintiff has insufficiently alleged causation and reliance as required to state a claim for relief under these causes of action.

#### 1. ICFA

Claims under ICFA require "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." De Bouse, 922 N.E.2d at 313.[13] The Illinois Supreme Court has held that in order to satisfy ICFA's proximate cause requirement, the plaintiff must provide proof of actual deception, either direct or indirect; that is, that either the plaintiff or a third party sufficiently connected to the plaintiff relied on the defendant's misleading statements. Id. at 316, 318. General allegations that "consumers, the medical community, the health care insurance industry, and the public" were deceived by a

---

[12] Although "Plaintiff does not concede" that Illinois law is the correct law to apply to its common law claims, see Opp'n at 4 n.1, both parties have relied on Illinois law in analyzing Plaintiff's state law claims, and neither has put forth any argument that the laws of any other state should control the case at hand.

[13] In a previous Bextra case within this MDL, this Court held that, under ICFA, it was sufficient to allege that "defendants' deceptive marketing was aimed at convincing the entire medical community that Celebrex had benefits over traditional NSAIDs." Bextra & Celebrex Mktg., 2007 WL 2028408, at *3. However, because the Illinois Supreme Court in De Bouse subsequently rejected that theory in 2009, this Court's reasoning in the previous Bextra case is no longer applicable. See De Bouse, 922 N.E.2d at 319.

14

pharmaceutical company's statements about a drug are insufficient to satisfy ICFA's proximate cause requirement. Id. at 319. Instead, the plaintiff must allege that particular doctors with a "demonstrated connection" to the plaintiff were actually deceived by the defendant's statements. Id. As discussed above, Plaintiff has not sufficiently alleged such third-party reliance in the instant case, so Plaintiff's ICFA claim is dismissed for lack of causation.

### 2. Fraud

Plaintiff's common law fraud claim, which includes allegations of fraudulent misrepresentation and fraudulent concealment, similarly fails to allege causation. Under Illinois law, both species of fraud require reliance. To adequately plead fraudulent misrepresentation, a plaintiff must allege (1) the existence of "a false statement of material fact," (2) the defendant's knowledge of the statement's falsity, (3) the defendant's "intent that the statement induce the receiver to act," (4) the plaintiff's justifiable reliance on the truth of the statement, and (5) injury. Bauer v. Giannis, 834 N.E.2d 952, 957 (Ill. App. Ct. 2005). A fraudulent concealment claim must allege that (1) "the defendant concealed a material fact under circumstances that created a duty to speak," (2) the defendant intended to induce a false belief, (3) the plaintiff justifiably relied on this silence "as a representation that the fact did not exist," (4) the plaintiff would have acted differently had it known of the concealed information, and (5) the plaintiff suffered damages as a result. Id. at 957–58.

For the reasons already discussed, Plaintiff has failed to demonstrate that it, or any other third party, "justifiably relied" on Defendants' statements or silence as required to show proximate cause. Again, Plaintiff's general averment that "HCSC, physicians, and patients relied on Defendants' deceptive trade practices" does not suffice because it does not "state with particularity the circumstances constituting fraud." See SAC ¶ 85; Fed. R. Civ. P. 9(b). Plaintiff's foreseeability argument cannot save its fraud claims because foreseeability is not an element of those claims. See Sassak v. City of Park Ridge, 431 F. Supp. 2d 810, 820 (N.D. Ill. 2006).

//

### 3. Unjust Enrichment

Unjust enrichment does not require the same type of showing of causation or reliance, but Plaintiff's unjust enrichment claim is nevertheless dismissed because it is not a freestanding cause of action under Illinois law, and Plaintiff's underlying claims are deficient. See Martis v. Grinnell Mut. Reinsurance Co., 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) ("When an underlying claim of fraud, duress or undue influence is deficient, a claim for unjust enrichment should also be dismissed.") (internal citations and quotation marks omitted).

Accordingly, the Court finds that, with respect to Plaintiff's RICO and state law claims, the SAC fails to plead causation under any cognizable legal theory.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS with prejudice Defendants' Motion to Dismiss in its entirety. Plaintiff did not take advantage of the Court's prior leave to amend to add sufficient allegations of causation. The Court construes Plaintiff's failure to cure this defect as an inability to comply with the Court's instructions or the pleading requirements of Rule 8(a). Accordingly, the Court finds that amendment in this case would be futile.

**IT IS SO ORDERED.**

Dated: August 2, 2012

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE